UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------ x

Louis Diaz, Gregory Korniloff and Jack Toal,    :
on behalf of themselves and as representatives  :    Civil Action No. 08-CV-00401 (CM)
of the Class,                          :
                                  :    *Electronically Filed*
                Plaintiffs,    :
                                  :
         v.                       :
                                  :
NBC Universal, Inc.,                :
                                  :
                Defendant.    :

------------------------------------------------ x


## MEMORANDUM OF LAW IN SUPPORT OF NBC UNIVERSAL, INC.'S MOTION TO DISMISS THE COMPLAINT AND IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR INJUNCTIVE RELIEF


DAVIS WRIGHT TREMAINE LLP
Robert D. Balin (RB5847)
Deborah A. Adler (DA0909)
1633 Broadway
New York, New York 10019
Telephone:  (212) 489-8230
Fax:  (212) 489-8340


Provisionally Admitted *Pro Hac Vice*

DAVIS WRIGHT TREMAINE LLP
Kelli Sager (Cal. Bar No. 120162)
Andrew J. Thomas (Cal. Bar No. 159533)
865 S. Figueroa St., Suite 2400
Los Angeles, California 90017-2566
Telephone:  (213) 633-6800
Fax:  (213) 633-6899

Attorneys for Defendant NBC Universal, Inc.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ........................................................................................ 5

ARGUMENT ............................................................................................................ 7

I.   PLAINTIFFS' CLAIMS ALL FAIL BECAUSE THE STATEMENT AT
     ISSUE WAS NOT "OF AND CONCERNING" ANY OF THE
     PLAINTIFFS. ................................................................................................. 7

     A.   Plaintiffs' Claims Are Barred By The Well-Established Prohibition
          Against "Group Libel" Claims ............................................................ 9

     B.   Plaintiffs' Claims All Are Barred Because No Reasonable Person
          Could Interpret The Legend As Referring To Federal Drug
          Enforcement Administration Agents, Rather Than New York City
          Narcotics Officers. ............................................................................ 15

II.  PLAINTIFFS' EMOTIONAL DISTRESS CLAIMS INDEPENDENTLY
     FAIL .......................................................................................................... 21

III. PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF MUST BE
     DENIED BECAUSE IT WOULD BE AN UNCONSTITUTIONAL
     PRIOR RESTRAINT ON SPEECH, BECAUSE PLAINTIFFS CANNOT
     SHOW IRREPARABLE INJURY OR A LIKELIHOOD OF SUCCESS
     ON THE MERITS, AND BECAUSE THE BALANCE OF HARDSHIPS
     WEIGHS STRONGLY IN FAVOR OF UNIVERSAL AND AGAINST
     INJUNCTIVE RELIEF. ............................................................................ 23

     A.   The Injunction Plaintiffs Seek Would Be An Unconstitutional Prior
          Restraint On Speech. ......................................................................... 24

     B.   Plaintiffs Cannot Demonstrate The Irreparable Injury Necessary
          To Justify Issuance Of An Injunction. .............................................. 27

     C.   Plaintiffs Do Not Satisfy The Remaining Requirements For
          Issuance Of A Preliminary Injunction. ............................................. 30

CONCLUSION ...................................................................................................... 32

# TABLE OF AUTHORITIES

Page

**Cases**

Adams v. WFTV, Inc.,
   691 So. 2d 557 (Fla. App. 1997)...................................................................... 9, 13

Alexander v. United States,
   509 U.S. 544, 113 S. Ct. 2766 (1993)..................................................................... 24

Alexis v. District of Columbia,
   77 F. Supp. 2d 35 (D.D.C. 1999)............................................................................ 13

Algarin v. Town of Wallkill,
   421 F.3d 137 (2d Cir. 2005) .......................................................................... 2, 8, 11

American Malting Co. v. Keitel,
   209 F. 351 (2d Cir. 1913) ....................................................................................... 28

Anyanwu v. Columbia Broadcasting System, Inc.,
   887 F. Supp. 690 (S.D.N.Y. 1995) ..................................................................... 8, 11

Baker v. Los Angeles Herald Examiner,
   42 Cal. 3d 254 (1986) ............................................................................................. 17

Bantam Books, Inc. v. Sullivan,
   372 U.S. 58, 83 S. Ct. 631 (1963)........................................................................... 25

Barger v. Playboy Enterprises, Inc.,
   564 F. Supp. 1151 (N.D. Cal. 1983),
   judgment aff'd, 732 F.2d 163 (9th Cir. 1984) ........................................................ 13

Blanksteen v. New York Mercantile Exchange,
   879 F. Supp. 363 (S.D.N.Y. 1995) ......................................................................... 29

Blatty v. New York Times Co.,
   42 Cal. 3d 1033 (1986) ..........................................................................3, 9, 13, 22

Blue Cross of Central New York, Inc. v. Wheeler,
   93 A.D.2d 995, 461 N.Y.S.2d 624 (4th Dep't 1983)............................................. 30

Bourgeau v. New York News,
   5 Med. L. Rptr. 1799 (N.Y. Sup. Ct. N.Y. Cty. 1979)........................................... 18

Brady v. Ottaway Newspapers, Inc.,
   84 A.D.2d 226, 445 N.Y.S.2d 786 (2d Dep't 1981).............................................. 12

Brass v. American Film Technologies, Inc.,
   987 F.2d 142 (2d Cir. 1993) ..................................................................................... 1

Bynog v. SL Green Realty Corp.,
   2005 WL 3497821 (S.D.N.Y. Dec. 22, 2005) ....................................................... 28

Carlucci v. Poughkeepsie Newspapers, Inc.,
    57 N.Y.2d 883, 456 N.Y.S.2d 44 (1982) ................................................................ 7

Caulfield v. Board of Ed. Of City of New York,
    486 F. Supp. 862 (E.D.N.Y. 1979) ........................................................................ 7

CBS v. Davis,
    510 U.S. 1315, 114 S. Ct. 912 (1994) .................................................................. 26

CBS v. United States District Court,
    729 F.2d 1174 (9th Cir. 1983) .............................................................................. 31

Celle v. Filipino Reporter Enterprises Inc.,
    209 F.3d 163 (2d Cir. 2000) .................................................................................. 8

Cerasani v. Sony Corp.,
    991 F. Supp. 343 (S.D.N.Y.1998) ......................................................................... 7

Chambers v. Time Warner, Inc.,
    282 F.3d 147 (2d Cir. 2002) .................................................................................. 1

Checkers Motors Co. v. Chrysler Corp.,
    405 F.2d 319 (2d Cir. 1969) ................................................................................ 23

Chicherchia v. Cleary,
    207 A.D.2d 855, 616 N.Y.S.2d 647 (2d Dep't 1994) ........................................... 18

Church of Scientology Int'l v. Time Warner, Inc.,
    806 F. Supp. 1157 (S.D.N.Y. 1992) .................................................................... 11

Citibank, N.A. v. Citytrust,
    756 F.2d 273 (2d Cir. 1985) .......................................................................... 28, 29

Cohn v. National Broadcasting Co.,
    67 A.D.2d 140, 414 N.Y.S.2d 906 (1st Dep't 1979) .............................................. 8

Community for Creative Non-Violence v. Pierce,
    814 F.2d 663 (D.C. Cir. 1987) ............................................................................ 28

Corning Inc. v. PicVue Electronics, Ltd.,
    365 F.3d 156 (2d Cir. 2004) ................................................................................ 32

Cox Broadcasting Corp. v. Cohn,
    420 U.S. 469, 95 S. Ct. 1029 (1975) ................................................................... 26

Cox Texas Newspapers, L.P. v. Penick,
    219 S.W.3d 425 (Tex. App. 2007) ....................................................................... 14

Davis v. Costa-Gravas,
    654 F.Supp. 653 (S.D.N.Y. 1987) ....................................................................... 21

Dean v. Dearing,
    263 Va. 485, 561 S.E.2d 686 (2002) ................................................................... 14

Donini Int'l, S.P.A. v. Satec (USA) LLC,
    2004 WL 1574645 (S.D.N.Y. July 13, 2004) ....................................................... 28

Drug Research Corp. v. Curtis Publishing Co.,
    7 N.Y.2d 435, 199 N.Y.S.2d 33 (1960) ................................................................. 8, 15

Durepo v. Flower City Television Corp.,
    147 A.D.2d 934, 537 N.Y.S.2d 391 (4th Dep't 1989) ........................................... 23

Elrod v. Burns,
    427 U.S. 347, 96 S. Ct. 2673 (1976) ..................................................................... 31

Feche v. Viacom Intern., Inc.,
    233 A.D.2d 125, 649 N.Y.S.2d 782 (1st Dep't 1996) ...................................... 16, 17

Florida Star v. B.J.F.,
    491 U.S. 524, 109 S. Ct. 2603 (1989) ................................................................... 26

Friends of Falun Gong v. Pacific Cultural Enterprise, Inc.,
    288 F. Supp. 2d 273 (E.D.N.Y. 2003),
    aff'd, 109 Fed. Appx. 442, 44 (2d Cir. 2004) ..................................................... 8, 10

Gertz v. Robert Welch, Inc.,
    418 U.S. 323, 94 S. Ct. 2997 (1974) ..................................................................... 30

Goldblum v. NBC,
    584 F.2d 904 (9th Cir. 1978) ................................................................................. 25

Hammer v. Trendl,
    2002 WL 32059751 (E.D.N.Y. Oct. 10, 2002) ..................................................... 28

Hunt v. NBC,
    872 F.2d 289 (9th Cir. 1989) ................................................................................. 25

Hustler Magazine v. Falwell,
    485 U.S. 46, 108 S. Ct. 876 (1988) ....................................................................... 21

Idema v. Wager,
    120 F. Supp. 2d 361 (S.D.N.Y. 2000) ............................................................. 22, 23

In re Charlotte Observer,
    921 F.2d 47 (4th Cir. 1990) ................................................................................... 29

In re King World Prod'ns,
    898 F.2d 56 (6th Cir. 1990) ................................................................................... 31

In re Providence Journal Co.,
    820 F.2d 1342 (1st Cir. 1986) ............................................................................... 25

In re Zyprexa Injunction,
    474 F. Supp. 2d 385 (E.D.N.Y. 2007) ................................................................. 29

James v. Gannett Co.,
    40 N.Y.2d 415, 386 N.Y.S.2d 871 (1976) .......................................................... 9, 17

Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.,
    323 F. Supp. 2d 525 (S.D.N.Y. 2004) ................................................................. 27

Jordan v. Metropolitan Life Ins. Co.,
    280 F. Supp. 2d 104 (S.D.N.Y. 2003) ............................................................. 27, 28

Joseph Burstyn, Inc. v. Wilson,
   343 U.S. 495, 72 S. Ct. 777 (1952).................................................................25

Julian v. American Business Consultants,
   2 N.Y.2d 1, 155 N.Y.S.2d 1 (1956)................................................................15

Kaplan v. Board of Educ. of City School Dist.,
   759 F.2d 256 (2d Cir. 1985)...........................................................................23

Kilgore v. Younger,
   30 Cal. 3d 770, 640 P.2d 793 (Cal. 1982) ......................................................17

Kirch v. Liberty Media Corp.,
   2004 WL 2181383 (S.D.N.Y. Sept. 27, 2004),
   aff'd in part and reversed in part on other grounds,
   449 F.3d 388 (2d Cir. 2006) ............................................................................17

Komarov v. Advance Magazine Publishers, Inc.,
   180 Misc. 2d 658, N.Y.S.2d 298 (N.Y. Sup. Ct. N.Y. Cty. 1999) ................23

Macaulay v. Bryan,
   75 Nev. 278, 339 P.2d 377 (Nev. 1959) ..................................................10, 14

Manno v. Hembrooke,
   120 A.D.2d 818, 501 N.Y.S.2d 933 (3d Dep't 1986)..............................22, 23

Mazurek v. Armstrong,
   520 U.S. 968, 117 S. Ct. 1865 (1997)..............................................................23

Metromedia Broadcasting Corp. v. MGM/UA Entertainment Co.,
   611 F. Supp. 415 (C.D. Cal. 1985) ..................................................................29

Metropolitan Opera Ass'n v. Local 100,
   239 F.3d 172 (2d Cir. 2001) .................................................................4, 27, 28

Moore v. Consolidated Edison Co.,
   409 F.3d 506 (2d Cir. 2005) ............................................................................23

National Nutritional Foods Ass'n v. Whelan,
   492 F. Supp. 374 (S.D.N.Y. 1980) ............................................................10, 11

Near v. Minnesota,
   283 U.S. 697, 51 S. Ct. 625 (1931)...........................................................4, 25, 26

Nebraska Press Ass'n v. Stuart,
   427 U.S. 539, 96 S. Ct. 2791 (1976)..........................................................4, 24, 25

Neiman-Marcus v. Lait,
   13 F.R.D. 311 (S.D.N.Y.1952) ........................................................................12

New Era Publications Int'l v. Henry Holt & Co.,
   695 F. Supp. 1493 (S.D.N.Y. 1988) ................................................................27

New York Times Co. v. Sullivan,
   376 U.S. 254, 84 S. Ct. 710 (1964)........................................................... passim

New York Times Co. v. United States,
    403 U.S. 713, 91 S. Ct. 2140 (1971).................................................................... 4

Nintendo of America, Inc. v. Lewis Galoob Toys, Inc.,
    16 F.3d 1032 (9th Cir. 1994) ...................................................................... 32

Noral v. Hearst Publications,
    40 Cal. App. 2d 348 (1940) ....................................................................... 13

Oakland Tribune, Inc. v. Chronicle Publ'g Co.,
    762 F.2d 1374 (9th Cir. 1985) .................................................................... 29

Oklahoma Publ'g Co. v. District Court,
    430 U.S. 308, 97 S. Ct. 1045 (1977)........................................................... 26

Organization for a Better Austin v. Keefe,
    402 U.S. 415, 91 S. Ct. 1575 (1971)...................................................... 25, 26

Reader's Digest Ass'n v. Superior Court,
    37 Cal. 3d 244 (1984) ................................................................................ 22

Reuters Ltd. v. United Press Int'l, Inc.,
    903 F.2d 904 (2d Cir. 1990) ...................................................................... 27

Rogers v. Grimaldi,
    695 F. Supp. 112 (S.D.N.Y. 1988) ............................................................ 25

Rosenblatt v. Baer,
    383 U.S. 75, 86 S. Ct. 669 (1966).............................................................. 14

Ryckman v. Delavan,
    25 Wend. 186 (N.Y. 1840) ........................................................................ 11

Sacco v. Pataki,
    114 F. Supp. 2d 264 (S.D.N.Y. 2000) .................................................. 10, 11

Satz v. Board of Educ. of City of New York,
    118 Misc. 2d 676, 461 N.Y.S.2d 692 (Civ. Ct. Queens Cty. 1983) ......................... 30

Scelfo v. Rutgers University,
    116 N.J. Super. 403, 282 A.2d 445 (1991) ............................................... 18

Schad v. Borough of Mt. Ephraim,
    452 U.S. 61, 101 S. Ct. 2176 (1981)........................................................... 25

Silsdorf v. Levine,
    59 N.Y.2d 8, 462 N.Y.S.2d 822 (1983) ..................................................... 17

Sweeney v. Prisoners' Legal Servs. of New York, Inc.,
    146 A.D.2d 1, 538 N.Y.S.2d 370 (3d Dep't),
    appeal dismissed, 74 N.Y.2d 842, 546 N.Y.S.2d 558 (1989)............................ 22, 23

Terwilliger v. Wands,
    17 N.Y. 54 (1858)...................................................................................... 22

Thomas v. Jacksonville Television, Inc.,
    699 So. 2d 800 (Fla. App. 1997)................................................................ 13

Truong v. American Bible Society,
    367 F. Supp. 2d 525 (S.D.N.Y. 2005) .................................................................. 2

Underwager v. Channel 9 Australia,
    69 F.3d 361 (9th Cir. 1995) ............................................................................... 17

Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.,
    454 F. Supp. 2d 62 (E.D.N.Y. 2006) ............................................................... 29

Vogel v. Hearst Corp.,
    116 N.Y.S.2d 905 (N.Y. Sup. Ct. Kings Cty. 1952)........................................ 18

Wilson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
    111 A.D.2d 807, 490 N.Y.S.2d 553 (2d Dep't 1985)....................................... 22

**Statutes**

Federal Rule of Civil Procedure 12(b)(6) ...................................................................... 1

Federal Rule of Civil Procedure 65(c) ........................................................................ 32

Federal Rule of Evidence 201(b) .................................................................................. 1

**Other Authorities**

Restatement (Second) of Torts § 558 (1977) ................................................................. 7

Restatement (Second) of Torts § 564A comment b (1977) ......................................... 13

Robert D. Sack, Sack on Defamation:  Libel, Slander and Related Problems
    § 2.9.4 (3d ed. updated 2006) ................................................................... 13, 30

W. Page Keeton et al., Prosser and Keeton on Torts § 111, at 784 (5th ed. 1984)...................... 10

**Constitutional Provisions**

United States Constitution, First Amendment .................................................... passim

## PRELIMINARY STATEMENT

Defendant NBC Universal, Inc. ("Universal") respectfully submits this memorandum of law in opposition to plaintiffs' Application for Injunctive Relief and in support of Universal's cross-motion to dismiss plaintiffs' Complaint pursuant to F.R.Civ.P. Rule 12(b)(6). The Complaint arises from the feature film American Gangster (the "Film"), which was produced by Universal Pictures, a division of Universal City Studios LLLP. The Film is described as being "based on" a true story involving a notorious heroin dealer, Frank Lucas, who was a key figure in the New York City drug trade in the late 1960s and early 1970s.[1]

This lawsuit was filed by plaintiffs Louis Diaz, Gregory Korniloff and Jack Toal, purporting to sue individually and as representatives of a class of "approximately 400 present and former Special Agents of the New York office of the United States Drug Enforcement Administration" who were employed at any point during a twelve-year period. It asserts claims for libel, intentional infliction of emotional distress, and negligent infliction of emotional distress, and seeks an injunction to prohibit Universal from any further distribution of the Film in its current form.

Although the Complaint contains a lengthy description of the many items in the Film with which plaintiffs are dissatisfied, the libel claim identifies only one statement that is claimed

---

[1]  For the Court's convenience, Universal concurrently is submitting a time-coded DVD of the entire Film, along with an excerpted DVD that contains the statement at issue and relevant portions of the Film. (Affidavit of Andrew J. Thomas ¶¶ 4-5 and Exhs. B, C. Time-code cites are to Exh. B.) Because plaintiffs' claims specifically refer to and arise from the Film, it is deemed part of the Complaint, and may be considered by this Court on a motion to dismiss. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002). The Court also may take judicial notice of the content of the Film because it is capable of accurate and ready determination and is not subject to reasonable dispute. Fed. R. Evid. 201(b). See generally Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993) (on motion to dismiss, court may consider documents incorporated by reference in the Complaint, matters of which the court may take judicial notice, and documents on which plaintiffs relied in bringing suit).

to be defamatory:  a legend that appears for a few seconds at the end of the Film stating that Lucas's cooperation with authorities after his arrest "led to the conviction of three quarters of New York City's Drug Enforcement Agency."  As plaintiffs have conceded, however, <u>nothing</u> in the Film identifies or references the named plaintiffs, or any individual member of the putative plaintiff class.  Instead, plaintiffs' claims are based entirely on the theory that the reference to "three quarters of New York City's Drug Enforcement Agency" impliedly referred to <u>every</u> member of a group of 400 former and current DEA agents who worked at the New York office of the federal Drug Enforcement Administration between 1972-1985, and therefore "falsely depicts them as convicted criminals."  (Compl., ¶ 66.)

But as discussed in more detail below, this kind of "group libel" claim is barred under controlling constitutional and common law principles, which require libel plaintiffs to demonstrate that an allegedly defamatory statement is "of and concerning" a particular person. Courts across the United States consistently have held that when a reference is made to a large group of people, <u>no</u> individual within that group can fairly say that the statement is about them, nor can the "group" as a whole state a claim for defamation.  <u>See</u>, <u>e.g.</u>, <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254, 288, 84 S. Ct. 710, 730 (1964) (rejecting libel suit arising from statements about police conduct on grounds that the plaintiff, a police commissioner, could not demonstrate that the allegedly libelous statements "were made 'of and concerning'" him).  <u>See also</u> <u>Algarin v. Town of Wallkill</u>, 421 F.3d 137, 139-40 (2d Cir. 2005) (affirming dismissal of police officers' claim based on statements in commissioners' report because statements did not identify specific officers involved in alleged wrongdoing, but merely referenced the department generally); <u>Truong v. American Bible Society</u>, 367 F. Supp. 2d 525, 528-29 (S.D.N.Y. 2005) ("it is clear that 'group libel' is not actionable"); <u>Blatty v. New York Times Co.</u>, 42 Cal. 3d 1033,

1046 (1986) (in sustaining demurrer, California Supreme Court noted that "where the group is large – in general, any group numbering over twenty-five members – the courts in California and other states have consistently held that plaintiffs cannot show that the statements were 'of and concerning them'"). For this reason alone, plaintiffs' claims all must be dismissed with prejudice.

Second, even assuming that a group of 400 federal agents could overcome the constitutional and common law prohibition against "group" libel, which they cannot, plaintiffs' claims independently would be barred because the legend at the end of the Film cannot reasonably be interpreted as referring to this particular group in any event. The references in the Film to police corruption clearly and unmistakably focus on the New York Police Department ("NYPD"), and provide a contrast between a handful of corrupt local New York City narcotics officers and an honest New Jersey police officer, who joins with federal agents to bring down Frank Lucas and the corrupt New York officers. The specific text at issue – which follows scenes depicting the arrest of characters who are portrayed throughout the Film as corrupt local police officers – could not reasonably be interpreted as being "of and concerning" plaintiffs, who are agents of the United States government, and who are not identified, portrayed, or referred to in any fashion during the Film. Under the First Amendment and the common law, this defect provides an independent basis for this Court to dismiss the Complaint with prejudice.

Third, plaintiffs' claims for intentional and negligent infliction of emotional distress are barred under the same constitutional and common law principles as plaintiffs' libel claim; in addition, since emotional distress is an element of damage in a libel claim, the Second and Third Causes of Action are entirely superfluous, and do not state a separate claim for relief.

Finally, plaintiffs' Fourth Cause of Action for injunctive relief fails to state an

independent claim, and should be dismissed for the same reasons as plaintiffs' libel and

emotional distress claims.  In addition, the injunction claim independently runs afoul of both the

First Amendment and common law.  Although the Film was released nationally on November 2,

2007, plaintiffs waited more than 10 weeks – nearly the entire duration of its U.S. theatrical run –

before filing this lawsuit.  Plaintiffs then waited another week to file their Application for Order

to Show Cause (the "Injunction Application"), which seeks an order enjoining Universal from

further "distributing or showing" the Film in its current form.

This belated request for a prior restraint strikes at the heart of the First Amendment.  The

United States Supreme Court repeatedly has recognized that government restriction of speech in

the form of a prior restraint against the media constitutes "the most serious and the least tolerable

infringement on First Amendment rights."  Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 559,

96 S. Ct. 2791, 2803 (1976).  Indeed, the Supreme Court has declared that prior restraints may be

justified, if at all, only in the most exceptional circumstances – such as to prevent the publication

of the sailing dates of troop ships or the location of soldiers in wartime, Near v. Minnesota, 283

U.S. 697, 716, 51 S. Ct. 625, 631 (1931), or to "suppress[] information that would set in motion a

nuclear holocaust."  New York Times Co. v. United States, 403 U.S. 713, 726, 91 S. Ct. 2140,

2147 (1971) (Brennan, J., concurring).  No such exceptional circumstance exists here.

Plaintiffs' bid for injunctive relief also is foreclosed by the long-standing rule in this

Circuit that "equity will not enjoin a libel" because there are adequate legal remedies available

for damages arising from harmful speech.  Metropolitan Opera Ass'n v. Local 100, 239 F.3d

172, 177 (2d Cir. 2001).  Accordingly, plaintiffs cannot establish that they will suffer irreparable

injury from further distribution of the Film.  Moreover, plaintiffs cannot establish a likelihood of

success on the merits, and the balance of hardships weighs decidedly in favor of Universal. For all these reasons, their request for an injunction should be denied.

Because none of plaintiffs' claims can survive constitutional and common law scrutiny, and because there is no basis upon which plaintiffs could remedy these inherent defects, their entire Complaint should be dismissed with prejudice, and their Application for an injunction should be denied.

## **STATEMENT OF FACTS**

Plaintiffs Louis Diaz, Gregory Korniloff, and Jack Toal have sued on behalf of themselves and as representatives of a class of approximately 400 present and former Special Agents in the New York office of the United States Drug Enforcement Administration who worked there between 1973 and 1985. (Compl., ¶¶ 1, 7, 15-17.)

The Complaint alleges that the three named plaintiffs and every member of the class were defamed by text that appears on the screen at the end of the Film. (Id., ¶¶ 63-82.)[2] The Film depicts the life of Frank Lucas (played by Denzel Washington), an African American drug kingpin in New York City who was arrested in 1975 and subsequently convicted of drug trafficking. (See id., ¶ 3; see also Exh. B.)[3] The Film also includes a character identified as Richie Roberts, a New Jersey (Essex County) law enforcement official, who is played by Russell Crowe. (See Compl., ¶ 4; see also Exh. B.) Throughout the Film, there are references to

---

[2]   The Film was produced by Universal City Studios LLLP, a company based in California. (See Thomas Affidavit at ¶ 6 and Exh. D; see also Affidavit of Gabriela Garcia at ¶ 2. The named defendant, NBC Universal, is the indirect parent company of Universal City Studios, and is based in New York. (Garcia Affidavit at ¶ 2.)

[3]   The Film is a creative work inspired by true events, that includes dramatizations, composite characters, and similar literary license common to this genre. As is common with motion pictures inspired by true events, the Film ends with a standard disclaimer noting that a number of the incidents included are "fictionalized," and that "some of the characters have been composited or invented …." (Exh. B at 03:36.25.)

corruption among some members of the local police in New York and New Jersey, and several characters depict corrupt NYPD narcotics detectives – including one played by Josh Brolin, identified as Detective Trupo of the New York City Special Investigations Unit. (See Exhs. B, C.) Nowhere in the Film is there any character identified as a federal Drug Enforcement Administration agent, nor is there any reference to any federal agent being corrupt. To the contrary, early in the Film, Roberts is told by his boss that he is "not the only honest cop in town," and the boss encourages him to accept a new assignment working with a special narcotics investigative team, which has been proposed by and will partner with federal agents. (Exh. B at 01:42.23 – 01:43.46.)

At the end of the Film, after the Lucas character has been arrested by Roberts and his team,[4] there are a series of vignettes that depict Lucas meeting with Roberts, scenes that show photographs of the actors who portray corrupt New York City narcotics officers being tacked to a bulletin board, and scenes showing those same local police officers being arrested (and, in one case, committing suicide). Voiceovers accompanying these scenes include "news" reports describing the arrests and prosecution of local police officers by federal authorities. (Id. at

---

[4]   Plaintiffs repeatedly refer to a scene in the Film in which the corrupt New York City narcotics officers storm into Lucas's home and steal his "getaway" money; plaintiffs complain that this scene inaccurately depicts the actual arrest of Lucas by federal authorities on February 28, 1975. (E.g., Compl., ¶ 30.) But plaintiffs' attempt to link this scene with Lucas' arrest is entirely without basis. No one in the scene described in the Complaint is identified or depicted as being a federal agent; instead, the scene includes only Detective Trupo and the other actors who play local New York City police officers throughout the Film. Indeed, plaintiffs' Complaint expressly acknowledges that the officers depicted in this scene are "identified as members of the New York City Special Investigations Unit." (Id.) Moreover, this scene does not depict an "arrest" of Frank Lucas; instead, the Film shows the arrest taking place on an entirely different day, as Lucas is leaving church with his wife and mother. (Exh. B at 03:15.44 – 03:16.37.) Thus, contrary to the insinuation fostered by plaintiffs' inaccurate description of the Film, no reasonable person could believe that the scene depicting corrupt New York City police officers at the Lucas house purported to show the actual events that occurred when the real Frank Lucas was arrested in 1975.

03:24.50 – 03:26.54.)  Several screens immediately following those vignettes include text at the

bottom, one of which refers to Lucas's cooperation with authorities, and notes that Lucas's

cooperation led to "the convictions of three quarters of New York City's Drug Enforcement

Agency."  (See id.; see also Compl., ¶¶ 64-66.)[5]

## ARGUMENT

### I.    PLAINTIFFS' CLAIMS ALL FAIL BECAUSE THE STATEMENT AT ISSUE WAS NOT "OF AND CONCERNING" ANY OF THE PLAINTIFFS.

It is a long-standing requirement for any defamation claim that the plaintiff demonstrate

that the allegedly defamatory statement was "of and concerning" him or her.  See Restatement

(Second) of Torts § 558 (1977); see also Cerasani v. Sony Corp., 991 F. Supp. 343, 355

(S.D.N.Y.1998) ("[h]ornbook libel law requires that an allegedly defamatory statement must be

'of and concerning' a particular individual"; "[a] complaint must be dismissed where this

requirement is not satisfied") (citations omitted); Carlucci v. Poughkeepsie Newspapers, Inc., 57

N.Y.2d 883, 885, 456 N.Y.S.2d 44, 45 (1982) (fundamental to any libel claim is a false and

defamatory statement that is specifically "of and concerning" the plaintiff).

In New York Times v. Sullivan, 376 U.S. at 288, the Supreme Court made clear that this

requirement is of constitutional dimension, holding that the plaintiff's defamation claim was

"constitutionally defective" under the First Amendment because he could not show that the

---

[5]   This Court may take judicial notice of the fact that, during the time period depicted in the Film, there were widely-publicized corruption investigations involving the New York City police force, and in particular, its narcotics unit.  See, e.g., Caulfield v. Board of Ed. Of City of New York, 486 F. Supp. 862, 885 (E.D.N.Y. 1979), aff'd, 632 F.2d 999 (2d Cir. 1980) (court may take judicial notice of historical facts); see also Thomas Affidavit, Exhs. E and F.  An August 2000 New York Magazine article credited at the end of the Film, which was attached to plaintiffs' Injunction Application, stated that, "by 1977, 52 of the 70 officers" who had worked in "the NYPD's infamously corrupt Special Investigations Unit" – or roughly three quarters of those officers – were "either in jail or under indictment."  See Amorosa Affirmation, Ex. A at 11. Proof of this historical fact is not necessary to this Court's determination of Universal's motion to dismiss, but it provides context to the scenes and legend contained in the Film.

challenged statements were "of and concerning" him.  Id. at 288; accord Celle v. Filipino

Reporter Enterprises Inc., 209 F.3d 163, 176 (2d Cir. 2000).

Whether any statement is, or is not, about the plaintiff is a threshold question of law for

the Court.  See, e.g., Carlucci, 57 N.Y.2d at 885, 456 N.Y.S.2d at 45; Cohn v. National

Broadcasting Co., 67 A.D.2d 140, 143-44, 414 N.Y.S.2d 906, 907-08 (1st Dep't 1979).  New

York courts routinely dispose of libel claims on a motion to dismiss where, as here, the

statements could not reasonably be construed as being about the plaintiff.[6]

Plaintiffs cannot meet this fundamental constitutional and common law requirement for

two independent reasons.  First, courts consistently have held that statements about members of a

large group cannot meet the "of and concerning" requirement as a matter of law, because no one

person within the group can claim to have been identified.  New York Times, 376 U.S. at 288

(rejecting libel claim based on statements about police conduct, which did not identify any

individual, on the grounds that they were not "of and concerning" the plaintiff police

commissioner).  Because plaintiffs' only theory for relief falls squarely within the prohibited

sphere of "group libel," their claims should be dismissed for this reason alone.

Second, even assuming, for sake of argument, that a group of 400 current and former

federal agents could survive the prohibitions against "group libel" claims, plaintiffs nonetheless

could not meet the "of and concerning" requirement because the statement at issue plainly does

not refer to this particular group of people.  As discussed below, when properly reviewed in

---

[6]   See, e.g., Algarin v. Town of Wallkill, 421 F.3d at 139-40 (affirming dismissal because
statements were not "of and concerning" plaintiffs); Friends of Falun Gong v. Pacific Cultural
Enterprise, Inc., 288 F. Supp. 2d 273, 282 (E.D.N.Y. 2003), aff'd, 109 Fed. Appx. 442, 44 (2d
Cir. 2004) (dismissing defamation claim based on group libel doctrine); Anyanwu, supra, 887 F.
Supp. at 693 (same); Drug Research Corp. v. Curtis Publishing Co., 7 N.Y.2d 435, 199 N.Y.S.2d
33 (1960) (dismissing complaint where alleged libel was not "of and concerning" the plaintiff);
Cohn, 67 A.D.2d at 143-44, 414 N.Y.S.2d at 907-08 (same).

context,[7] the statement plainly is referring to corrupt local police officers, who are portrayed as characters throughout the Film, and is not referring to federal agents.  Consequently, for this additional reason, plaintiffs' claims all must be dismissed.

**A.    Plaintiffs' Claims Are Barred By The Well-Established Prohibition Against "Group Libel" Claims.**

The allegations in plaintiffs' Complaint make clear why their claims fail as a matter of law:  the underlying lawsuit is not based on any allegedly defamatory statements concerning any particular individuals, but instead is based on a theory of "group libel" supposedly directed "against hundreds" of individuals who worked in the New York office of the United States Drug Enforcement Administration.  (Compl., ¶ 1.)  Plaintiffs do not and cannot point to <u>any</u> statements in the Film that specifically refer to the named plaintiffs, or any individual members of this group of approximately 400 people.  Instead, their claim is premised on the theory that a legend contained at the end of the Film that refers to "the convictions of three quarters of New York City's Drug Enforcement Agency" is defamatory to the plaintiffs' group in general, and therefore defames each of its individual members.

But as indicated in the cases cited above, "'group libel' is not actionable under New York law,"[8] nor is it permitted under the laws of the other jurisdictions across the country in which

---

[7]  In evaluating the "of and concerning" requirement, the publication must be tested by its effect on the average viewer, and its meaning must be derived "from the whole scope and apparent object of the writer."  <u>James v. Gannett Co.</u>, 40 N.Y.2d 415, 420, 386 N.Y.S.2d 871, 875 (1976); <u>see</u> <u>also</u> Section I(B), <u>infra</u>.

[8]  California law arguably applies to this case because Universal Studios, which produced the Film, is headquartered in California and most of the Film's production took place there.  However, with respect to the issues raised in this Motion, the law in all potentially relevant jurisdictions – New York, as well as in the three states where the individual plaintiffs actually reside – in is accord.  <u>See</u>, <u>e.g.</u>, <u>Blatty</u>, 42 Cal. 3d at 1046 (statements about group numbering more than twenty-five members are not actionable under "of and concerning" requirement); <u>Adams v. WFTV, Inc.</u>, 691 So. 2d 557, 557 (Fla. App. 1997) (dismissing libel action brought by hundreds of fishermen because "for a group defamation to be actionable by a member of that

named plaintiffs reside.  As a result, plaintiffs' claims should be dismissed with prejudice because "under the group libel doctrine,' a plaintiff's defamation claim is 'insufficient if the allegedly defamatory statements referenced the plaintiff solely as a member of a group.' … In order to overcome the group libel doctrine, a plaintiff must demonstrate that 'the circumstances of the publication reasonably give rise to the conclusion that there is a particular reference to the member.'" Friends of Falun Gong, 288 F. Supp. 2d at 282 (dismissing defamation claim because "it is plain to the Court that the defendants' statements are barred by the group libel doctrine") (citations omitted) (emphasis added).  See also National Nutritional Foods Ass'n v. Whelan, 492 F. Supp. 374, 380 (S.D.N.Y. 1980) ("[w]here the group or class disparaged is a large one, absent circumstances pointing to a particular plaintiff as the person defamed, no individual member of the group or class has a cause of action").

The rationale behind the strict limitations on group libel claims is that "such a general condemnation could not reasonably be regarded as referring to each individual or any particular individual within the group; nor is it calculated to induce the reasonable belief of enough likelihood of its applicability to a particular person to impair or injure such person's reputation." W. Page Keeton et al., Prosser and Keeton on Torts § 111, at 784 (5th ed. 1984); accord Sacco v. Pataki, 114 F. Supp. 2d 264, 271 (S.D.N.Y. 2000).  This conclusion is especially appropriate here, because even if the challenged statement concerned the plaintiff group – which it did not

---

group when there is no specific reference to a member (no plaintiff was named or depicted in the advertisement), the group must be small enough for the defamation to be reasonably understood to refer to that member"); Macaulay v. Bryan, 75 Nev. 278, 281, 339 P.2d 377, 378 (Nev. 1959) ( "[i]t is clear, under the law, that an individual may not, as a general rule, recover damages for defamation of a group or class of persons of which he is a member.  When the group or class is large the defamatory matter must point to, or single out, the plaintiff as the person involved") (citation omitted).  Because the result is the same regardless of which state's law is applied, and without waiving any future choice of law arguments, the issues presently before the Court can be decided under the law of the forum state.

(see Section I(B), infra) – it would have referred only to some ("three quarters") but not all, of

the members of that group. See Algarin, 421 F.3d at 140 (noting importance of "whether the

defamatory statement refers to 'all' or only 'some' members of the group," and observing that

even small groups generally are not permitted to bring defamation claims where only some

percentage of their members were targeted by statement); Sacco, 114 F. Supp. 2d at 271 (same).

Moreover, courts have long recognized that the restrictions on group libel claims are

essential to the protection of free speech interests, particularly where, as in the Film, the

challenged speech concerns matters of public interest:

> It is far better for the public welfare that some occasional consequential injury to
> an individual, arising from general censure of his profession, his party, or his sect,
> should go without remedy, than that free discussion of the great questions of
> politics, or morals, or faith, should be checked by the dread of embittered and
> boundless litigation.

Ryckman v. Delavan, 25 Wend. 186, 199 (N.Y. 1840); see also Church of Scientology Int'l v.

Time Warner, Inc., 806 F. Supp. 1157, 1160 (S.D.N.Y. 1992) (restricting group libel claims

serves "the public interest in ensuring open and vigorous debate").

Applying these principles, courts in this Circuit consistently have held that defamation

claims may not be maintained based on statements concerning large groups such as the class of

400 plaintiffs in this case. See, e.g., National Nutritional Foods, 492 F. Supp. at 380 ("New

York follows the general common law rule, applied since The King v. Alme & Nott, 3 Salk. 224,

91 Eng.Rep. 790 (1699), that group libel is not actionable"); Church of Scientology Int'l, 806 F.

Supp. at 1160 ("if a plaintiff is libeled as a member of a large group, the 'of and concerning

requirement' is not properly pleaded" and the claim should be dismissed). Indeed, one court in

the Southern District has noted the absence of "any cases where individual members of groups

larger than sixty have been permitted to go forward." Anyanwu v. Columbia Broadcasting

System, Inc., 887 F. Supp. 690, 693 (S.D.N.Y. 1995) (emphasis added) (granting the defendant's

motion to dismiss a libel claim because "[b]ased on size alone as indicated below, the group is too large to allow an individual unspecified member to sue for libel"); see also Neiman-Marcus v. Lait, 13 F.R.D. 311 (S.D.N.Y. 1952) (dismissing claim based on alleged defamation of group of 382, but allowing claim based on alleged defamation of group of 25).

In one rare case, Brady v. Ottaway Newspapers, Inc., 84 A.D.2d 226, 445 N.Y.S.2d 786 (2d Dep't 1981), the court permitted a group of 53 police officers to pursue a libel claim, declining to follow the absolute rule of twenty-five adopted by other jurisdictions. But the Brady court emphasized that although the difference between 25 and 53 was "measurable," it was "not significant," and that 53 "is substantially smaller than the group of 382 saleswomen" rejected as too large by the federal district court in Neiman-Marcus. Id. at 238 (citing Neiman-Marcus, 13 F.R.D. at 311). The Brady court was dubious that any significantly larger group could satisfy the "of and concerning" requirement, noting that "where the group named approaches class size, no personal reference can be found" and therefore no defamation claim could be maintained. Id. at 228. Finally, Brady emphasized that the defamatory statement at issue in that case challenged the honesty and integrity of all of the 53 officers in the group. The court noted that a different result might hold in situations where (as here), "only a portion of the group is [allegedly] defamed." Id. at 231 n.3 (emphasis added).[9] Thus, the circumstances that one state court found sufficient to warrant a modest extension of group libel to a statement concerning a group of 53 small-town officers are not present here, and, in any event, could never justify extending group

---

[9]    The Brady court also noted the "prominence" of the group "within the geographical area of publication," and observed that the alleged defamation was published in a local newspaper, and that the 53 officers were "prominent public officials" in a small town that was "the kind of place where people know each other." Id. at 239-40. By contrast, the Film was widely released, and even the individually-named plaintiffs are scattered around the country.

libel to cover a statement allegedly about some members of a group of approximately 400 individuals across a wide geographic area.

The restrictions applied to "group libel" claims by federal and state courts in New York are consistent with rulings by courts across the country, including in the states where the three individual plaintiffs reside – California, Florida, and Nevada.  As the California Supreme Court has stated, "where the group is large – in general, any group numbering over twenty-five members – the courts in California and other states have consistently held that plaintiffs cannot show that the statements were 'of and concerning them.'"  See Blatty, 42 Cal. 3d at 1046.  Other jurisdictions are in accord.  Restatement (Second) of Torts § 564A comment b (1977) (proposing a "rule of 25" that prohibits claims by groups of more than twenty-five individuals); Robert D. Sack, Sack on Defamation:  Libel, Slander and Related Problems § 2.9.4 (3d ed. updated 2006) ("Sack on Defamation"); Alexis v. District of Columbia, 77 F. Supp. 2d 35, 41 (D.D.C. 1999) ("the cases surveyed from other federal and state jurisdictions … evince a consistent rule of thumb, however, that unnamed group members generally are not permitted to sue for group defamation if the group has more than 25 members; they will almost invariably not be permitted to sue if the group has more than 100 members"); Noral v. Hearst Publications, 40 Cal. App. 2d 348, 350 (1940) (upholding dismissal of suit based on statement concerning group of 162); Barger v. Playboy Enterprises, Inc., 564 F. Supp. 1151, 1153-55 (N.D. Cal. 1983), judgment aff'd, 732 F.2d 163 (9th Cir. 1984) (dismissing defamation suit based on statements concerning one group of 100-125 and another group of 500); Thomas v. Jacksonville Television, Inc., 699 So. 2d 800, 802, 805-06 (Fla. App. 1997) (affirming dismissal of group libel claim by group of 436 commercial net fisherman); Adams, 691 So. 2d at 558 (affirming dismissal of defamation

action brought by group of 637 fishermen); Macaulay, 75 Nev. at 282 (dismissing group libel claim).

Finally, in addition to the prohibition against group libel claims of this size in general, the United States Supreme Court unequivocally has held that even the "small group" theory of libel "is constitutionally insufficient" where the plaintiffs are current or former government workers and the challenged statement concerns their performance of government functions. Rosenblatt v. Baer, 383 U.S. 75, 82-83, 86 S. Ct. 669, 674 (1966) (holding former supervisor of county recreation area could not proceed with libel claim because "[a] theory that the [newspaper] column cast indiscriminate suspicion on the members of the group responsible for the conduct of this governmental operation is tantamount to a demand for recovery based on libel of government"); see also New York Times, 376 U.S. at 291-92.

Rosenblatt's prohibition against current or former government actors invoking the "small group theory" of libel applies to statements critical of law enforcement officials. See Dean v. Dearing, 263 Va. 485, 490, 561 S.E.2d 686, 689-90 (2002) (upholding demurrer to complaint brought by police officer based on allegations of corruption and felonious conduct made against five to eight member police department in which officer worked); see also Cox Texas Newspapers, L.P. v. Penick, 219 S.W.3d 425, 435-37 (Tex. App. 2007) (following Rosenblatt and Dean and disallowing libel claim brought by a district attorney). As the Dean Court explained:

> Following the opinion in Rosenblatt, there is little question that the use of 'small group theory' alone as the basis for satisfying the 'of and concerning' element of a common law defamation action against a government actor does not survive constitutional scrutiny.

263 Va. at 489.

Accordingly, because all of plaintiffs' claims are based on the theory that a defamatory statement was made about every agent of the New York City office of the federal Drug Enforcement Administration who served at any point during the years 1973-1985, and because the First Amendment and common law do not permit such "group libel" claims, particularly where the claim involves government officials acting in their official capacity, the Complaint must be dismissed in its entirety, with prejudice.

### B.    Plaintiffs' Claims All Are Barred Because No Reasonable Person Could Interpret The Legend As Referring To Federal Drug Enforcement Administration Agents, Rather Than New York City Narcotics Officers.

The United States Supreme Court has made clear that whenever the gravamen of a claim is an attempt to impose liability for allegedly false speech, courts must "examine for [themselves] the statements in issue and the circumstances under which they were made to see … whether they are of a character which the principles of the First Amendment … protect." New York Times v. Sullivan, 376 U.S. at 285.  This threshold determination applies equally to the constitutional requirement that the allegedly defamatory statement was made "of and concerning" the plaintiffs; the court must closely scrutinize the statement at issue to determine whether the publication can fairly be read as referring to the individual plaintiff(s).  Id.; see also Drug Research Corp., 7 N.Y.2d at 439, 199 N.Y.S.2d at 36 (granting motion to dismiss where publication could not fairly be read to be of and concerning the individual plaintiff; court noted that "[t]he sufficiency of the pleading depends in part on whether the article, when fairly read, concerns the plaintiff").[10]

---

[10]   As indicated above, when there is no defamatory statement that is of and concerning a particular person – as here – courts routinely dismiss the complaint.  See note 7, supra; see also Julian v. American Business Consultants, 2 N.Y.2d 1, 17, 155 N.Y.S.2d 1, 16 (1956) (affirming dismissal of defamation claim because "[t]he book itself fails to reveal any connection between any of the alleged defamatory matter and the plaintiff").

Thus, for example, in <u>New York Times</u>, the United States Supreme Court reversed a libel judgment in favor of the plaintiff, a police commissioner, that was based on allegedly false statements concerning the conduct of the Montgomery, Alabama police. Despite the fact that the plaintiff had produced witnesses to testify that the references to "police" were understood by them to impugn the commissioner, the Supreme Court held that the evidence was "constitutionally defective," and that the plaintiff could not meet his burden of demonstrating that the statements were "of and concerning" him. As the Court explained, "it is plain that these statements [about the police] could not reasonably be read as accusing respondent of personal involvement in the acts in question. ... Although the statements may be taken as referring to the police, they did not on their face make even an oblique reference to [the plaintiff] as an individual." 376 U.S. at 288-89. The Court also rejected the witnesses' testimony because it was based "not on any statements in the advertisement" identifying the plaintiff, "and not on any evidence that he had in fact" been involved in the police conduct, "but solely on the unsupported assumption that, because of his official position, he must have been." 376 U.S. at 289. This sidestepping of the "of and concerning" requirement, the Court found, would also sidestep the prohibition against libel claims by the government, by allowing "an otherwise impersonal attack on governmental operations [to be] a libel of an official responsible for those operations." 376 U.S. at 292. The same constitutional scrutiny applies to plaintiffs' attenuated claims here.

In evaluating allegedly defamatory statements to determine if they meet the threshold "of and concerning" requirements, courts follow two important principles: first, the allegedly defamatory statement must be viewed in context, rather than taking reviewing the statement in isolation. <u>See</u>, <u>e.g.</u>, <u>Feche v. Viacom Intern., Inc.</u>, 233 A.D.2d 125, 125, 649 N.Y.S.2d 782, 782 (1st Dep't 1996) (determination of whether a statement is "of an concerning" a party requires the

court to consider the entire work as a whole and to "tak[e] into account the context in which the remark was uttered"); James, 40 N.Y.2d at 420 (same).[11]

Second, the court should view the statement as it would be interpreted by a reasonable reader. Silsdorf v. Levine, 59 N.Y.2d 8, 12-13, 462 N.Y.S.2d 822, 825 (1983) ("it is for the court to decide whether the statements complained of are 'reasonably susceptible of a defamatory connotation'"; "[t]he entire publication, as well as the circumstances of its issuance, must be considered in terms of its effect upon the ordinary reader") (emphasis added). "The test for whether a statement is 'of and concerning' an individual is whether "[a]n average viewer would ..., taking into account the context in which the remark was uttered, perceive that [the speaker] was making a factual statement about" the plaintiff. Kirch v. Liberty Media Corp., 2004 WL 2181383, *5 n.15 (S.D.N.Y. Sept. 27, 2004), aff'd in part and reversed in part on other grounds, 449 F.3d 388 (2d Cir. 2006) (quoting Feche, 233 A.D.2d at 125) (emphasis added); accord James, 40 N.Y.2d at 419-20; Kilgore v. Younger, 30 Cal. 3d 770, 777, 640 P.2d 793, 797 (Cal. 1982) (affirming dismissal of defamation claim because statements concerning organized crime activities could not reasonably be understood as being about the plaintiff, and explaining that "the publication[s] [are] to be measured by the natural and probable effect [they] would have on the mind of the average reader") (citations omitted).[12]

---

[11] See also Underwager v. Channel 9 Australia, 69 F.3d 361, 366 (9th Cir. 1995) (in evaluating allegedly defamatory statements, court emphasized that it was required to examine "the totality of the circumstances," including the "broad context" of the defendants' report); Baker v. Los Angeles Herald Examiner, 42 Cal. 3d 254, 260-61 (1986) (in evaluating statements at issue, "[t]he publication in question must be considered in its entirety; it may not be divided into segments and each portion treated as a separate unit") (citations omitted).

[12] Thus, plaintiffs' hearsay allegations about what particular individuals thought the legend "meant" (Compl., ¶¶ 55, 60) cannot overcome this threshold requirement. Moreover, as the United States Supreme Court held in New York Times v. Sullivan, declarations by individuals attesting to their beliefs about an allegedly defamatory statement cannot satisfy the "of and

Applying these principles, it is clear that plaintiffs cannot meet their burden – and it is "not a light one" – of demonstrating that the defamatory legend at the end of the film reasonably could be interpreted as actually referring to them. Chicherchia v. Cleary, 207 A.D.2d 855, 855, 616 N.Y.S.2d 647, 648 (2d Dep't 1994).[13]  To the contrary, viewed in context, the legend at the very end of the 2 ½ hour Film that refers to "three quarters of New York City's Drug Enforcement Agency" cannot reasonably be understood as being about the group that includes the individual and class plaintiffs.

Critically, as discussed above, the Film does not contain any scenes depicting, or any statements concerning, any corruption or wrongdoing by agents in the United States Drug Enforcement Administration in which plaintiffs worked.  To the contrary, the Film repeatedly and consistently depicts a group of corrupt local police narcotics detectives in New York City that use their status as police officers to shake down drug traffickers and to get involved in drug trafficking activities themselves.  See Statement of Facts, supra; see also Exs. B, C.

---

concerning" requirement where, as here, the connection to the plaintiffs is solely a result of their affiliation with a government agency.

[13]  This requirement that the statement be linked to the individual plaintiffs applies even where the plaintiffs actually are depicted – unlike the present circumstances, where the plaintiffs were not named or shown at any point during the Film.  See, e.g., Scelfo v. Rutgers University, 116 N.J. Super. 403, 407-09, 282 A.2d 445, 447-48 (1991) (dismissing libel claim by two campus police officers whose photograph was included along with an article titled, "YAFs, Cops, Rightists:  Racist Pig Bastards"); Vogel v. Hearst Corp., 116 N.Y.S.2d 905, 907, 908 (N.Y. Sup. Ct. Kings Cty. 1952) (photograph that featured two girls listening to a college lecture that accompanied an article titled "Can Marriage Be Taught," which included three black strips stating  "I can't stand his mother"; "How far dare an engaged girl go?"; and "What if she doesn't want children" did not refer to or impute any defamatory statement about the two plaintiffs); Bourgeau v. New York News, 5 Med. L. Rptr. 1799, 1800 (N.Y. Sup. Ct. N.Y. Cty. 1979) (rejecting libel claim arising out of the use of a photograph of a construction worker gazing upon women passersby in an article entitled, "When rape is psychological"; court held that no "reasonably minded person could possibly derive the impression that this plaintiff was any kind of rapist from viewing the picture and reading the accompanying article").

For example:

- The core group of corrupt police officers are first shown in what is identified as the "New York City Police Plaza," where their ringleader, Detective Trupo, flashes his badge and checks out a suitcase full of drugs; the suitcase is then taken to an apartment that functions as a make shift drug laboratory. (Ex. B at 01:14.05 – 01:15.45.)

- The same group of corrupt NYPD police officers warns the film's hero, New Jersey (Essex County) officer Richie Roberts, not to come "unannounced" to New York City, which is their turf. (Id. at 02:03.00 – 02:04.22.)

- The group of corrupt local police officers stop drug kingpin Frank Lucas' car as he is leaving his wedding, to shake him down for money. Lucas refers to the corrupt cops' ringleader as "Detective," and Detective Trupo responds, "Maybe I'm special," and then points to his badge, saying "see, Special Investigations Unit. Special." (Id. at 02:23.07 – 02:25.00.)

- The group of corrupt NYPD police officers pull over a car with Lucas in it a second time, and take heroin from the trunk of the car, as Roberts secretly watches. (Id. at 02:34.28 – 02:36.20.)

- Lucas complains to a colleague about Detective Trupo, saying that the problem with the "Special Investigations Unit" officers is that they "think they're special." (Id. at 02:43.44 – 02:44.15.)

- Detective Trupo and the other corrupt local officers storm into Lucas' house looking for his "getaway money," where Trupo hits Lucas's wife, kills Lucas' guard dog, and discovers a stash of money. (Id. at 02:57.27 – 03:01.35.) No one in the scene is

described as, or depicted as being, a federal agent.  To the contrary, Trupo tells

Lucas's wife that Lucas's "illustrious career is over," and the "feds" are going to

come confiscate everything, "but not before I get my gratuity."  (Id. at 02:58.08 –

02:58.22.)  Furthermore, in this scene, Lucas is not at the house, nor is he arrested;

instead, in the Film, his arrest takes place later, as he is leaving church with his wife

and mother, and is conducted by Roberts and his team.  (Id. at 03:15.43 – 03:17.18.)

Additionally, in the few minutes preceding the statement at issue, voice-over "news"

broadcasts make clear that the corrupt policemen depicted in the Film are members of the New

York City police department.  The audio includes the following statements:

- "In what is being called the City's largest police corruption scandal, 32 more

  officers were indicted today in federal court on bribery charges.  These officers

  will face stiff prison terms, say federal prosecutors, if found guilty."

- "The report by federal investigators into New York's ever-widening police

  corruption scandal claims that more than half of the City's officers assigned to

  drug enforcement have engaged in some form of corruption."

- Noting that the investigation of "… an elite Narcotics Squad, SIU, led to the arrest

  of New York City detectives"

- "Convicted of extortion, members of New York City's Special Investigations

  Narcotics Unit, will face sentencing today in federal court."

(Id. at 03:24.50 – 03:26.54.)  While the audience hears these voiceovers regarding the arrest and

conviction of New York City Police Department officers, various scenes depict the apprehension

of the group of corrupt NYPD officers that were depicted throughout the movie (sometimes with

other officers applauding the arrest), and the suicide of Detective Trupo.  (See id.)

The references in the Film to federal drug enforcement officials are positive, contrasting their sincerity to the cause of fighting drugs with the corruption of certain members of the local police. For example, when hero Richie Roberts is asked by his boss to lead a special Essex County Narcotics Squad investigating major drug trafficking, his boss says that "the good news is, you're not the only honest cop in town," noting that a special narcotics bureau in Washington wanted to set up an investigative team, and that the federal agents "are not a dog and pony show, they are sincere." (Id. at 01:42.23 – 01:43.46.) There also are references at the end of the Film to unidentified federal investigators and prosecutors who investigated and prosecuted the corrupt local police officers, and a screen notation at the end of the Film that "federal authorities confiscated over $250 million" of Lucas's assets. (See id. at 03:24.50 – 03:26.08, 3:37:31:17.)

Consequently, when viewed as a whole, as required by well-established defamation law, the legend at the end of the Film cannot reasonably be understood as being "of and concerning" individual members or a group of current and former federal Special Agents in the United States Drug Enforcement Administration.[14]

## II.    PLAINTIFFS' EMOTIONAL DISTRESS CLAIMS INDEPENDENTLY FAIL.

Although styled as "emotional distress" claims, plaintiffs' Second and Third claims purport to arise from the same allegedly false statement as their libel claim (see Compl., ¶¶ 74-76, 78-82); consequently, both are subject to the same requirements and defenses that would apply to a defamation claim. As the United States Supreme Court noted in Hustler Magazine v.

---

[14] This conclusion is further buttressed by the advisement to viewers at the end of the Film that it was "based on the article 'The Return of Superfly' by Mark Jacobson," and while "based on a true story, some scenes or characters have been composed or invented, and a number of incidents fictionalized." See Exh. B at 03:30.58; see also Davis v. Costa-Gravas, 654 F.Supp. 653, 655, 658 (S.D.N.Y. 1987) (rejecting plaintiff's libel claim based on film that was "not a non-fictional documentary" and that "cannot be understood as other than a dramatization of a true story" and explaining that "self-evidently a docudrama partakes of author's license" and thus "does not demand literal truth in every episode depicted").

<u>Falwell</u>, 485 U.S. 46, 50, 54-56, 108 S. Ct. 876, 881-82 (1988), the same constitutional defenses that apply to a libel claim apply equally to a claim labeled "intentional infliction of emotional distress"; "the State's interest in protecting [persons] from emotional distress" is not "sufficient to deny First Amendment protection to speech," even if the speech "is patently offensive and is intended to inflict emotional injury ...." <u>See</u> <u>also</u> <u>Wilson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 111 A.D.2d 807, 808, 490 N.Y.S.2d 553, 555 (2d Dep't 1985) ("it would be improper to allow plaintiff to evade the specific prerequisites for a libel action by presenting his cause of action in terms of the generalized tort of intentional infliction of emotional distress"); <u>Terwilliger v. Wands</u>, 17 N.Y. 54 (1858) (same); <u>Blatty v. New York Times Co.</u>, 42 Cal. 3d at 1042 ("constitutional protection does not depend on the label given the stated cause of action. ... [N]o cause of action can claim talismanic immunity from constitutional limitations. ...."); <u>Reader's Digest Ass'n v. Superior Court</u>, 37 Cal. 3d 244, 265 (1984) (dismissing plaintiff's emotional distress claim after finding that it was based on the same facts as the constitutionally-barred defamation and privacy claims; "liability cannot be imposed on any theory for what has been determined to be a constitutionally protected publication"). Because plaintiffs' emotional distress claims suffer from the same constitutional and common law defects as their libel claim (<u>see</u> Sections I(A) and I(B), <u>supra</u>), they must be dismissed with prejudice.

In addition, because plaintiffs' claims for emotional distress purport to arise from precisely the same statement in the Film as their libel claim, they must be dismissed as superfluous under New York law. <u>See</u>, <u>e.g.</u>, <u>Sweeney v. Prisoners' Legal Servs. of New York, Inc.</u>, 146 A.D.2d 1, 7, 538 N.Y.S.2d 370, 374 (3d Dep't), <u>appeal dismissed</u>, 74 N.Y.2d 842, 546 N.Y.S.2d 558 (1989); <u>Manno v. Hembrooke</u>, 120 A.D.2d 818, 820, 501 N.Y.S.2d 933, 936 (3d Dep't 1986). As this District made clear in <u>Idema v. Wager</u>, 120 F. Supp. 2d 361 (S.D.N.Y.

2000) – a case on which plaintiffs rely – "New York courts have consistently held that a plaintiff may not maintain a separate claim for intentional infliction of emotional distress grounded in the same facts as a claim for libel." Id. at 370; see also Durepo v. Flower City Television Corp., 147 A.D.2d 934, 537 N.Y.S.2d 391 (4th Dep't 1989); Sweeney, 146 A.D.2d at 7; Manno, 120 A.D.2d at 820.[15] For these reasons, plaintiffs' emotional distress claims should be dismissed.

**III.    PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF MUST BE DENIED BECAUSE IT WOULD BE AN UNCONSTITUTIONAL PRIOR RESTRAINT ON SPEECH, BECAUSE PLAINTIFFS CANNOT SHOW IRREPARABLE INJURY OR A LIKELIHOOD OF SUCCESS ON THE MERITS, AND BECAUSE THE BALANCE OF HARDSHIPS WEIGHS STRONGLY IN FAVOR OF UNIVERSAL AND AGAINST INJUNCTIVE RELIEF.**

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S. Ct. 1865, 1867 (1997) (citations omitted) (emphasis in original); accord Moore v. Consolidated Edison Co., 409 F.3d 506, 510 (2d Cir. 2005); Checkers Motors Co. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir. 1969).

In this Circuit, a district court may issue a preliminary injunction only where the moving party demonstrates "(1) that he or she will suffer irreparable harm absent injunctive relief, and (2) either (a) that he or she is likely to succeed on the merits, or (b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." Moore, 409 F.3d at 510 (internal citations omitted); accord Kaplan v. Board of Educ. of City School Dist., 759 F.2d 256, 259 (2d Cir. 1985).

---

[15] As Idema held, a duplicative emotional distress claim must be dismissed even though the underlying libel claim is insufficient as a matter of law. 120 F. Supp. 2d at 370-71; accord Komarov v. Advance Magazine Publishers, Inc., 180 Misc. 2d 658, 660, N.Y.S.2d 298 (N.Y. Sup. Ct. N.Y. Cty. 1999) (dismissing as duplicative a claim for intentional infliction of emotion distress where libel claim was dismissed due to "fair and true report" privilege).

For the reasons presented below, plaintiffs cannot remotely satisfy the requirements for injunctive relief, and their request for an injunction in support of their claims here is foreclosed as a matter of law by the First Amendment and by the long-standing rule in this Circuit that equity will not enjoin an alleged libel.[16]

### A.    The Injunction Plaintiffs Seek Would Be An Unconstitutional Prior Restraint On Speech.

In their Injunction Application, plaintiffs ask the Court to enter an order enjoining Universal, and all persons acting in concert with it, from:

>    (i)    directly or indirectly using, distributing or showing the Film with the Legend, or any part of the Legend, or otherwise conveying all or part of the statements contained in the Legend;

>    (ii)    directly or indirectly using, distributing, or showing any signs, prints, packages, and advertisements bearing all or any part of the Legend; and

>    (iii)    disbursing any of the revenues generated by the Film, or commingling those revenues with revenues from sources other than the Film.

See Plaintiff's Proposed Order To Show Cause.[17]

Because such an order would "freeze," not just chill, Universal's exercise of its First Amendment right to disseminate the Film, Nebraska Press, 427 U.S. at 559, it would constitute a "classic example[] of [a] prior restraint[]." Alexander v. United States, 509 U.S. 544, 550, 113 S. Ct. 2766, 2771 (1993). Such prior restraints are barred by the First Amendment.[18]

---

[16] The injunctive relief cause of action also is barred for the same reasons as plaintiffs' other claims, and Universal's motion to dismiss should be granted as to this claim as well.

[17] As discussed below, plaintiffs' Application does not offer any basis for the third part of the injunction request, nor is there any legal ground that would support such an order.  See Section III(B), infra.

[18] Courts uniformly have held that both fact-based and fictional motion pictures receive full First Amendment protection, because "[t]he importance of motion pictures as an organ of public

As the United States Supreme Court has recognized, restraining the publication of information by the media undermines the "main purpose" of the First Amendment, which is "to prevent all such previous restraints upon publications as [have] been practiced by other governments." Nebraska Press, 427 U.S. at 557 (citations omitted). As Chief Justice Hughes explained in Near v. Minnesota, "[t]he fact that for approximately one hundred and fifty years there has been almost an entire absence of attempts to impose [prior restraints] … is significant of the deep-seated conviction that such restraints would violate constitutional right." 283 U.S. at 718. See also In re Providence Journal Co., 820 F.2d 1342, 1348 (1st Cir. 1986) ("[i]n its nearly two centuries of existence, the Supreme Court has never upheld a prior restraint on pure speech") (emphasis added).

A prior restraint on expression thus "comes … with a 'heavy presumption' against its constitutional validity." Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S. Ct. 1575, 1578 (1971); accord Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S. Ct. 631, 640 (1963). This antipathy toward prior restraints remains strong even where substantial competing interests are asserted. For example, in Nebraska Press, the United States Supreme Court rejected a prior restraint against the publication of a criminal defendant's murder confession, even though the Court found that such publicity "might impair the defendant's right to a fair trial" under the Sixth Amendment. 427 U.S. at 563. Likewise, the Supreme Court repeatedly has found that

---

opinion is not lessened by the fact that they are designed to entertain as well as inform." Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501, 72 S. Ct. 777, 780 (1952); accord Schad v. Borough of Mt. Ephraim, 452 U.S. 61, 65, 101 S. Ct. 2176, 2181 (1981) ("[e]ntertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television and live entertainment, such as musical and dramatic works fall within the First Amendment guarantee"). See also Rogers v. Grimaldi, 695 F. Supp. 112, 116 (S.D.N.Y. 1988) ("motion pictures are a form of expression protected by the First Amendment"), aff'd, 875 F.2d 994 (2d Cir. 1989); Hunt v. NBC, 872 F.2d 289, 291, 295 (9th Cir. 1989) (denying request for prior restraint against television docudrama); Goldblum v. NBC, 584 F.2d 904, 906 (9th Cir. 1978) (same).

First Amendment rights to publish must prevail, even in cases involving such strong interests as the confidentiality of rape victims, <u>Cox Broadcasting Corp. v. Cohn</u>, 420 U.S. 469, 496, 95 S. Ct. 1029, 1046 (1975) (invalidating Georgia law restricting publication of rape victim's name); <u>Florida Star v. B.J.F.</u>, 491 U.S. 524, 536, 109 S. Ct. 2603, 2610 (1989) (rape victim's name), and the interest in protecting minors charged with murder, <u>Oklahoma Publ'g Co. v. District Court</u>, 430 U.S. 308, 311, 97 S. Ct. 1045, 1047 (1977). <u>See also</u> <u>CBS v. Davis</u>, 510 U.S. 1315, 1318, 114 S. Ct. 912, 914-15 (1994) (Blackmun, J., in chambers) (request for injunction against broadcaster was denied; Justice Blackmun noted that "this 'most extraordinary remedy'" of a prior restraint may be considered "only where the evil that would result from the reportage is both great and certain and cannot be mitigated by less intrusive measures," which was not satisfied by plaintiff's allegations that significant economic harm would result from disclosures).

Where, as here, the interest asserted by the moving party is an interest in protecting against reputational injury resulting from an alleged libel, the First Amendment's prohibition on prior restraints is absolute. Indeed, in <u>Near v. Minnesota</u>, its first modern prior restraint case, the United States Supreme Court squarely rejected the notion that allegations of libel could be sufficient to justify the issuance of a prior restraint on speech. Specifically, the Court struck down a prior restraint against an anti-Semitic publication that allegedly disturbed the "public peace" and provoked "assaults and the commission of crime," emphasizing that such orders should be granted only in "exceptional cases." <u>Near</u>, 283 U.S. at 716, 722. In discussing those categories of cases, Chief Justice Hughes suggested that prior restraints might be granted only in circumstances such as threatened publication of the sailing dates of troop transports or the movement of soldiers during wartime. <u>Id.</u> at 716. <u>See also</u> <u>Organization for a Better Austin</u>, 402 U.S. at 418-19; <u>New Era Publications Int'l v. Henry Holt & Co.</u>, 695 F. Supp. 1493, 1525

(S.D.N.Y. 1988) ("we accept as black letter that an injunction is not available to suppress

defamatory speech"), aff'd, 873 F.2d 576 (2d Cir. 1989); Metropolitan Opera Ass'n, 239 F.3d at

176-77 ("prior restraints are the most serious and the least tolerable infringement on First

Amendment rights") (citations omitted); Jordan v. Metropolitan Life Ins. Co., 280 F. Supp. 2d

104, 111-12 (S.D.N.Y. 2003) (injunction against alleged defamation "would be unconstitutional

as a prior restraint on freedom of expression").

Because the injunctive relief plaintiffs seek is plainly barred by the First Amendment, the

Court should enter an order denying injunctive relief for this reason alone.

### B.    Plaintiffs Cannot Demonstrate The Irreparable Injury Necessary To Justify Issuance Of An Injunction.

In addition to its constitutional defects, plaintiffs' request for injunctive relief should be

denied because they cannot meet the requirements for an injunction. A showing of irreparable

harm "is the single most important prerequisite for the issuance of a preliminary injunction."

Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990) (citations omitted). The

moving party "must first demonstrate that such injury is likely before the other requirements for

the issuance of an injunction will be considered." Id.; see also Johnson Controls, Inc. v. A.P.T.

Critical Sys., Inc., 323 F. Supp. 2d 525, 531 (S.D.N.Y. 2004) (same). Furthermore, the harm

must be "imminent, not remote or speculative, and the alleged injury must be one incapable of

being fully remedied by monetary damages." Reuters, 903 F.2d at 907 (citations omitted). Here,

plaintiffs cannot show irreparable harm because courts consistently have held that alleged

reputational injuries are fully compensable in damages; plaintiffs therefore have an adequate

remedy at law.

It is well-established under Second Circuit law that equity will not enjoin a libel. "For

almost a century the Second Circuit has subscribed to the majority view that, absent

extraordinary circumstances, injunctions should not ordinarily issue in defamation cases."
Metropolitan Opera Ass'n, 239 F.3d at 177; see also American Malting Co. v. Keitel, 209 F. 351,
354 (2d Cir. 1913) ("[e]quity will not restrain by injunction the threatened publication of a libel,
as such, however great the injury to property may be.  This is the universal rule in the United
States") (citations omitted).  This rule derives from the principle that "injunctions are limited to
rights that are without an adequate remedy at law, and because ordinarily libels may be remedied
by damages, equity will not enjoin a libel absent extraordinary circumstances." Metropolitan
Opera Ass'n, 239 F.3d at 177; see also Community for Creative Non-Violence v. Pierce, 814
F.2d 663, 672 (D.C. Cir. 1987) ("[t]he usual rule is that equity does not enjoin a libel or slander
and that the only remedy for defamation is an action for damages") (citations omitted).[19]

Because alleged injury to reputation is compensable in damages, plaintiffs bringing
defamation claims cannot, as a matter of law, establish the irreparable injury necessary to obtain
injunctive relief.  For this reason, plaintiffs have failed to make the threshold showing of
irreparable harm necessary for injunctive relief.

In addition, plaintiffs' extreme and unexplained delay in seeking injunctive relief belies
any claim of irreparable harm.  It is well established that a party's lengthy delay before filing suit
or seeking injunctive relief provides compelling evidence that the plaintiff has not suffered and
will not suffer irreparable harm.  See, e.g., Citibank, N.A. v. Citytrust, 756 F.2d 273, 277 (2d Cir.
1985) (finding plaintiffs failed to establish irreparable harm).

---

[19]  This rule consistently has been applied by the federal district courts of New York.  See Jordan
v. Metropolitan Life Ins. Co., 280 F. Supp. 2d at 112; Bynog v. SL Green Realty Corp., 2005
WL 3497821, at *3 (S.D.N.Y. Dec. 22, 2005) (denying request for injunction against posting
allegedly defamatory comments on Web site); Donini Int'l, S.P.A. v. Satec (USA) LLC, 2004
WL 1574645, at * 7 (S.D.N.Y. July 13, 2004) (noting the "long-standing rule in this Circuit" that
"equity will not enjoin threatened libel or defamation since there are adequate legal remedies
available for damages arising from harmful speech"); Hammer v. Trendl, 2002 WL 32059751 at
* 2 (E.D.N.Y. Oct. 10, 2002) (denying request for injunction against unfavorable book reviews).

As one court explained, "a plaintiff's undue delay in seeking injunctive protection can preclude, as a matter of law, the finding that the plaintiff will suffer irreparable harm if the provisional remedy is not granted." Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc., 454 F. Supp. 2d 62, 68 (E.D.N.Y. 2006). Such delay "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." Citibank, 756 F.2d at 277 (citations omitted); accord Blanksteen v. New York Mercantile Exchange, 879 F. Supp. 363, 367 (S.D.N.Y. 1995) ("a lack of diligence will preclude the granting of preliminary injunctive relief to the extent that it is probative of a lack of irreparable harm"); see also Oakland Tribune, Inc. v. Chronicle Publ'g Co., 762 F.2d 1374, 1377 (9th Cir. 1985) ("[p]laintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm"); Metromedia Broadcasting Corp. v. MGM/UA Entertainment Co., 611 F. Supp. 415, 427 (C.D. Cal. 1985) (four-month delay in filing suit after plaintiff was aware of claim supported denial of injunction motion).

Plaintiffs delayed more than 10 weeks from the time the Film was distributed in theaters nationwide to file this action, and waited nearly 12 weeks before they sought any form of injunctive relief. During that time, by their own admission, millions of people saw the Film in theaters. Plaintiffs' delay in seeking relief defeats any claim that they will suffer irreparable injury in the absence of injunctive relief now.[20]

Finally, as indicated above, plaintiffs have included an unsupported request for an order enjoining Universal from "disbursing" any revenues received to date from the Film or from

---

[20] The widespread distribution also makes an injunction futile, providing an independent basis for denying the Application. See, e.g., In re Zyprexa Injunction, 474 F. Supp. 2d 385, 426 (E.D.N.Y. 2007) (court refused to enjoin websites from re-posting confidential documents, stating that such an order would be "a fruitless exercise of the court's equitable power"); see also In re Charlotte Observer, 921 F.2d 47, 50 (4th Cir. 1990) (prior restraint improper because, "[o]nce announced to the world, the information lost its secret characteristic").

"commingling" those revenues with any other monies. As a practical matter, because the Film has been in domestic theatrical release since November 2, 2007, and in international release since mid-November 2007, it would be impossible at this late date to segregate the revenues received from the Film. Legally, there is no basis for this request, and plaintiffs have not even attempted to provide one. Neither disgorgement of profits nor restitution is a proper remedy in a defamation action alleging injury to reputation, and plaintiffs certainly do not suggest that the defendant in this case would be unable to satisfy a monetary judgment for damages.[21]

### C.     Plaintiffs Do Not Satisfy The Remaining Requirements For Issuance Of A Preliminary Injunction.

In addition to the other defects in their injunction claim, plaintiffs cannot establish a likelihood of success on the merits, nor can they demonstrate that the balance of hardships favors them. For these additional reasons, their Injunction Application should be rejected.

### 1.     Plaintiffs Cannot Establish A Likelihood Of Success On The Merits.

For all of the reasons set forth in Sections I and II above, plaintiffs cannot establish a likelihood of success on the merits. Universal hereby incorporates by reference these legal arguments as an additional basis upon which this Court should deny plaintiffs' Application.

---

[21] The traditional remedies for defamation are compensatory damages (in the form of out-of-pocket special damages and general damages for reputational injury) and, in appropriate cases and upon proof of constitutional "actual malice," presumed or punitive damages. See, e.g., Gertz v. Robert Welch, Inc., 418 U.S. 323, 349-50, 94 S. Ct. 2997, 3011-12 (1974); 2 Sack on Defamation, at §§ 10.2 and 10.3. In contrast, restitutionary remedies require that a benefit must have passed from the claimant to the defendant for which the claimant should be compensated. See, e.g., Blue Cross of Central New York, Inc. v. Wheeler, 93 A.D.2d 995, 995, 461 N.Y.S.2d 624, 626 (4th Dep't 1983); see also Satz v. Board of Educ. of City of New York, 118 Misc. 2d 676, 681, 461 N.Y.S.2d 692, 695 (Civ. Ct. Queens Cty. 1983). Here, plaintiffs have not alleged that any benefit passed from them to Universal, and therefore cannot establish that they are entitled to any restitutionary remedy.

### 2.     The Balance Of Hardships Weighs In Favor Of Universal And Against Issuance Of An Injunction.

Injunctive relief should be denied for the separate and additional reason that the magnitude of the harm to Universal that would result from the issuance of the requested injunction far outweighs the harm to plaintiffs if the Film continues to be distributed, as it has for nearly three months. First, Universal would suffer irreparable harm from the abridgement of its First Amendment rights. "The first amendment informs us that the damage resulting from a prior restraint – even a prior restraint of the shortest duration – is extraordinarily grave." CBS v. United States District Court, 729 F.2d 1174, 1177 (9th Cir. 1983); see also In re King World Prod'ns, 898 F.2d 56, 60 (6th Cir. 1990) (a prior restraint "by … definition, has an immediate and irreversible sanction") (citations omitted). As Justice Black stated in the New York Times (Pentagon Papers) case, "every moment's continuance of the injunctions against these newspapers amounts to a flagrant, indefensible, and continuing violation of the First Amendment." 403 U.S. at 714-15 (Black, J., concurring). Other decisions similarly have recognized that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690 (1976).

Second, as set forth in the accompanying Affidavits of John Morici and Jack Ledwith, Universal would suffer severe economic hardship if it were enjoined from further distribution of the Film. The costs associated with halting all distribution of the Film to theaters for exhibition, whether domestically or internationally, recalling all prints of the Film in circulation, re-editing the Film and re-issuing new theatrical prints, would quickly run into the millions of dollars. See

Affidavit of John V. Ledwith, Jr., at ¶¶ 2-4.[22]  Universal also would suffer substantial economic

harm if it were prevented from issuing the DVD of the Film as scheduled.  See Affidavit of John

Morici, at ¶¶ 2-5.  For this additional reason, plaintiffs' Application should be denied.

## CONCLUSION

For all of the reasons set forth above, Universal respectfully requests that the Court grant

its Motion to Dismiss the Complaint and enter an order dismissing this action in its entirety,

without leave to amend, and denying plaintiffs any form of injunctive relief in this action.

Dated:  New York, New York
        February 1, 2008

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By: _____/s/_____
        Robert D. Balin (RB5847)

1633 Broadway
New York, New York 10019
Telephone:  (212) 489-8230
Facsimile:  (212) 489-8340

Provisionally Admitted *Pro Hac Vice*

Kelli Sager (Cal. Bar No. 120162)
Andrew J. Thomas (Cal. Bar No. 159533)
DAVIS WRIGHT TREMAINE LLP
865 S. Figueroa St., Suite 2400
Los Angeles, California 90017-2566
Telephone:  (213) 633-6800
Facsimile:  (213) 633-6899

Attorneys for Defendant NBC Universal, Inc.

---

[22]  The economic harm alone would mandate that plaintiffs post a bond if any injunction were allowed, in the amount of millions, if not tens of millions, of dollars.  See Fed. R. Civ. P. 65(c) ("[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant ...."); Corning Inc. v. PicVue Electronics, Ltd., 365 F.3d 156, 158 (2d Cir. 2004); see also Nintendo of America, Inc. v. Lewis Galoob Toys, Inc., 16 F.3d 1032, 1036-37 (9th Cir. 1994) (presumption that wrongfully enjoined party "is entitled to have the bond executed and recover provable damages up to the amount of the bond").  But no amount of money could recompense Universal for the incalculable and irreparable injury to its First Amendment rights from an injunction.

mentation or enforcement of the adult entertainment establishment licensing ordinance challenged in these actions until further order of this court.

IT IS SO ORDERED this 22nd day of June, 1979.

# BOURGEAU v. NEW YORK NEWS

### New York Supreme Court
### New York County

BOURGEAU v. NEW YORK NEWS, INC., September 14, 1979

### REGULATION OF MEDIA CONTENT

**Defamation — Defamatory content (§11.05)**

**Defamation — Summary judgment (§11.55)**

**Privacy — Statutory right to privacy — State statutory protections (§13.051)**

Evidence, in construction workers' invasion of privacy action under New York Civil Rights Law against newspaper for its publication of photograph, to accompany article on "psychological rape," that depicted plaintiffs ogling young woman, showing that picture was relevant to article, that matter was one of legitimate public interest, and that newspaper had not acted in grossly irresponsible manner, warrants summary judgment for newspaper.

---

Invasion of privacy and libel action brought by construction workers against newspaper for publication of photograph depicting workers ogling woman. Upon cross motions for summary judgment.

Plaintiffs' motion for summary judgment denied.

Defendant's motion for summary judgment granted.

Joseph P. Callahan, of Callahan & Wolkoff, New York, N.Y. for plaintiffs.

Rudolph W. Giuliani, Marjorie Thalheimer Coleman, and Ann R. Loeb, of Patterson, Belknap, Webb & Tyler, New York, for defendant.

*Full Text of Opinion*

Silbowitz, J.

Plaintiffs move for summary judgment against defendant publisher on their cau-

ses of action alleging violation of their right to privacy (Section 51 of the Civil Rights Law) and common law libel. Defendant cross-moves for summary judgment dismissing the complaint.

It appears that on or about Aug. 29, 1974, an employee of defendant New York News, Inc., photographed the plaintiffs at a construction site in Manhattan at which a demonstration by a feminist rights organization was in progress. Thereafter, on Aug. 30, 1974, defendant published an article concerning the demonstration and included the photograph in question. The article was entitled "Fems Attack Street Ogling." The photograph depicted plaintiffs gazing upon an attractive woman passerby. Plaintiffs concede that this first publication was in connection with the reporting of a newsworthy event as described in the accompanying article.

However, in the New York Daily News edition of Aug. 14, 1977, this photograph was re-published and used to illustrate an article entitled "When rape is psychological." Beneath the photograph was the caption "What's going on here? Psychological rape, according to one sociologist, it is and can be as devastating as a physical attack." The article contained the views of certain psychologists and one sociolgist commenting on certain types of male conduct towards women. "Psychological rape" was defined as the ". . . stares, leers, crude remarks and other behavior with which men terrorize and intimidate woman without laying a finger upon them . . ."

Plaintiffs, by their own admission, have chosen as their first and chief cause of action, an allegation that defendant's subsequent publication of their photograph constituted a violation of their right to privacy as codified by Section 51 of the Civil Rights Law. This section, in pertinent part, provides that "Any person whose . . . picture is used within this State for advertising purposes or for the purposes of trade without . . . written consent . . . may . . . sue and recover damages . . . ."

Plaintiffs contend that the use of their photogrgh was not related in any manner to the article in question and its use was merely to make the article more interesting and attractive and thus enhance the saleability of defendant's newspaper. They alleged that the photograph was used for ". . . advertising purposes or for the purposes of trade . . ." within the purview of Section 51.

It is well settled that a picture, if used to illustrate an article on a matter of public interest, is not considered for the purpose

of trade or advertising within the prohibition set forth in Section 51 of the Civil Rights Law, unless the picture has no real relationship to the article or unless the article is an advertisement in disguise (Murray v. New York Magazine, 27 N.Y. 2d 406, Dallesandro v. Holt & Co., 4 A.D. 2d 470).

It cannot seriously be argued that the article did not deal with a matter of public interest. In this era of burgeoning women's rights, awareness and the evolution of traditional male/female roles, the article clearly focused upon a matter of legitimate public interest and concern.

In addition, it is apparent that the illustrative photograph bore a real relationship to the article. The plaintiffs, herein, are depicted as gazing or staring at a young woman. This very activity was categorized by a sociologist in the article as a form of "psychological rape." Thus the photograph merely depicted a common-place activity and the opinion of a sociologist as to what this type of conduct denoted. Without in any manner forming an opinion as to the views set forth in the article, it is clear, however, that the illustrative photograph bore a real relationship to a category of conduct discussed in the article. Defendant has demonstrated that, within the purview of applicable decisional law, plaintiffs have utterly failed to prove any violation of Section 51 of the Civil Rights Law.

Nor has a cause of action founded upon libel been demonstrated. This court agrees with the opinion of Justice Aspland as set forth in Roskos v. New York News ( — Misc. 2d — , 4 Med.L.Rptr. 2148 [Sup. Ct. Suffolk, Co. 1979), which dealt with the identical photographs and publications involved in this application. Justice Aspland stated "The court cannot conceive that a reasonably minded person could possibly derive the impression that this plaintiff was

any kind of rapist from viewing the picture and reading the accompanying article. It is obvious that the picture was selected at random without any intention of personal individualization and as an example of commonplace "girl watching," the latter being the subject of a bizarre, and hightly imaginative, interpretation on the part of one sociologist and certain psychologists."

It is the opinion of this court that the article and illustrative photograph is not reasonably susceptible of any defamatory meaning either as libel per se or libel per quod. In addition the Court of Appeals has stated in Chapadeau v. Utica Observer (38 N.Y.2d 196 [1 Med.L.Rptr. 1693]), that ". . . where the content of an article is arguably within the sphere of legitimate public concern, which is reasonably related to matters of legitimate public concern, the person defamed may recover, however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties."

As in Roskos v. New York News (supra), plaintiffs have, aside from not proving defamation, failed to demonstrate that defendant acted in a grossly irresponsible manner under the guidelines set forth by the Court of Appeals.

Accordingly, defendants cross-motion is for summary judgment dismissing the action is granted and plaintiffs' motion is denied. Settle order.

# Prosser and Keeton
## on
# THE LAW OF TORTS

**W. Page Keeton**
*General Editor*

---

**W. Page Keeton**
*Holder of W. Page Keeton Chair in Tort Law*
*University of Texas at Austin*

**Dan B. Dobbs**
*Rosenstiel Professor of Law, University of Arizona*

**Robert E. Keeton**
*Langdell Professor Emeritus, Harvard Law School*

**David G. Owen**
*Webster Professor of Tort Law, University of South Carolina*

---

**FIFTH EDITION**
**HORNBOOK SERIES**
**LAWYER'S EDITION**

St. Paul, Minn.
**WEST PUBLISHING CO.**
1984

## Group Defamation

Ordinarily, no action lies for the publication of a general condemnation concerning a large group or class of persons, simply because such a general condemnation could not reasonably be regarded as referring to each individual or any particular individual within the group; nor is it calculated to induce the reasonable belief of enough likelihood of its applicability to a particular person to impair or injure such person's reputation. But the size of the class, the nature or generality of the charge, and the extravagance of the accusation are all factors that can have a considerable bearing on whether or not the statement can be said to relate to the plaintiff to the extent of casting enough suspicion on the plaintiff to cause others to believe reasonably that the statement is probably applicable to the plaintiff.

It has been observed that there are in reality at least three separate types of derogatory or defamatory statements about groups.[57]

There is in the first place the general statement—such as the derogatory statement that all lawyers are liars, or a disparaging statement about an entire minority racial group. Such statements are held not to be actionable by individual members of the group or class in the absence of evidence of special circumstances at the time of publication which reasonably give rise to the conclusion that there is particular reference to a particular member.[58] But if the plaintiff is the only lawyer present, or for some other reason, the words are reasonably understood by the hearers or readers to be directed individually at him, the personal application may be made to appear.

Then there is the more specific statement of derogatory conduct about a rather definite number of persons. Here, there is much more likelihood that the statement can reasonably be believed to refer or probably refer to the plaintiff.[59] Some courts seem to require that the statement be susceptible of the reasonable construction of applicability to each member of the group, or at least to the particular plaintiff. Others, and it would seem the preferable view, would be satisfied if a reasonable person would conclude that statement is probably applicable to the plaintiff. The 1962 decision by the Supreme Court of Oklahoma in Fawcett Publications, Inc. v. Morris[60] may, as Eldredge has indicated, become a landmark in American law. There the plaintiff was a fullback on the alternate squad of a football team (composed of 60 or 70 players) that was allegedly using an amphetamine drug to "hop up" football players. A judgment on a verdict for the plaintiff was upheld.

The third type of statement is the kind where only some members of a relatively small group—such as engineers of a particular company or 25 members of the staff—have been accused of specific or discreditable conduct. At one point in time, the statement was made that a right of action was uniformly denied because the statement could not reasonably be regarded as referring to each member of the group, and therefore the person or persons to whom it referred[61] could not be identified. But most courts today would probably take into consideration the circumstances and decide each case on the basis of the magnitude of the suspicion cast on each person in the group.[62] If plaintiff's standing with others could rea-

57. Eldredge, The Law of Defamation, 1978, 54.

58. See Second Restatement of Torts, § 564A.

59. Foler v. Curtis Publishing Co., D.C.Cir. 1950, 182 F.2d 377 (60 cab drivers employed by one company—no recovery); Louisville Times v. Stivers, 1934, 252 Ky. 843, 68 S.W.2d 411 ("Stivers clan"—no recovery); Bornmann v. Star Co., 1903, 174 N.Y. 212, 66 N.E. 723 (12 doctors at a hospital—recovery).

60. Okl.1962, 377 P.2d 42, appeal dismissed, certiorari denied 376 U.S. 513, 84 S.Ct. 964, 11 L.Ed.2d 968,

rehearing denied 377 U.S. 925, 84 S.Ct. 1218, 12 L.Ed. 2d 217.

61. Note, Liability for Defamation of a Group, 1934, 34 Colum.L.Rev. 1322, 1327.

62. Hardy v. Williamson, 1891, 86 Ga. 551, 12 S.E. 874 ("some" of 11 engineers employed by one company); Neiman-Marcus Co. v. Lait, S.D.N.Y.1952, 13 F.R.D. 311 (25 salesmen; "most of the sales staff are fairies"); American Broadcasting-Paramount Theatres,

sonably be affected—a jury question—by the likelihood of the applicability of the defamatory conduct to the plaintiff, then it is actionable.

Nonactionable group defamation has been a fertile and dangerous weapon of attack on various racial, religious, and political minorities,[63] and has led to the enactment of criminal statutes in a number of states.[64]   Thus far, any civil remedy for such broadside defamation has been lacking.

 **WESTLAW REFERENCES**

di defamation
topic(defamation)
defamation  /5   means defin! term restatement  /s  torts  /5  558
defamation  /s  history commonlaw england
defam!  /s  injunction enjoin!
headnote(defam!  /s  "first amendment")
headnote(defam!  /s  free!  /s  speech)

*Definition*

restatement  /s  torts  /5  559
defam! libel! slander!  /s   coward drunkard hypocrite liar scoundrel crook anarchist skunk bastard eunuch "rotten egg" heartless
headnote(defam! libel! slander!  /s  hatred contempt ridicule)
defam! libel! slander!  /s  namecalling
defam! libel! slander!  /p  standard*  /s  conduct behavior

*Who May Be Defamed*

defam! libel! slander!  /s  cause action!  /s  dead deceased living alive
topic(237)  /p  abatement survival  /p  death deceased died

*Interpretation: Inducement, Innuendo and Colloquium*

headnote(defam! slander! libel!  /s  innuendo)
defam! slander! libel!  /p  jest fun irony sarcasm satir! allusion

Inc. v. Simpson, 1962, 106 Ga.App. 230, 126 S.E.2d 873 (one of two).

**63.** See Riesman, Democracy and Defamation: Control of Group Libel, 1942, 42 Col.L.Rev. 727; Tanenhaus, Group Libel, 1950, 35 Corn.L.Q. 261.

**64.** See Scott, Criminal Sanctions for Group Libel: Feasibility and Constitutionality, 1951, 1 Duke B.J. 218; Beth, Group Libel and Free Speech, 1955, 39 Minn.L. Rev. 167; Notes, 1947, 42 Col.L.Rev. 727; 1952, 32 Bos. U.L.Rev. 414; 1952, 61 Yale L.J. 252; 1953, 33 Or.L. Rev. 360.

§ 112

**1.** See supra, § 111.

headnote(defam! slander! libel!  /p  implication implied**)

*Reference to Plaintiff and Defamation of a Group, Including Plaintiff*

defam! slander! libel!  /p  technical!  /s  pleading* proof prov!

*Group Defamation*

restatement  /s  torts  /5  564a

## § 112.   Libel and Slander

The erratic and anomalous historical development of the law of defamation[1] has led to the survival until the present day of two forms of action for defamatory publications. One is libel, which originally concerned written or printed words;  the other slander, which might be, and usually was, of an oral character.   Libel was criminal in its origin, and it has remained a common law crime;[2] while slander was never criminal in itself, and could become so only when the words amounted to some other offense, such as sedition, blasphemy, or a breach of the peace.[3]   When the two at last met in the common law courts, they tended to become separate rather than united;  and since libel was already established as the greater wrong, greater responsibility continued to be attached to it.[4]   There is some reason to believe that this was in part at least a conscious effort to rescue a portion of the law of defamation from the morass into which the law of slander had fallen;[5] and no doubt it was encouraged by the reverence of an illiterate nation for the printed word, and its correspondingly greater potentialities for harm.   It was accordingly held that some kinds of defamatory words might be actionable without proof

**2.** See Kelly, Criminal Libel and Free Speech, 1958, 6 Kan.L.Rev. 295;  Leflar, The Social Utility of the Criminal Law of Defamation, 1956, 34 Tex.L.Rev. 984.

**3.** 1 Russell, Crimes, 8th ed. 1923, 983. Some slanderous words, such as those imputing unchastity to a woman, are now made criminal by special statutes in various jurisdictions.

**4.** Holdsworth, Defamation in the Sixteenth and Seventeenth Centuries, 1925, 41 L.Q.Rev. 13, 16; Kelly, Criminal Libel and Free Speech, 1958, 6 Kan.L.Rev. 295; Note, 1955, 25 U.Chi.L.Rev. 132.

**5.** 1 Street, Foundations of Legal Liability, 1906, 292.

**21.** Sisler v. Gannett Co., Inc. 1986, 104 N.J. 256, 516 A.2d 1083 (one who does not qualify as a constitutional-law public figure because there is no pre-existing controversy and because he has not thrust himself into the public eye, may still be required to prove knowing or reckless falsehood if he engages in conduct he should know would implicate a legitimate public interest and public scrutiny); cf. Dairy Stores, Inc. v. Sentinel Publishing Co., Inc., 1986, 104 N.J. 125, 516 A.2d 220 (common law fair comment privilege expanded; seller of essential product such as drinking water involves public interest, knowing or reckless falsehood required).

**22.** See § 113A below, this Supplement.

**23.** See § 116 below, this Supplement.

## § 111. Defamation

**Page 777**

**85.** And even more clearly the unauthorized publication of the plaintiff's picture in a legal publication that offends many persons, or the attribution to the plaintiff of sexual fantasies, as in Ashby v. Hustler Magazine, Inc., 6th Cir. 1986, 802 F.2d 856. Such claims are now often presented as "false light" privacy claims. See § 117, this Supplement.

**Page 779**

**5.** Dairy Stores, Inc. v. Sentinel Publishing Co., 1986, 104 N.J. 125, 516 A.2d 220 (distinguishing product disparagement). See § 128, Main Volume.

**6.** See, Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 1985, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593.

**7.** Advanced Training Systems, Inc. v. Caswell Equipment Co., Inc., Minn.1984, 352 N.W.2d 1, 42 A.L.R.4th 299.

**12.** The usual rule is that the stockholder cannot recover for the corporation's loss when the corporation is defamed, even though, indirectly, it is the stockholder who will suffer. But if the publication defames the stockholder and does *not* defame the corporation, loss of corporate business resulting from defamation of the stockholder may be recoverable. See Sisler v. Gannett Co., Inc., 1986, 104 N.J. 256, 516 A.2d 1083.

**Page 780**

**To original text, quoted below, add new note:**

In order that the defendant's words may be defamatory, they must be understood in a defamatory sense.[15.5]

**15.5** Funderburk v. Bechtel Power Corp., 1985, 103 Wash.2d 796, 698 P.2d 556 ("whore's nest" understood as reference to messy premises, not to "morals of the nurses" working there, hence no defamation).

**Page 783**

**51.** Subjective intent to refer to the plaintiff is not required if the statement is reasonably understood to be of and concerning the plaintiff, provided the fault re-

quired in defamation actions is established. New England Tractor-Trailer Training of Conn., Inc. v. Globe Newspaper, 1985, 395 Mass. 471, 480 N.E.2d 1005.

**New text following n. 56:**

Under some circumstances, at least, the Constitution itself may demand a clear reference to the plaintiff as a prerequisite to the defendant's liability.[56.5]

**56.5** Blatty v. New York Times Company, Cal. 1986, 42 Cal.3d 1033, 232 Cal.Rptr. 542, 728 P.2d 1177 (listing "bestsellers" except plaintiff's alleged bestseller did not sufficiently refer to the plaintiff under constitutional standards).

**Page 784**

**To original text, quoted below, add new note:**

. . . casting enough suspicion on the plaintiff to cause others to believe reasonably that the statement is probably applicable to the plaintiff.[56.10]

**56.10** See, McCullough v. Cities Service Company, Okl. 1984, 676 P.2d 833 (using the "intensity of suspicion test," holding that negative statements about doctors of osteopathy were not actionable by individual).

## § 112. Libel and Slander

**Page 789**

**47.** Great Coastal Express, Inc. v. Ellington, 1985, 230 Va. 142, 334 S.E.2d 846.

**51.** Great Coastal Express, Inc., v. Ellington, 1985, 230 Va. 132, 334 S.E.2d 846 (commercial bribery involves moral turpitude, a decision for court, not jury).

**Page 791**

**74.** Aronson v. Wiersma, 1985, 65 N.Y.2d 592, 493 N.Y.S.2d 1006, 483 N.E.2d 1138 (statements that she doesn't hand in her time sheets, is neglectful of her job, are no reflection on plaintiff as a writer or researcher).

**Page 795**

**29.** Saunders v. Vanpelt, Me.1985, 497 A.2d 1121.

**Page 796**

**38.** In the narrow situation involving a private plaintiff and non-First Amendment speech, presumed damages have been resurrected. Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 1985, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593. This could re-institute the debate, under state law, as to the application of the rules of "libel per se" or "libel per quod." See, Main Volume, note 36a. Cf. Great Coastal Express, Inc. v. Ellington, 1985, 230 Va. 142, 334 S.E.2d 846 (where defamatory statement does not make danger to reputation apparent, Times-Sullivan rules apply to require knowing or reckless falsehood).