UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------------- x

Louis Diaz, Gregory Korniloff and Jack Toal, on behalf of themselves and as representatives of the Class,

Plaintiffs,

vs.

NBC Universal, Inc.,

Defendant.

: Civil Action No. 08-CV-00401 (CM)
:
: *Electronically Filed*
:
:
:
: **AFFIDAVIT OF**
: **ANDREW J. THOMAS**
:
:

------------------------------------------------------- x

STATE OF CALIFORNIA      )
                         : ss.:
COUNTY OF LOS ANGELES)

    Andrew J. Thomas, being duly sworn, deposes and says:

    1.    I am an attorney licensed to practice before the courts of the State of California. My application to be appear before this Court pro hac vice was provisionally granted by the Court during the telephonic hearing on January 23, 2008.  I am a partner in the law firm of Davis Wright Tremaine LLP, counsel for defendant NBC Universal, Inc. ("Universal") in this action.

    2.    I submit this Affirmation (a) in support of Universal's motion, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Complaint of plaintiffs Louis Diaz, Gregory Korniloff and Jack Toal, and (b) in opposition to plaintiffs' request for injunctive relief set forth in their Application for Order to Show Cause, filed January 23, 2008.  This affidavit is submitted for the purpose of placing before the Court pleadings and other documents and information that the Court may judicially notice under Rule 201 of the Federal Rules of Evidence or that the Court otherwise properly may consider on a motion to dismiss, as well as in opposition to plaintiffs' injunction application.

3.      The Complaint in this action was filed on January 16, 2007, and served on Universal on January 23, 2008.  Annexed as Exhibit A is a true and correct copy of the Complaint in this action, including the exhibits thereto.

4.      Annexed as Exhibit B is a DVD containing a true and correct copy of the motion picture <u>American Gangster</u>.  Copies presented to the Court have a legend at the top that reads "For Litigation Purposes – Court Copy" and copies served on plaintiffs' counsel have a legend that reads "For Litigation Purposes – Service Copy."  All copies have a time counter at the bottom of the screen, and Universal has cited to scenes from the film in its brief by referring to these time codes.  Because plaintiffs' claims specifically refer to and arise from the film, it is deemed part of the Complaint, and may be considered by this Court on a motion to dismiss.  Universal also requests that the Court take judicial notice of the DVD under Federal Rule of Evidence 201(b) on the ground that its contents are capable of accurate and ready determination and are not subject to reasonable dispute.

5.      Annexed as Exhibit C is a DVD containing selected excerpts from the motion picture <u>American Gangster</u>, which show that the police officers who are portrayed throughout the film as being corrupt, who are depicted conducting a raid on the home of Frank Lucas, and who are shown being arrested at the end of the film as a result of cooperation by Frank Lucas with law enforcement, all are members of the Special Investigations Unit of the New York Police Department.  Again, copies presented to the Court have a legend at the top that reads "For Litigation Purposes – Court Copy" and copies served on plaintiffs' counsel have a legend that reads "For Litigation Purposes – Service Copy."  The Court may consider the DVD on a motion to dismiss, and may take judicial notice of its contents, for the reasons stated in the preceding paragraph.

6.      Annexed as Exhibit D is a true and correct copy of the copyright registration for the film American Gangster, which was obtained from the Internet web site of the United States Copyright Office, www.copyright.gov.  It identifies the author of American Gangster as Universal City Studios LLLP and identifies the copyright claimant as Universal City Studios Productions LLLP.

7.      Annexed as Exhibit E are true and correct copies of newspaper articles published in the New York Times during the years 1974-1976, which were obtained from the New York Times Company web site, www.nytimes.com, on January 28, 2008.  The articles report on investigations and prosecutions of New York Police Department narcotics officers, including Special Investigations Unit detectives, on various corruption charges.  For example, a February 20, 1974 article headlined "2 Officers Say Bribery Pervaded Narcotics Unit" reports that NYPD officers testified that "at least half of the detectives assigned to the elite unit charged with arresting major heroin dealers here were accepting large cash bribes between 1968 and 1971 …."  Another article, dated March 9, 1974, reports on the indictment of 12 members of the NYPD's "elite special investigating unit of the Narcotics Division" on charges of "stealing cash from narcotics dealers [and] reselling heroin they had seized in an arrest …."  A third article, dated November 23, 1974 and headlined "Three Former Elite Detectives Indicted in Shakedown Scheme," reports that three members of "the Police Department's Special Investigations Unit" were indicted in Brooklyn on charges that they "illegally took nearly $100,000" from narcotics-dealing suspects.  Universal requests that the Court take judicial notice of the statements in the attached articles under Federal Rule of Evidence 201(b).

8.      Annexed as Exhibit F are excerpts from the Knapp Commission Report on Police Corruption, issued August 3, 1972.  In the "Summary" section, the Knapp Commission reported

that police corruption was "widespread" and that in narcotics enforcement illegal pay-offs of police officers were "commonly received and could be staggering in amount." <u>See</u> Exhibit at p. 20. In the chapter titled "Narcotics," the Commission found that "[c]orruption in narcotics law enforcement has grown in recent years to the point where high-ranking police officials acknowledge it to be the most serious problem facing the Department." <u>See</u> Exhibit at p. 91. The Report concluded that both main units of the New York Police Department Narcotics Division – the field unit and the Special Investigations Unit – were "pervaded by corruption." Exhibit at pp. 93-94. Among the problems discussed in subsections of this Chapter are "extortion and bribe-taking," "stealing money and narcotics," and "possession and sale of narcotics." Exhibit at pp. 94-104. In Chapter 23, titled "The Criminal Justice System and Police Corruption," the Report states that during the period 1968-1972, 218 police defendants were prosecuted on corruption charges in Bronx, New York, Queens, Kings and Richmond Counties. <u>See</u> Exhibit at pp. 249-252. Universal requests that the Court take judicial notice of these portions of the Knapp Commission Report under Federal Rule of Evidence 201(b).

_____
Andrew J. Thomas

State of California
Country of Los Angeles

Subscribed and sworn to before me this 31st day of January, 2008,

by _ANDREW J. THOMAS_____,

proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature _Sabrina S. Scott_, NOTARY PUBLIC (Seal)



EXHIBIT A

Judge McMahon

08 CV 00401

## UNITED STATES DISTRICT COURT
### FOR THE
### SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

Louis Diaz, Gregory Korniloff and Jack Toal,
on behalf of themselves and as representatives
of the Class,

Civil Action No.08-CV-

                   Plaintiffs,

**CLASS ACTION COMPLAINT**

                v.

NBC Universal, Inc.,

**JURY TRIAL DEMANDED**

                 Defendant.

RECEIVED
JAN 16 2008
U.S.D.C. S.D. N.Y.
CASHIERS

-------------------------------------------------------x

### CLASS ACTION COMPLAINT

Louis Diaz, Gregory Korniloff and Jack Toal, on their own behalf, and as

representatives of the Class, Plaintiffs, by their attorneys, Dominic F. Amorosa and

Carey & Associates LLC, bring this civil class action against Defendant NBC

Universal, Inc. and respectfully allege the following upon information and belief:

### INTRODUCTION

1.    This class action involves a deliberate, callous and intentional defamation

and libel *per se* against hundreds of honest, decent and courageous agents of the

New York City Branch of the United States Drug Enforcement Administration,

also known as the New York City Drug Enforcement Agency ("**DEA**") by the

defendant, NBC Universal, Inc. ("**NBC Universal**") through its wholly owned movie studio, Universal Studios. The defamation was motivated by greed and financial gain. The defendant, NBC Universal, has refused to retract the defamation, and has offered false denials for its conduct. The defamation and libel are of the most egregious kind, adversely affecting the reputations for integrity and honesty of hundreds of DEA agents, who are the class members, and thereby damaging them in current trades and professions.

2.    The defamation involved the defendant NBC Universal, through its Universal Studios, falsely communicating, in writing, to millions of people in a motion picture called American Gangster that three quarters of New York City's DEA, from approximately 1973 through approximately 1985, were convicted criminals. With this utterly false and defamatory statement the defendant has ruined and impugned the reputations of these honest and courageous public servants in the eyes of millions of people who have already been exposed to this defamation and damaged them in their current trades and professions, and, if not stopped by an injunction, will further ruin and impugn their reputations in the eyes of millions more who are about to be exposed to the defamation, and will further damage them in their current trades and professions.

3.    Defendant NBC Universal, through its Universal Studios, produced, released and distributed American Gangster to the public. American Gangster purports to

represent the alleged narcotics' trafficking activities of Frank Lucas who in the early 1970's, up until his arrest on January 28, 1975 by New York City's DEA, was a major narcotics' trafficker in the New York City area. As a result of his narcotics' trafficking, Lucas became a target of New York City's DEA and the United States Attorney's Office for the Southern District of New York ("USAO"). After an intensive investigation, New York City's DEA, assisted by officers of the New York City Police Department ("NYPD"), arrested Lucas on January 28, 1975 at this house in Teaneck, New Jersey. At the time of his arrest Lucas' house was lawfully searched pursuant to warrant and $585,000 in currency was seized which had been derived from the sale of narcotics. Lucas was thereafter tried in September 1975 by the USAO, convicted and sentenced to 40 years' imprisonment. Subsequently, he cooperated with the USAO and with New York City's DEA and assisted in the apprehension and convictions of numerous other narcotics' traffickers. Lucas' cooperation, however, did not lead to the conviction of a single agent of New York City's DEA or member of the NYPD, or of any other law enforcement official in New York or elsewhere, ever.

4.    American Gangster, which asserts it is based on "a true story", represents the above events falsely. It asserts that one Richard Roberts, a former law enforcement official in Newark, New Jersey, was the individual primarily responsible, together with others working in his squad, for investigating,

- 3 -

apprehending and prosecuting Lucas. American Gangster represents that it was with Roberts that Lucas cooperated after his arrest in the investigation of other criminality. American Gangster represents the search of Lucas' house on January 28, 1975, actually conducted lawfully by New York City's DEA and NYPD officers, referred to above, in the most awful and corrupt manner during which Lucas' wife was assaulted, his dog shot in a vicious manner, and hundreds of thousands of dollars stolen by corrupt law enforcement officials. American Gangster falsely represents that Lucas cooperated with Roberts in causing the convictions of the corrupt law enforcement officials who searched his house on January 28, 1975. American Gangster falsely represents that Lucas not only cooperated with Roberts in investigating corrupt law enforcement officers, but, in a legend that appears at the end of the film, falsely states as a fact that this **"collaboration led to the convictions of three quarters of New York City's Drug Enforcement Agency."** This legend is false, defamatory and libelous *per se.* No such thing ever occurred. Not a single agent of New York City's DEA, or any other law enforcement officer, was convicted of anything based upon the so-called "collaboration" of Lucas and Roberts. Nor was a single agent of New York City's DEA or officer of the NYPD convicted in any case or investigation involving Frank Lucas whether based upon a collaboration of Lucas and Roberts or any other resource.

- 4 -

5.     This shockingly false legend was designed to give credence to the factual allegations of American Gangster, to validate American Gangster's claim that it was "based upon a true story", to induce critics to recommend it to the public, to induce the public to pay to view it, and to further induce the public to believe the events shockingly and falsely depicted (to the effect that corruption among law enforcement authorities investigating Lucas was rampant, and included the officers who searched his house, assaulted his wife, shot his dog and stole hundreds of thousands of dollars from him) were in fact true, when they were in fact untrue. Defendant's clever scheme, in essence a scheme to defraud the public at the expense of Special Agents of New York City's DEA, was in fact successful. Millions of people were induced to pay for viewing this film who would not have paid had they known the truth, that is, that the movie is riddled with falsity and that not a single Special Agent or employee of the New York City DEA, or officer of the NYPD, was convicted as a result of the so called "collaboration" of Lucas and Roberts. The whole premise of American Gangster would have been eviscerated if the truth were revealed, and the defendant would not have made the money it did make if the libel was not made.

6.     As a result of viewing American Gangster, millions of people now believe an awful falsity: that these law enforcement officials, DEA and NYPD officers, who searched Lucas' house, in addition to their colleagues, were brutally corrupt

- 5 -

and were convicted for this corruption as a result of the so called "collaboration" of Lucas and Roberts. Hundreds of honest and courageous DEA Special Agents who risked their lives on a daily basis on the streets of New York City in the 1970's and 1980's have been deliberately defamed, libeled and slandered in the eyes of millions, and damaged in their current trades and professions, by defendants in a reckless, ruthless and malicious effort to make hundreds of millions of dollars. An injunction barring further distribution of this motion picture with this false legend must issue to prevent further irreparable harm to these courageous and honest former and present public servants by preventing millions of others from viewing the lie that three quarters of them are convicted felons. Defendant must also be ordered to compensate Plaintiffs and the Plaintiff Class for the harm caused.

## CLASS ACTION ALLEGATIONS

7.     Plaintiffs sue on their own behalf and as representatives of the Class which is comprised of approximately 400 present and former Special Agents of the New York City DEA each of whom was employed at some time during the period from 1973 through 1985.

8.     The class is so numerous that joinder of all members is impracticable.

9.     There are questions of law and fact common to the class. The predominant questions of law and fact include, among others, whether:

(a) Defendant has libeled and defamed all of the Special Agents of New York City's DEA from 1973 through 1985 by its written publication as a fact in American Gangster that Lucas' and Roberts' "collaboration led to the convictions of three quarters of New York City's Drug Enforcement Agency".

(b) Defendant has intentionally or negligently inflicted severe emotional distress upon all members of the class by this false assertion.

(c) Class members have been damaged, the extent to which members of the Class have sustained damages, and what is the proper measure of those damages in excess of $5,000,000.

(d) Class members have suffered and continue to suffer irreparable harm as a result of the false legend published to the world in American Gangster and its refusal to retract the defamatory and false statement in American Gangster that three quarters of the class were convicted of crimes based upon the "collaboration" of Lucas and Roberts.

10.    Plaintiffs do not have any interests that are adverse or antagonistic to the class and are committed to the vigorous prosecution of this action and have retained competent counsel to proceed with the prosecution.

## JURISDICTION AND VENUE

11.    The Court has diversity jurisdiction of this class action pursuant to Title 28,

- 7 -

USC, Section 1332(d) since this is a class action and the matter in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, and is a class action in which a single member of the class is a citizen of a different state from that of the defendant.

12.     The Court, alternatively, has jurisdiction of the Plaintiffs' Complaint, independent of the Class action, pursuant to Title 28, USC, Section 1332(a), under its diversity jurisdiction as Plaintiffs are citizens of different states from defendant and the amount in controversy for the three individual Plaintiffs is in excess of $75,000 exclusive of interests and costs.

13.     Venue is proper in this District, pursuant to Title 28, USC Section 1391(a)(1) and (c), as defendant NBC Universal resides in New York, New York where its principal place of business is located, and pursuant to Section 1391(a)(2), as a substantial part of the events giving rise to the cause of action in this District, and as American Gangster was distributed to many thousands of people in this District.

**THE PARTIES**

14.     Defendant, NBC Universal, is a Delaware corporation with its principal place of business in New York, New York.

15.     Plaintiff Jack Toal is a former Special Agent of the New York City DEA,

having been employed in that position from 1969 to 1982. He is a resident of the State of Florida

16.    Plaintiff Gregory Korniloff is a former Special Agent of the New York City DEA, having been employed in that position from 1971 to 1978. He is a resident of the State of Nevada.

17.    Plaintiff Louis Diaz is a former Special Agent of the New York City DEA, having been employed in that position from 1975 to 1985. He is a resident of the State of California.

## DETAILED ALLEGATIONS

18.    Defendant NBC Universal is in the business, among other things, of producing, releasing and distributing motion pictures to the public throughout the world.

19.    On or about November 2, 2007, defendant NBC Universal released and distributed a motion picture to the public called American Gangster.

20.    American Gangster has been distributed and shown in movie theaters in every state in the United States, as well as in this District.

21.    American Gangster has been seen by millions of people and defendant is seeking to have it seen by millions more, including by means of DVD sales. It has grossed at least $127,000,000 in profits for the defendant, excluding profits made

- 9 -

through secondary businesses.

22.    American Gangster purports to represent the narcotics' trafficking activities of Frank Lucas. In the early 1970's, up until his arrest by New York City DEA agents and NYPD officers on January 28, 1975, Lucas was a major narcotics' trafficker in the New York City area.

23.    On January 28, 1975, Lucas was arrested at his home in Teaneck, New Jersey by New York City DEA agents and officers of the NYPD. At the time of his arrest, Lucas' house was searched pursuant to a valid search warrant and $585,000 in currency was seized. The search was carried out in an entirely legal manner. Gregory Korniloff, a Plaintiff herein and a representative of the Class, was the New York City DEA case agent on the Lucas investigation and was present during the search of Lucas' house, and participated in the arrest of Lucas.

24.    Lucas was prosecuted by the USAO in the SDNY, was tried in September 1975, and was sentenced to 40 years' imprisonment.

25.    At the time, there were media reports of the Lucas case, including the facts relating to the search of Lucas' house by New York City DEA and the NYPD.

26.    Following his conviction, Lucas began to cooperate with New York City DEA and with the USAO in the SDNY in their efforts to apprehend and prosecute other narcotics' traffickers. In this respect his cooperation was substantial.

27.    Lucas' cooperation did not lead to the conviction of a single agent of New York City's DEA, or of any other law enforcement officer, including officers employed with the New York City Special Investigations Unit.

28.    Not a single DEA agent or employee in New York or elsewhere was ever convicted of anything in connection with Lucas' narcotics activities.

29.    Defendant NBC Universal was aware of this, or recklessly ignored evidence of it, prior to releasing American Gangster to the public.

30.    American Gangster represents the search of Lucas' house in the most awful manner during which Lucas' wife was assaulted, his dog shot in a vicious manner and all his currency stolen by corrupt law enforcement officers identified as members of the New York City Special Investigations Unit.  All of these depictions are untrue.

31.    The New York Special Investigations Unit had nothing to do with the arrest and prosecution of Lucas, and not a single Officer of the Special Investigations Unit was convicted of anything as a result of Lucas' cooperation with anyone.

32.    American Gangster is riddled with other false representations with respect to corruption by law enforcement officials investigating Lucas.

33.    American Gangster falsely represents the role of one Richard Roberts, a then law enforcement officer in New Jersey, in the investigation, apprehension and

- 11 -

prosecution of Lucas.

34.    American Gangster falsely represents that Roberts and his squad were primarily responsible for Lucas' arrest and prosecution, whereas it was New York City's DEA and the USAO which were responsible for Lucas arrest and prosecution. Roberts was involved in a secondary prosecution of Lucas in New Jersey which followed Lucas' arrest and prosecution in the USAO.

35.    American Gangster represents that after Lucas' arrest, he cooperated with Roberts in the prosecution of corrupt law enforcement officers, including cooperation against the officers who were alleged to corruptly search Lucas' house. As noted, Lucas' house was lawfully searched.

36.    American Gangster falsely suggests that Lucas was a victim of a corrupt law enforcement system and leaves the impression that Lucas should be commended for his "collaboration" with Roberts in clearing up the corruption within New York City's DEA.

37.    At the very end of American Gangster, a written legend appears on the screen that was designed by defendant to emphasize the "truth" of the various allegations made in the film.

38.    The legend states that Roberts and Lucas' **"collaboration led to the convictions of three quarters of New York City's Drug Enforcement Agency"**.

- 12 -

39.    This representation is an utter and complete falsity. Roberts and Lucas' "collaboration" did not lead to the convictions of three quarters of the New York City's Drug Enforcement Agency.

40.    Roberts and Lucas' "collaboration" did not lead to the conviction of a single DEA agent or employee or of any other New York law enforcement official, including representatives of the Special Investigations Unit.

41.    The written legend at the end of American Gangster is false and defames Plaintiffs and the Plaintiff Class.

42.    On November 23, 2007, counsel for plaintiff Gregory Korniloff, wrote to the Universal Studios, owned by Defendant, demanding that the false legend be removed from further distribution of American Gangster. A copy of this letter is attached to this Complaint as Exhibit 1 and incorporated by reference herein.

43.    On December 7, 2007, David L. Burg, Senior Vice President of NBC Universal, wrote to Mr. Korniloff's counsel rejecting his demand. A copy of Mr. Burg's letter is attached here as Exhibit 2 and incorporated by reference herein.

44.    One of Mr. Burg's assertions in his letter of December 7, 2007 is that the "corrupt law enforcement officers portrayed in the film are specifically identified as members of the New York City Police Department, and the film refers to their subsequent prosecution by the federal government".

- 13 -

45.    This assertion, like the legend itself, is false.  There was not a single member of the New York City Police Department so prosecuted by the federal government or any other government.  Nor was there any Agency of the NYPD known as New York City's Drug Enforcement Agency, the agency alleged in the legend to have had three quarters of its members convicted.  The only entity known as New York City's Drug Enforcement Agency is DEA.

46.    Other than DEA, there has never been a New York City Drug Enforcement Agency, federal or state.  Nor has there ever been a DEA agent convicted of anything relating to the narcotics' activities of Lucas.

47.    Defendant has made millions of dollars in profits from distributing American Gangster after the retraction was demanded, further demonstrating its malice and willfulness in its original release.

48.    Before it published it to the world, Defendant was well aware that the legend was false or recklessly ignored evidence that it was false.

49.    A simple Google search of "New York City Drug Enforcement Agency" conducted on December 20, 2007 produced hundreds of thousands of hits.  The first hit was the address of DEA Headquarters in Manhattan.  Almost all of the first 100 hits identify this entity with the United States Drug Enforcement Administration, or DEA.

- 14 -

50.    New York City's Drug Enforcement Agency is identical in the minds of the public with New York City's DEA, and defendant was aware, or recklessly disregarded evidence of this, before it published the false legend.

51.    Millions of people who saw the film and read the legend came to believe that three quarters of New York City's DEA in this period were convicted for corruption.

52.    This false legend was designed in part to induce the public to purchase tickets to view American Gangster by giving the false appearance to the public, and to critics reviewing the film for the public, that American Gangster's representations of corrupt law enforcement activities with respect to Lucas were factual when they were not factual.

53.    The false legend was designed in part to validate the claim made in American Gangster that it was "based upon a true story".

54.    The false legend was also designed to induce the public to believe the events shockingly and falsely depicted in American Gangster (that corruption among law enforcement authorities investigating Lucas was rampant, and included the agents and officers who searched his house, assaulted his wife, shot his dog and stole hundreds of thousands of dollars from him) were in fact true, when they were not.

55.    People who have seen American Gangster have reported to others that it was

- 15 -

a good film and depicted the corruption of numerous members of New York City's DEA who were convicted as a result of the "collaboration" of Lucas with Richard Roberts.

56.    Defendant's deliberate scheme to falsify the facts, and to make the public believe the falsity, in order to have them pay to view the film, has been very successful. The false legend made money for defendant that it would not have made if the false legend were not published.

57.    Millions of people who have seen the film were induced to see it based in part upon the libel that Lucas and Roberts' "collaboration" led to the convictions of three quarters of New York City's DEA.

58.    Millions of viewers of this film now believe that the law enforcement authorities who in fact searched Lucas' house, who were honest and courageous New York City DEA Agents and officers of the NYPD, were brutally corrupt and were convicted for this corruption as a result of the so called "collaboration" of Lucas with Roberts.

59.    Hundreds of honest and courageous New York City DEA Agents who risked their lives on a daily basis on the streets of New York City in the 1970's have been deliberately defamed, libeled and slandered in the eyes of millions, and damaged in their current trades and professions, by the defendant in a reckless and ruthless and

- 16 -

malicious effort to make millions of dollars.

60.    Approximately 20 soldiers stationed in Iraq who saw the American Gangster

recently questioned a former Special Agent of New York City's DEA about the

legend after they saw the film.  The former New York City DEA agent is now also

stationed in Iraq and is a member of the Class.  This former New York City DEA

agent is on a leave of absence from his employment with the Suffolk County

Prosecutor's Office.  The soldiers all understood the legend to refer to convictions

of Special Agents of DEA, and asked the former agent of DEA how it came about

that three quarters of the New York City DEA were convicted criminals.  Although

the former New York City DEA agent told these solders the truth, that no such

thing had happened, he felt deeply hurt and embarrassed by the questions even

though he knew the legend was false.  Although he explained the truth to the

soldiers, his affidavit states that he could not "explain it to the millions of others

who have seen this lie and also believed it to be true."

61.    Some members of the Plaintiff Class are currently employed as private

investigators and defendant's false statement, asserted as fact, damages them in

their trade and profession.

62.    Many members of the Plaintiff Class have current employment and

defendant's false and defamatory legend in American Gangster not only harms

- 17 -

their reputations, but it also damages them in that employment.

## FIRST CAUSE OF ACTION
### LIBEL PER SE

63.    Paragraphs 1 through 62 of this Complaint are hereby incorporated by reference herein.

64.    The legend appearing at the end of American Gangster that Lucas and Roberts' "collaboration led to the convictions of three quarters of New York City's Drug Enforcement Agency" is false, untrue, defamatory and libelous per se and on its face.

65.    There can be no more harmful lie than to say that a law enforcement officer has been convicted of corruption.

66.    The false statement exposes Plaintiffs and the Plaintiff Class to hatred, contempt and ridicule because it falsely depicts them as convicted criminals when in actual fact they are honest and courageous former and current law enforcement officers.

67.    Many of the class members have active employment, including employment with the DEA and in other law enforcement agencies and security companies. Defendant's publication of this false, defamatory and libelous statement to the world has damaged them in this employment.

- 18 -

68.    Defendant caused the libelous statement to be published to the world knowingly and willfully as a fact either with knowledge of its falsity or with reckless disregard for its truth.

69.    Defendant refused Plaintiffs' demand that it retract the false statement from further release to the public.

70.    The defamatory statement was not privileged in any manner.

71.    The statement was intended to injure Plaintiffs and the Plaintiff Class in their reputations, character and businesses and in fact did so.

72.    As a direct and proximate cause of defendant's libel, Plaintiffs and the Plaintiff Class have been damaged in an amount to be determined at trial but in excess of $5,000,000 exclusive of interests and costs.

## SECOND CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

73.    All of the allegations of paragraphs 1 to 72 of this Complaint are hereby incorporated by reference herein.

74.    Defendant intentionally caused Plaintiffs and the Plaintiff Class humiliation, ridicule, and mental anguish, and its refusal to retract the false legend has aggravated the harm caused, as millions of many people have seen the film after a retraction was demanded and denied by defendant.

- 19 -

75.    The false statement in the legend and the entire film was meant to expose, and did in fact expose, Plaintiffs and the Plaintiff Class to humiliation, hatred, contempt and ridicule.

76.    As a direct and proximate cause of the false statement and publication, Plaintiffs and the Plaintiff Class have suffered damages in the form of severe emotional distress in an amount not less that $5,000,000.

### THIRD CAUSE OF ACTION
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

77.    All of the allegations of Paragraphs 1 to 76 of this Complaint are hereby incorporated by reference herein.

78.    Plaintiffs and the Plaintiff Class were owed a duty by Defendant to use reasonable care in writing and publishing to the world the motion picture, American Gangster, and the factual assertions made in it.

79.    It was foreseeable to Defendant that a false statement alleging that three quarters of Plaintiff Class were convicted felons would damage their reputations, defame them, and injure them in their employment.

80.    Defendant breached this duty of care by publishing as a fact the false statement that Lucas and Roberts' "collaboration led to the convictions of three quarters of New York City's Drug Enforcement Agency".

- 20 -

81.    Defendant knew or should have known that the legend was false in its

entirety and knew that the failure to exercise due care in publishing American

Gangster to the world would cause Plaintiffs and the Plaintiff Class severe

emotional distress and other injures.

82.    As a direct and proximate cause of this breach, Plaintiffs and the Plaintiff

Class have suffered damages in the form of severe emotional distress and mental

suffering in an amount not less than $5,000,000.

### FOURTH CAUSE OF ACTION
### INJUNCTION

83.    All of the allegations of Paragraphs 1 to 82 of this Complaint are hereby

incorporated by reference herein.

84.    Plaintiffs and the Plaintiff Class, and the public in general, have suffered and

will continue to suffer irreparable harm from the publication of the false legend.

85.    Plaintiffs and the Plaintiff Class have and will continue to suffer damage to

their reputations for honesty and good character and will suffer a diminution of, or

lose entirely, their ability to hold and find employment as present and former law

enforcement agents of the federal government.

86.    The defamation in American Gangster has undermined and will continue to

undermine the trust that the public has a right to repose in the government agents

whose job it is to protect them from the illicit narcotics trade and other criminal

activity.

87.    Plaintiffs and the Plaintiff Class will succeed on the merits of this action.

88.    The false legend contains a libel *per se* that is incontrovertibly false.

89.    NBC Universal was aware of the falsity of the false legend before it was first published or recklessly disregarded whether or not it was true.

90.    NBC Universal, having been advised of the falsity of the legend, nevertheless continued to publish it for profit.

91.    NBC Universal acted negligently.

92.    NBC Universal acted with malice.

93.    There is no adequate remedy at law.

94.    For the libel that has already occurred, the only effective remedy will be an order directing NBC Universal to advertise to the same extent and by the same means it advertised the movie and the false legend a retraction of the false legend and a statement to the effect that no member of the Plaintiff Class was ever found guilty of any criminal offense related to Frank Lucas or to the events depicted in American Gangster.

95.    To prevent NBC Universal from continuing to harm the Plaintiff Class in the future, the only effective remedy will be an order directing NBC Universal to

strike the false legend from every copy of American Gangster that is shown, or may be shown, in the future, by every means, worldwide, and to replace it with the legend described in the preceding paragraph.

## DEMAND FOR JUDGMENT

Therefore, Plaintiffs and the Plaintiff Class demand judgment against defendant for the following relief, plus costs:

    a.    Ordering a preliminary and permanent injunction enjoining and restraining defendant, and all its officers and agents, servants, and employees, and all those persons in active concert or participation with them form directly or indirectly using, distributing or showing American Gangster to anyone else with the false legend;

    b.    Ordering the defendant to recall each copy of American Gangster that contains the false legend;

    c.    Ordering that defendant immediately deliver up all signs, prints, packages, and advertisements in its possession or under its control bearing the false legend;

    d.    Ordering restitution of all moneys obtained directly or indirectly by defendant by means of this improper conduct;

e.    Ordering defendant to disgorge all its profits from American
      Gangster;

f.    Ordering defendant to publish in the same media outlets in
      which it defamed Plaintiffs and the Plaintiff Class the truth
      about the New York City DEA's role in the investigation, arrest
      and prosecution of Frank Lucas;

g.    With respect to each cause of action awarding compensatory
      damages in an amount to be determined at trial, but at least in
      an amount of $5,000,000 exclusive of interests and costs;

h.    With respect to the first and second cause of action awarding
      punitive damages of $50,000.000;

i.    Awarding prejudgment interest pursuant to Title 28, USC
      Section 1961(a);

j.    Awarding costs and attorneys' fees in an amount to be
      determined at trial;

- 24 -

k.     Awarding such other relief, legal or equitable, that the Court

deems proper and just.

Dated:  January 15, 2008

Respectfully submitted,


/s/ Dominic F. Amorosa
DOMINIC F. AMOROSA
521 Fifth Avenue, Suite 3300
New York, New York 10175-3399
212-406-7000
lawoffices@dfamorosa.com


CAREY AND ASSOCIATES LLC

By: /s/ Michael Q. Carey
     Michael Q. Carey
521 Fifth Avenue, Suite 3300
New York, New York 10175-3399
212-758-0076
mqc@careylitigation.com
Attorneys for Plaintiffs and the Class

- 25 -

1

DOMINIC F. AMOROSA
ATTORNEY AT LAW
95 WORTH STREET
NEW YORK, NEW YORK 10013

TEL (212) 406-7000

e-mail: lawoffices@dfamorosa.com

www.dfamorosa.com

FAX (212) 233-7805

November 23, 2007

Maren Christensen
Executive Vice President and General Counsel
Universal Studios
100 Universal City Plaza
Universal City, CA 91608

Dear Ms Christensen:

I am writing to demand that you retract and correct immediately
the false and defamatory statement published as fact to the world at
the end of *AMERICAN GANGSTER*, a product of Universal
Studios, that Frank Lucas and Richard Roberts' "collaboration led
to the convictions of _ of the New York City's Drug Enforcement
Agency". They were responsible for no such thing and in fact no
such thing ever occurred. This false statement impugns and
damages the reputations of hundreds of honest, decent and
courageous agents of the New York City Drug Enforcement
Administration ("DEA") who risked their lives daily on the streets

of New York in this period of time bringing to justice people like Frank Lucas and Nicky Barnes.   Further, it was DEA, together with the United States Attorney's Office for the Southern District of New York ("USAO"), which apprehended, prosecuted and tried Frank Lucas and his suppliers, and not Richard Roberts and some Essex County law enforcement organization, as is alleged in *AMERICAN GANGSTER*.   The New Jersey prosecution of Frank Lucas in which Roberts was involved took place over one year after Lucas was prosecuted in the Southern District of New York in September 1975 in which he was sentenced to 40 years' imprisonment.

It is far more than ironic for *AMERICAN GANGSTER* to deprive New York City's DEA and the USAO of credit for apprehending and prosecuting Lucas and his gang while at the same time smearing DEA agents with false allegations of corruption:  it is actionable, and it is actionable on behalf of a whole class of DEA agents.

I represent Gregory Korniloff, a former New York City DEA Agent.  Mr. Korniloff was the case agent for DEA on Lucas' federal case and personally participated in the search of Lucas' house conducted in January 1975 pursuant to a valid federal search warrant, and the arrest of Lucas on that same day.  During this search $585,000.00 in currency was seized, which was later physically introduced into evidence during Lucas' federal criminal trial in the Southern District of New York in September 1975. *AMERICAN GANGSTER* represents this search in the most awful and corrupt manner during which Lucas' wife was assaulted, his dog shot in a vicious manner and thousands of dollars stolen by corrupt law enforcement officers portraying Mr. Korniloff and his colleagues, including other DEA Agents and officers of the NYPD, who assisted him on that day.   It is irrelevant to your liability that you represent the corrupt officers to be associated with New York City's Special Investigations Unit. This organization was

2.

disbanded long before Lucas came on the scene as a major narcotics dealer in New York, and was in no way associated with the investigation of Lucas.   The public knows full well that it was Mr. Korniloff and his colleagues who searched Lucas' home and, as a result of false depiction made in *AMERICAN GANGSTER*, now believe it was they who engaged in these egregious acts. *AMERICAN GANGSTER*'S final, gratuitous, maliciously false statement, placed in writing on the screen at the end of the movie for "truthful" emphasis, that Roberts and Lucas' "collaboration led to the convictions of _ of New York City's Drug Enforcement Agency", demonstrates that this libel of Mr. Korniloff and his colleagues was exactly what you intended.   While you may have the right to dramatize actual events, this right does not extend to destroying the reputations of honest and courageous public servants by deliberately misrepresenting the facts.

Moreover, apart from defamation, *AMERICAN GANGSTER* falsely attributes to Roberts and New Jersey law enforcement authorities admirable acts and conduct that were engaged in not by them, but by DEA agents.   As noted, it was not Roberts or his "unit" which arrested Lucas in January 1975; it was DEA.   It was not Roberts who first prosecuted Lucas; it was the USAO in the SDNY in September 1975.   I have personal knowledge of these facts as I personally led the federal prosecution of Lucas and his 18 co-defendants in September 1975.   After his 40-year sentence was imposed it was not Roberts with whom Lucas cooperated. It was with the USAO and DEA.   And, most importantly, Lucas' cooperation had nothing to do with incriminating law enforcement officials and certainly not members of the Special Investigations Unit.   Lucas' cooperation, which admittedly was substantial, was aimed at other narcotics dealers, not law enforcement officers.

*AMERICAN GANGSTER* is riddled with false information.   Its depiction of heroin being supplied to Lucas from Southeast Asia by means of the coffins of dead GI's is also false.   No such thing

3

happened.  If you had labeled your movie as fiction, it would have been one thing.  But to claim it is based upon fact, as you do, is quite another.  It is certainly no defense for you to assert that Lucas told you these events occurred, which I understand he has been doing of late.   For even the most cursory investigation would have established that such a false assertion was made to increase the likelihood that his "story" would be purchased by you.  Of course you already know this.  The same applies to Lucas' assertion that millions and millions of dollars in currency were stolen from his house during the search. This too was easily proven to be false.  When I debriefed Lucas following his decision to cooperate, he told me that he had no idea how much money he had at his house, that it was a week or a weekend's receipts from his narcotics business and that $585,000 sounded right.   This is documented throughout his case for anyone who really wanted to know it.

*AMERICAN GANGSTER'S* false depiction of actual events and its attribution to others of courageous acts engaged in by DEA agents deprive these individuals of their property rights.  You have profited enormously based on these false and defamatory statements at the expense of the individuals who actually were responsible for apprehending Lucas and his gang at great risk to their lives.

Please contact me at your earliest convenience.   However, I suggest you immediately cause the false statement at the end of the film to be removed from further distribution.

Sincerely,


Dominic F. Amorosa

4

cc:    Richard Cotton
       Executive Vice President and General Counsel
       NBC Universal


       Jeff Zucher
       President and CEO
       NBC Universal

2

12/28/2007  11:03   21223378055                                           PAGE  62



**NBC UNIVERSAL**

DAVID L BURG
Senior Vice President, Litigation

100 Universal City Plaza  Building 1280-6
Universal City, CA 91608
tel 818-777-1858
fax 818-866-2166
david.burg@nbcuni.com

December 7, 2007

VIA EMAIL:  lawoffices@dfamorosa.com
AND FIRST CLASS MAIL

Dominic F. Amorosa, Esq.
95 Worth Street
New York, New York  10013

Re:    *American Gangster*

Dear Mr. Amorosa:

Your letter to Maren Christensen of November 23, 2007 has been forwarded to me for response.

We have carefully reviewed your letter and do not believe anything in *American Gangster* -- including the end card legend you mentioned -- can reasonably be construed to defame or otherwise harm your client, Gregory Korniloff, or other former agents of the federal Drug Enforcement Administration. As you noted, the legend refers to "New York City's Drug Enforcement Agency" rather than the federal DEA. Indeed, the film -- which is a fictionalized work based on actual events -- does not address the federal prosecution of Mr. Lucas in which you and Mr. Korniloff apparently participated. Rather, the film dramatizes the prosecution of Mr. Lucas by the State of New Jersey and focuses exclusively on the activities of municipal and state law enforcement personnel. Moreover, the corrupt law enforcement officers portrayed in the film are specifically identified as members of the New York City Police Department, and the film refers to their subsequent prosecution by the federal government. The film in no way charges or even insinuates wrongdoing on the part of the federal Drug Enforcement Administration. Thus, we must respectfully deny the claim of your client and other former federal DEA agents.

Dominic F. Amorosa, Esq.
December 7, 2007
Page 2

     Please address any additional communication concerning this matter to me, and understand that Universal reserves all of its rights, remedies, and defenses.  Thank you.

Very truly yours,

David L. Burg
Senior Vice President, Litigation

UNITED STATES DISTRICT COURT

FOR THE

SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------x
Louis Diaz, Gregory Korniloff, and  :
Jack Toal, on their own behalf and  :
as representatives of the Class,    :
                                    :    Civil Action No. 08-cv-
          Plaintiffs,               :
                                    :
          v.                        :
                                    :
NBC Universal, Inc.                 :
                                    :
          Defendant.                :
-----------------------------------x
```

## CLASS ACTION COMPLAINT

DOMINIC F. AMOROSA
521 Fifth Avenue, Suite 3300
New York, New York 10175-3399
212-406-7000
lawoffices@dfamorosa.com

CAREY AND ASSOCIATES LLC
Michael Q. Carey
521 Fifth Avenue, Suite 3300
New York, New York 10175-3399
212-758-0076
mqc@careylitigation.com

Attorneys for Plaintiffs and the Class

EXHIBIT B



EXHIBIT C



EXHIBIT D



# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = American Gangster
Search Results: Displaying 1 of 11 entries

[◀ previous]   [next ▶]



### *AMERICAN GANGSTER.*

|  |  |
|---|---|
| **Type of Work:** | Motion Picture |
| **Registration Number / Date:** | PA0001589020 / 2007-10-31 |
| **Application Title:** | AMERICAN GANGSTER. |
| **Title:** | AMERICAN GANGSTER. |
| **Description:** | 7 film reels ; 35mm. |
| **Copyright Claimant:** | Universal City Studios Productions LLLP, Transfer: By written agreement.. Address: 100 Universal City Plaza, Universal City, California |
| **Date of Creation:** | 2006 |
| **Date of Publication:** | October 26, 2007 |
| **Nation of First Publication:** | United States |
| **Authorship on Application:** | Universal City Studios LLLP, employer for hire; Citizenship: United States. Authorship: Entire work except as noted. |
| **Preregistered as:** | PRE000000848 |
| **Pre-existing Material:** | Previously published music used with permission. |
| **Basis of Claim:** | All other cinematographic material. |
| **Names:** | Scott, Ridley<br>Universal City Studios Productions LLLP<br>Universal City Studios LLLP |

[◀ previous]   [next ▶]



| Save, Print and Email (Help Page) |
|---|
| Select Download Format  Full Record  ·   [ Format for Print/Save ] |

EXHIBIT E

# U.S. Looking Into Heroin Bribery Here; Some Officials Are Said to Be Implicated

### Judges, Prosecutors and Police Held Involved

By DAVID BURNHAM

A Federal investigation into bribery by New York heroin dealers has been under way for 14 months and is expected to lead to the indictment of key police officers and possibly officials in other areas of law enforcement, according to sources in the office of the Federal prosecutor and the Police Department.

The sources said the secret investigation had developed information indicating the involvement of policemen, some local prosecutors, lawyers, judges and court functionaries in patterns of corruption far more extensive and serious than emerged during the Knapp Commission hearings in the fall of 1971.

The investigation of the alleged corruption in many aspects of the official effort to curb the heroin traffic is continuing. It was reported to have begun more than a year ago



The New York Times
**Whitney North Seymour Jr. is heading the inquiry.**

with the assignment of an undercover agent to the élite unit that is supposed to arrest major dealers.

The undercover agent, whose family recently was moved to a new home in an unidentified area for protection against possible retaliation and who is himself under constant Federal protection, was an experienced

### Special Secret Agent in 14-Month Investigation

detective who served in the Narcotics Division from 1964 until 1970 before being reassigned to the division's Special Investigating Unit (S.I.U.) in April, 1971.

The reassignment of the undercover man, Robert L. Leuci, a 32-year-old second-grade detective, into the S.I.U. has been confirmed through an examination of Police Department records.

For more than a year, wearing a tiny radio transmitter in his belt and driving a tan two-door Pontiac equipped with an elaborate system of hidden microphones, Detective Leuci has been collecting evidence for a special investigating team established in the early spring of 1971 by United States Attorney Whitney North Seymour Jr.

One police official, who refused to comment directly,

**Continued on Page 48, Column 1**

The New York Times
Published: June 15, 1972
Copyright © The New York Times

9

# U.S. Looking Into Heroin Bribery Here;

## Judges and Prosecutors Are Said to Be Implicated



The New York Times

Sydney C. Cooper, left, commander in charge of anti-corruption efforts, and Nicholas Scoppetta, formerly with Knapp Commission, now with Federal prosecutor.

Continued From Page 1, Col. 3

used, sign language when asked what level the investigation had reached. Hand above his head, he pointed straight up toward the ceiling.

Other officials said the investigation illustrated the extreme difficulty of combating corruption in a vastly lucrative business such as heroin-dealing and raised questions about the efficacy of some of the reforms introduced in recent months by Police Commissioner Patrick V. Murphy.

Though ties have been found between gamblers and the police and other elements of law enforcement in many large American cities, this investigation appears to be one of the first that has found such links with heroin dealers.

It was this investigation, officials said, that former Deputy Police Commissioner Robert Daley was referring to when he said a detective specializing in major narcotics cases "had been questioned by prosecutors" just before he committed suicide last March 27.

### Special Assistance

The Federal team, which is reported to have included four other assistant United States attorneys and an unknown number of special investigators, was assisted in part by a confidential 18-man unit that was announced by Police Commissioner Murphy on March 8.

The purpose of this unit, Mr. Murphy said in a cryptic press release, was to follow up on leads of the Knapp Commission "as well as related leads" provided by Mr. Seymour.

The special 18-man police

### Found Dead in Car

The detective, Joseph Nunziatta, had been assigned to the Joint New York Narcotics Task Force—a Federal-local group—at the time he was found dead in his unmarked car in the Greenpoint section of Brooklyn.

More than two years ago, in an article on police corruption here, The New York Times quoted a detective with many years of experience in narcotics enforcement as saying that one of his fellow detectives had arranged payoffs to the police of up to $50,000 in return for such favors as the destruction of evidence gathered in wiretaps. "In April, 1971, at the beginning of a series of hearings on narcotics enforcement in New York, Joseph Fisch, chief counsel of the State Commission of Investigation, said police corruption was one reason the Police Department's war against heroin was "a failure, a monumental waste of manpower and money."

The current Federal investigation has been directed by Nicholas Scoppetta, a former assistant district attorney here who was on the staff of the Knapp Commission, and Edward M. Shaw, the executive assistant United States attorney in Mr. Seymour's office.

After a long conversation, Sergeant Durk and Detective Leuci went to the office of Irving Seidman, then the Brooklyn assistant district attorney in charge of the Rackets Bureau.

Mr. Seidman, now in private practice, has confirmed the report of the meeting with the two men, but said he could not recall the details of what was said other than that their com-

group, working out of an unmarked office on the sixth floor of a downtown building, is commanded by Sydney C. Cooper, previously in charge of all Police Department anticorruption efforts as the commander of the Internal Affairs Division.

The first act in the immediate chain of events leading to the investigation, one of the most extensive of its kind ever undertaken by a Federal prosecutor, took place in October, 1970, when Detective Leuci met Sgt. David Durk, also of the New York police, in the hallway of the Brooklyn District Attorney's office.

### Special Assignment

Detective Leuci then was on special assignment with the office of the Brooklyn prosecutor. Sergeant Durk was one of several policemen who by then had been publicly identified as assisting The Times in the preparation of a long article charging widespread corruption in the Police Department and the failure of high officials in both the department and the Lindsay administration to act on specific acts of corruption when these were brought to their attention.

plaint did not directly involve Brooklyn.

During the same period—October, 1970—the two policemen talked with Kenneth Conboy, an assistant district attorney in the office of the Manhattan District Attorney, Frank S. Hogan, and Mr. Fisch, the chief counsel of the State Commission of Investigation.

### No Follow-Up

For reasons that still remain obscure, neither the office of the Manhattan prosecutor nor the state group chose to follow up on their initial conversations with Detective Leuci.

Detective Leuci and Sergeant Durk, however, also held a series of meetings with Michael F. Armstrong, chief counsel of the Knapp panel; Paul Rooney, another former assistant United States attorney, and Mr. Scoppetta, who moved from the Knapp Commission to the Federal prosecutor's office last September.

Though neither Mr. Armstrong nor Mr. Knapp will discuss their dealings with Detective Leuci, a number of other commission sources report that they decided his information was so extensive and important that it was beyond the capability of their staff to handle. They decided to give the investigation to a permanent organization.

Early last year, Detective Leuci agreed to become an undercover agent for the Federal investigators and in April of that year, with the knowledge of Commissioner Murphy, he was assigned to the Special

The New York Times
Published: June 15, 1972
Copyright © The New York Times

Investigating Unit of the department's Narcotics Division.

None of those who took part in the conversations between Sergeant Durk and Detective Leuci and the various county, state and Federal officials are willing at this time to disclose exactly what allegations were made. Neither are any of these officials now willing to disclose the identity of those who have been implicated by Detective Leuci during his year as an undercover agent.

One indication of the kind of material that informants report will emerge from the investigation came on May 30, 1970, when Sergeant Durk, in a television interview, accused the Special Investigating Unit of failing to move against a major heroin operation centered on Pleasant Avenue in East Harlem after the S.I.U. had been given specific intelligence about the operation.

Sergeant Durk also said, in the TV interview, that he had been told that the heroin dealers involved had given policemen "many thousands of dollars" to learn how much they knew about the dealers' operations.

The sergeant said he first gave the information to Investigation Commissioner Robert K. Ruskin. Mr. Ruskin immediately got in touch with Howard R. Leary, who was then the Police Commissioner, who in turn informed Thomas C. Renaghan, the assistant chief inspector then in command of the Narcotics Division.

A meeting was arranged between Capt. Daniel E. Tange, commander of the Special Investigating Unit, and Sergeant Durk—a meeting that took place in the office of Commissioner Ruskin and in the Commissioner's presence. Captain Tange now is serving in Brooklyn.

"I gave the Special Investigating Unit specific, concrete evidence about a multi-kilo-a-week operation," Sergeant Durk said during the 1971 interview. "No arrests were ever made, no action was ever taken by the Police Department. I understand the case was closed."

Sergeant Durk has repeatedly refused to discuss any aspects of the current investigation.

Detective Leuci was a member of the Special Investigating Unit under Captain Tange when the events described by Sergeant Durk took place.

Though few details could be obtained about Detective Leuci's targets during the last year, the Federal undercover agent reportedly disclosed his activities to several acquaintances in the Narcotics Division last week.

According to one account of what he told his fellow policemen, the detective said he had made cases against "judges, bondsmen, lawyers and D.A.'s and a few cops." The policemen he named in the conversation, it was said, included several commanders.

The New York Times
Published: June 15, 1972
Copyright © The New York Times

# 2 Officers Say Bribery Pervaded Narcotics Unit

### By DAVID BURNHAM

Two New York police officers have given evidence showing that at least half of the detectives assigned to the élite unit charged with arresting major heroin dealers here were accepting large cash bribes between 1968 and 1971, law enforcement sources said yesterday.

The two officers, one a ranking commander, reportedly have been assisting the office of Deputy Attorney General Maurice H. Nadjari in an intensive investigation of the special investigating unit, which began with the discovery in late 1972 of the theft of millions of dollars worth of heroin and cocaine from the police property clerk's office.

### Two Allegedly Implicated

According to sources in the office of Mr. Nadjari, however, the two officers have provided leads and other information that strongly indicate a pattern of corruption far more pervasive than a single conspiracy to smuggle narcotics out of the department for resale on the streets of the city.

The two officers reportedly agreed to testify about the bribery within the investigating unit after they had been implicated in some of the schemes, according to sources in the office of Mr. Nadjari.

The investigation centers on at least a half dozen detectives the testimony has linked to alleged bribes of as much as $50,000, the sources said.

The bribes reportedly were paid by heroin dealers for such favors as avoiding arrest, the shading of critical testimony before grand juries and during trials, and for information about secret wiretaps.

One of the officers reportedly cooperating with a special grand jury empaneled by Mr. Nadjari in Manhattan is Lieut. Julia Tucker, whose transfer last year from the position as head of the sex-crime analysis squad prompted protests by

Continued on Page 20, Column 1

**The New York Times**
Published: February 20, 1974
Copyright © The New York Times

# 2 POLICEMEN LINK BRIBES TO HEROIN

## Continued From Page 1, Col. 3

several feminist organizations.

Lieutenant Tucker, who served with the narcotics division's special investigating unit from February, 1967, to November, 1969, was said to have already testified before the special grand jury several times.

At the time Lieutenant Tucker was removed as the head of the Sex-crime unit last November, former Police Commissioner Donald F. Cawley said the reassignment was a move that would prepare her for future promotion.

During the period in question, the special investigating unit had a peak strength of about 70 officers including six sergeants, a lieutenant and a captain. The unit's stated mission was to gather evidence against and arrest major heroin dealers.

Last week, the second in command of the unit during the years in question Lieut. John Egan, was indicted for perjury by the grand jury investigating the theft of the 398 pounds of heroin and cocaine, much of which was initially seized during the so-called "French Connection" case.

The specific charge against Lieutenant Egan was his denial to the grand jury that he knew anything about the payment of a bribe of $5,000 to $15,000 by a major heroin dealer for information about the wiretap that had been placed on the dealer's home.

The indictment also said the grand jury was investigating whether "the bribe in relation to the wiretap was the first in a series of bribes which ultimately effectuated the illegal removal of narcotics from the New York City Police Department Property Clerk's office."

A number of other officers associated with the investigating unit also have been implicated during the last year or two. Detective Joseph N. Nunziata apparently committed suicide in March, 1972, after being told he was under investigation by Federal authorities. Richard Bell, another former detective, on Nov. 8, 1973, was sentenced to 18 years in prison for burglary, criminal possession of dangerous drugs and attempted grand larceny.

Vincent Albano, also a former detective in the investigating unit, was forced out of the department in 1971 after he refused to answer questions before a grand jury investigating why he was shot six times as he left a Bronx grand jury with the court minutes of a heroin dealer named Salvatore Tommasetti.

The New York Times
Published: February 20, 1974
Copyright © The New York Times

# 12 in Police Narcotic Unit Charged With Corruption

## By PAUL L. MONTGOMERY

Twelve present and former members of the Police Department, including two lieutenants, were indicted yesterday on Federal charges of stealing cash from narcotics dealers, reselling heroin they had seized in an arrest and offering bribes to fellow officers to hinder prosecution of drug traffickers.

All 12 men were assigned to the élite special investigating unit of the Narcotics Division from December, 1969, to November, 1970, when the incidents detailed in five separate indictments occurred. The defendants, most of whom were arrested yesterday, allegedly realized a total of $434,100 from corrupt practices during the five cases.

The five indictments covered five different cases, none of which involved all the defendants at the same time. The Federal officials said the cases were "overlapping," but they did not necessarily indicate that the 12 defendants operated as a ring.

The indictments, handed up by Federal grand juries in in Brooklyn and Manhattan, were announced yesterday at a joint news conference by Edward J. Boyd 5th, Acting United States Attorney for the Eastern District of New York; Rudolph W. Giuliani, assistant United States attorney for the Southern District, and John W. Fallon, regional director of the Federal Drug Enforcement Administration.

The city's Police Commissioner Michael J. Codd, also attended the conference at the Federal drug unit's office, 555 West 57th Street. The Federal officials said policemen from the first deputy commissioner's office had participated in the in-

Continued on Page 23, Column 3

The New York Times

Published: March 9, 1974
Copyright © The New York Times

# 12 in Police Narcotic Unit Here Indicted on Corruption Charges

Continued From Page 1, Col. 4

vestigation and had been "invaluable."

"The indictments show I will not stand for any corruption," Commissioner Codd said. "I will cooperate with any agency to make certain we eradicate corruption."

Eight of the 12 men indicted were still on the force yesterday, and were immediately suspended. Commissioner Codd said seven had various detective assignments while the other, Lieut. Gabriel Stefania, was still assigned to the Narcotics Division.

The special investigating unit to which the men belonged, numbering 73 persons at its peak in 1970, was charged with gathering evidence against major narcotics dealers above the level of street dealers. The unit is under investigation by a number of agencies, including the office of the special prosecutor, Maurice H. Nadjari.

Mr. Nadjari's office has focused on the unit in connection with its investigation of the theft of 398 pounds of heroin from the Police Department property clerk sometime before 1972. Most of the narcotics were seized in 1962 in what became known as the "French Connection" case.

The Federal officials yesterday declined to speculate about any connection between their the Taft Hotel and divided $40,000 in cash that the men had.

¶On May 11, 1970, a number of South American men alleged to be drug traffickers, including Luis Torres and Wladimir Bandera of Chile, were arrested at Kennedy International Airport and on East 55th Street. Six of the defendants allegedly took $235,000 in cash from the men and divided it.

¶On April 14, 1970, two of the defendants arrested a narcotics ring including Yolanda Sarmiento and Emilio Diaz Gonzalez at 210 West 19th Street and seized 100 kilograms —220 pounds—of heroin and cocaine. The officers allegedly took $1,200 in cash and five kilograms of narcotics for resale. The alleged intermediaries in the transaction—Frank Ramos, Demetrios Papadakis, Elisa Possas and Joaquin Nieves, all civilians—were also indicted yesterday. After the arrest, Miss Sarmiento jumped $100,000 bail and fled to Argentina, and Mr. Diaz escaped from the Federal House of Detention on West Street and is still at large.

¶On Nov. 19, 1970, five of the defendants arrested Nicodemus Olate and Justo Quintanilla in a Queens apartment and stole $80,000 in cash.

## Bribery Alleged

In addition, the defendants were alleged to have offered fellow officers bribes of as

cases and the Nadjari investigation. They said the offices were "cooperating."

However, one man mentioned in an indictment yesterday, but not named as a defendant, was Detective Joseph N. Nunziata. He was found dead in March, 1972, allegedly a suicide, after being called in another Federal investigation. It was subsequently found that the detective's signature had been forged on withdrawal slips for the 398 pounds of stolen drugs.

Another man indicted yesterday, Lieut. John J. Egan, now retired, also was indicted last month on a perjury charge stemming from Mr. Nadjari's investigation. The lieutenant was charged in connection with an alleged bribe from Vincent Papa, a suspected narcotics dealer, who Mr. Nadjari's investigators say bought some of the stolen "French Connection" heroin.

These were the cases:

¶On Dec. 6, 1969, five of the defendants arrested four drug dealers — Sergio Fernandez, Jorge Petit, Juan Bonfante and a man identified as Mesias —at the McAlpin Hotel and seized 25 kilograms — about 55 pounds — of heroin. The indictment alleges that the officers took $20,000 from the dealers' safe-deposit box in the hotel and $3,900 from another location and divided the money.

¶On March 31, 1970, three of the defendants arrested Alberto Diaz and Raeul LaGuzman, suspected traffickers, at

much as $150,000 to hinder prosecution of narcotics dealers whom they had arrested.

The officials refused to say whether the police or Federal officials had initiated the investigation that led to the indictments. "I don't think it would be fruitful to comment on that," Commissioner Codd said.

Those indicted yesterday were identified as:

Lieutenant John J. Egan, retired, 63 years old, Smith Court, Monsey, N.Y.
Lieut. Gabriel Stefania, 80-42 263d Street Floral Park, Queens.
Sgt. Desmond Donegan, 51, 819 Bay Ridge Avenue, Brooklyn.
Sgt. James O'Brien, 43, 53 Marshall Avenue, Floral Park, L.I.
Detective John McClean, 521B 136th Street, Belle Harbor, Queens.
Detective Joseph Novoa, 1738 East 33d Street, Brooklyn.
Detective Ramon Viera, retired, 64 Stockbridge Road, Yonkers.
Detective Carl Aguiluz, 2 Janet Lane, Commack, L.I.
Detective Peter Daly, retired, 1150 55th Street, Brooklyn.
Detective Charles Worster, retired, 9 Harkin Lane, Hicksville, L.I.
Detective Leslie Wolff, 67-49 Fleet Street, Forest Hills, Queens.
Police Officer Edward Codelia, 15 West Walnut Street, Islip, L.I.

The Federal charges were brought under a statute that makes importing narcotics, or "the facilitation of transportation, concealment and sale of narcotic drugs" a Federal crime.

Arraignment of the 12 men was set for March 18 in the Federal District Courts in Brooklyn and Manhattan. After his arrest, Mr. Egan was released without bail yesterday by Magistrate Charles J. Hartenstine when his lawyer complained that the proposed $25,000 bond was "outrageous."

The New York Times
Published: March 9, 1974
Copyright © The New York Times

# 4 Officers Are Accused of Heroin Bribe

**By DAVID BURNHAM**

Capt. Daniel Tange, for almost two years the commander of the Police Department unit assigned to arresting major heroin dealers, was accused yesterday of sharing a bribe of at least $10,000 in return for helping three dealers go free.

The accusation against Captain Tange, once considered one of the most promising young commanders in the department, was made in an indictment of a sergeant and three detectives who had worked under the official when he led the special investigating unit of the Narcotics Division.

In announcing the indictment yesterday, which listed Captain Tange as a co-conspirator, Maurice H. Nadjari, the state's anticorruption prosecutor, said the former commander was now cooperating in an ongoing investigation of corruption in narcotics enforcement in New York City.

Yesterday's announcement means that 16 detectives—more than 20 per cent of the 72 men assigned to the investigating unit during 1969 and 1970—have already been indicted. Mr. Nadjari said further indictments were expected.

Mr. Nadjari, at a news conference attended by Police Commissioner Michael J. Codd, said the indictment of the sergeant and three detectives brought him a "good deal closer" to solving the theft of 398 pounds of heroin and cocaine stolen from the Police Department Property Clerk's office. Part of the stolen narcotics originally was seized in the case upon which the film "The French Connection" was roughly based.

According to the indictments announced yesterday, Captain Tange, the sergeant and the three detectives were all members of a unit which in June of 1969 placed an illegal wiretap on a residence in Queens.

"After unlawfully hearing telephonic communications concerning narcotics, three people were seized as they consummated an illegal sale of a quantity of narcotics on the street," Mr. Nadjari said.

Commissioner Codd said that 8.8 pounds of heroin worth approximately $400,000 on the

Continued on Page 39, Column 4

## NEWS INDEX

| | Page | | Page |
|---|---|---|---|
| About New York | 17 | Movies | 17-23 |
| Art | 18-19 | Music | 17-23 |
| Books | 31 | Obituaries | 36 |
| Bridge | 30 | Op-Ed | 33 |
| Business | 42-51 | Society | 41 |
| Crossword | 31 | Sports | 24-27, 30 |
| Editorials | 32 | Theaters | 17-23 |
| Family/Style | 40 | Transportation | 65 |
| Financial | 42-51 | TV and Radio | 67 |
| Going Out Guide | 18 | U. N. Proceedings | 12 |
| Man in the News | 39 | Weather | 65 |

News Summary and Index, Page 35

The New York Times
Published: March 15, 1974
Copyright © The New York Times



The New York Times

Detective Sgt. John Hourigan, left, and, reading to right: Detectives James Canavan, Maximo Jiminez and Dominick Butera leaving First Precinct station house yesterday.

# 4 POLICE ACCUSED OF A HEROIN BRIBE

Continued From Page 1, Col. 7

street had been confiscated.

Mr. Nadjari said that, according to the evidence presented to the grand jury, the four defendants, Captain Tange and other unnamed persons then agreed to secretly release one of the three persons who had been arrested in return for "a sum of money."

A further bribe was then solicited, he said, so that the case would be "resolved" and so that the two other arrested dealers "would go free" following a pretrial hearing on a motion that the seizure had not been legal.

# A POLICE CAPTAIN TELLS OF BRIBERY

## Testifies on the Retirement of Indicted Detective

By JOHN T. McQUISTON

Police Capt. Daniel Tange, for almost two years the commander of an élite 73-man unit assigned to arresting major heroin dealers, testified yesterday as a witness at a departmental hearing for Detective John F. McClean, charged with accepting bribes to hinder the prosecution of narcotics dealers.

Captain Tange, who appeared with representatives from the office of Maurice H. Nadjari, the special state prosecutor, told of sharing a $1,000 bribe with Detective McClean in June or July, 1969, when Captain Tange was head of the special narcotics investigating unit.

Captain Tange also told of receiving graft payments from several members of his unit and how he later became an informer against the men for both Federal and state prosecutors.

Detective McClean is among more than 30 members of the former unit indicted for allegedly extorting more than $500,000 from drug dealers.

### Filed for Retirement

Under suspension since his Federal indictment last March, he filed for retirement last month. However, under the Police Department's rules, any outstanding charges against him must be resolved within 30 days.

Captain Tange's testimony yesterday was an apparent effort by the department to resolve the McClean case. Captain Tange told the hearing officers that he paid the $1,000 to Detective McClean at a meeting in The Pub, a bar and grill in Kew Gardens, Queens.

"I requested to be included in any illegal money," Captain Tange said, then added that Detective McClean replied he would include him as "an equal partner."

Detective McClean's attorney, Albert Brackley, charged that Captain Tange was "framing" his client because he had been caught himself and had "made a deal" for immunity and a pension.

Through cross-examination, Captain McClean disclosed that he has remained on the Police Department roster while serving as an informant for the office of Mr. Nadjari. He earns more than $27,000 a year, and having been granted immunity by Mr. Nadjari, remains eligible to retire in four more years on a pension at half pay.

"I have no guarantee of a pension," he told the hearing officers. However, he added that "there have been discussions about it."

The case is expected to resume today before the departmental Trial Commissioner, Philip Michael.

Captain Tange was listed as a co-conspirator in charges filled last March by Mr. Nadjari's office against four police officers. Captain Tange was accused of sharing a bribe of at least $10,000 in return for helping three dealers go free.

At the time, Mr. Nadjari announced that Captain Tange was cooperating in an ongoing investigation of corruption in narcotics enforcement in New York City. Mr. Nadjari said the indictment had brought him a "good deal closer" to solving the theft of 398 pounds of heroin and cocaine stolen from the Police Department Property Clerk's office.

The New York Times

Published: October 16, 1974
Copyright © The New York Times

# Three Former Elite Detectives Indicted in Shakedown Scheme

## By MARY BREASTED

Three former detectives of the Police Department's Special Investigations Unit were indicted yesterday by a Federal grand jury in Brooklyn on charges that they installed illegal wiretaps on the telephones of three narcotics-dealing suspects and later illegally took nearly $100,000 from them and from other suspects.

Also yesterday, a former head of the elite police unit, Capt. Daniel E. Tange, agreed to pay a fine of $15,000 to the Police Department pension fund and resign immediately rather than face a departmental trial on charges that he shared in bribes to hinder the prosecution of narcotics investigations.

Another former head of the Special Investigations Unit, Lieut. John Egan, was named as a co-conspirator in the seven-count Federal indictment.

Those named as defendants were John McClean, 39 years old, of 521 Beach 136th Street, Belle Harbor, Queens; Ramon Viera, 46, of 64 Stockbridge Road, Yonkers, and Edward Codelia, 32, of 15 West Walnut Street, West Islip, L.I.

During a departmental trial last month, Captain Tange had testified against former Detective McClean, saying the two of them had shared a $1,000 bribe in June or July, 1969. The police say that Captain Tange has been quietly cooperating in corruption investigations since 1972 and that this was taken into account in the decision to have him pay a fine in lieu of prosecution.

𝕿𝖍𝖊 𝕹𝖊𝖜 𝖄𝖔𝖗𝖐 𝕿𝖎𝖒𝖊𝖘

Published: November 23, 1974
Copyright © The New York Times

# FOUR IN DRUG UNIT INDICTED IN THEFT

## Detectives, 2 Retired, Held in Stealing of $8,000 'From Narcotics Suspect

### By MARCIA CHAMBERS

Four detectives once assigned to an elite narcotics unit in the Police Department were accused yesterday of stealing $8,000 from a suspected narcotics trafficker and then lying at his trial.

Conspiracy, grand larceny, illegal wiretapping and perjury indictments were announced yesterday against the detectives, two of whom are now retired. The charges grew out of an investigation conducted by Maurice H. Nadjari, the special state anticorruption prosecutor.

Yesterday's indictments bring to 44 the number of men who have, in one form or another, been indicted or named as coconspirators on Federal or state charges. At top strength the now-defunct unit, which specialized in arresting major narcotics dealers, had 90 men assigned to it.

The four detectives pleaded not guilty at their arraignment late yesterday and were paroled without bail.

They are Michael DiSalvatore, 50, of Uniondale, L. I., and Eric Seise, 45, of Tappan, N.Y., who are retired, and Gerald Kelly, 34, of New Hyde Park, L. I., and Thomas Watkins, 37, of Staten Island, who are now assigned to Brooklyn precincts. Mr. Kelly and Mr. Watkins were suspended yesterday.

According to the 13-page indictment, the four defendants conspired in 1969 to arrest Hector Echeverria, a suspected narcotics dealer, by placing an illegal wiretap on Mr. Echeverria's home telephone from which they obtained "incriminating information."

The defendants then submitted a "perjured affidavit," to a Manhattan judge, saying their information about Mr. Echeverria came from a confidential informer. Based on that information, Criminal Court Judge Joel Tyler signed a search warrant.

According to Robert Simels, the special assistant Attorney General who presented the case to the grand jury, the defendants, then searched Mr. Echeverria's apartment in Washington Heights, arrested him for possession of one pound of cocaine, and then divided $8,000 they found among themselves.

Subsequently, the detectives were accused of lying during the trial about the wiretap, the search warrant and where the cocaine was found. Mr. Echeverria's trial ended with a deadlocked jury, apparently a result of a conflict in testimony between the officers who testified the cocaine was found in the apartment, and a superintendent who saw the police seize the drugs in the basement, Mr. Simels said.

### The New York Times

Published: May 15, 1975
Copyright © The New York Times

# Undercover Drug Agent
# Is Indicted on 15 Counts

### By MARCIA CHAMBERS

An undercover detective whose arrest on a Federal indictment 18 months ago in part resulted in the end of an unusual investigation of the garment district was indicted yesterday by a special state grand jury, on bribery and extortion charges.

The detective was identified as Leslie Wolff, who with his "partner," Herman Goldfarb, ran a trucking company for a year in the garment district in an operation called Project Cleveland. The project was designed by city and Federal undercover agents to catch racketeers who work for organized crime.

Ultimately, Project Cleveland, which had been expected to take five years, was dismantled after 17 months. The reasons are still the subject of controversy and debate.

Before his assignment to the project, Detective Wolff had been a member of the now-defunct elite narcotics investigation unit set up by the Police Department to arrest major narcotics traffickers. Thus far, of the 90 detectives in the unit, more than half have been indicted by Federal or state grand juries or implicated in criminal activities.

It was in his capacity as a detective in the narcotics unit during 1969 and 1970—three years before his assignment to Project Cleveland—that the 40-year-old detective was indicted yesterday on 15 counts of conspiracy, grand larceny, bribe receiving, extortion, possession of stolen property and official misconduct.

The indictment had been sought by Maurice H. Nadjari, a special state prosecutor.

According to Joel Cohen, an assistant to Mr. Nadjari in charge of the case, Detective Wolff is accused of extorting or receiving bribes totaling $35,000 from narcotics suspects, in return for not arresting or prosecuting them. The money that was said to have been shared with a team of four detectives, from the special investigating unit.

A former police captain, Daniel Tange, who commanded the elite unit, and his previously admitted accepting graft, was mentioned in the indictment as one of the police officials who received $1,000. Captain Tange's share was said to be part of $8,000 that Detective Wolff and his partners are accused of stealing from an apartment of a man they search-

ed had arrested on narcotics charges.

Captain Tange, highest ranking member of the unit accused of corruption, was never prosecuted after he agreed to cooperate and to testify against other officers. Thus far, although he has been granted immunity from prosecution, he has apparently not given any information on alleged corrupt acts of higher-ranking officers.

Another policeman involved in the transactions outlined in the indictment obtained by Mr. Nadjari was former Detective David J. Cody. He shot himself to death in May, 1974, the day he was to appear before a Federal grand jury investigating narcotics graft.

Still another officer involved in the case—and perhaps the best known—is Robert Leuci, a former member of the special investigation unit and a well-known police informant who, the indictment disclosed, provided part of the testimony that led to Detective Wolff's indictment yesterday.

### Key to Wolff's Past

Detective Leuci was the one man who might have given prosecutors in the Joint Strike Force Against Organized Crime in New York an insight into Detective Wolff's past before they agreed to his assignment on Project Cleveland.

But he neglected to do so, and on March 8, 1974, the day the Federal indictment was to be announced, it was sealed instead. The same day the word went out in the garment district that Mr. Goldfarb's partner had to leave town to take care of his parents, who had been in an automobile accident.

It was the end of Detective Wolff's participation in the project.

When the Federal indictment involving a group of policemen in the special investigation unit was unsealed in November, 1974, Detective Wolff learned that his indictment had been dropped for lack of evidence.

In the spring of 1974, Detective Leuci admitted he had been involved in more wrongdoing as a police officer than he had previously admitted.

Late yesterday afternoon, Detective Wolff pleaded not guilty at his arraignment before Supreme Court Justice John M. Murtagh, and was paroled in his own custody pending a hearing next month. The Police Department has put Detective Wolff on "modified assignments."

# CUNNINGHAM WRIT BACK IN SPOTLIGHT

## Aides of Bronx Leader and Nadjari Due In Court Today on Next Moves In Inquiry

### By MAURICE CARROLL

The focus of the question of alleged political corruption in the Bronx swung back yesterday to the effort by Patrick J. Cunningham, the state Democratic chairman, to quash a subpoena ordering him to testify before a grand jury.

Governor Carey's order on Tuesday expanding the authority of Maurice H. Nadjari, the special state prosecutor, to include Bronx politics cleared one obstacle to the Nadjari investigation, but the legal motion by Mr. Cunningham remained to be acted upon.

According to Mr. Nadjari, the investigation centers on Mr. Cunningham in his role as County Democratic leader of the Bronx.

Justice Leonard H. Sandler of State Supreme Court, the newly appointed judicial overseer of the Nadjari inquiries, planned to call in lawyers for both sides today for an informal conference about the next legal procedure.

His predecessor, John M. Murtagh, had been preparing a ruling on Mr. Cunningham's motion when he died of a heart attack this month.

Now, with the Governor's order in the record, lawyers for both sides pondered whether to seek further hearings before Justice Sandler, ask for the right to file briefs, or make some other move.

Although the legal complexities continued, the political aspect of the case was simplified somewhat by the shrinking of the cast of characters.

### No Major Roles

The Bronx District Attorney, Mario Merola, and Mr. Nadjari's nominal superior, Attorney General Louis J. Lefkowitz, both said that, as far as they could tell, they no longer had major roles to play.

Mr. Merola, who had agreed to be superseded in connection with the Cunningham investigation, on the ground that his political career and Mr. Cunningham's both were based in the same political organization, said: "I presume now that I'm out of it. Nadjari has carte blanche."

Mr. Lefkowitz said of Mr. Nadjari: "He's got the ball. He's got five months to produce."

The special prosecutor was appointed by Gov. Nelson A. Rockefeller to investigate the criminal-justice system. His tenure expires at the end of June. The current dispute began when Governor Carey, a Democrat, tried to dismiss Mr. Nadjari, a Republican, in December. News leaks from the Nadjari office promptly proclaimed that this would thwart an investigation of Mr. Cunningham and Bronx politics. Eventually, Mr. Lefkowitz, whose acquiescence is necessary to remove Mr. Nadjari, gave him six months to finish his investigations.

Yesterday, Mr. Cunningham held a series of meetings on party matters to show that he was still in charge.

### Sentences Imposed

And Mr. Nadjari issued a statement announcing that four-year sentences had been imposed on two witnesses who had refused to testify before a grand jury investigating the theft of 400 pounds of narcotics from the police property clerk's office — the so-called "French Connection" case.

Assistant Special Prosecutor Joel Cohen said that if the two, Rocco Evangelista, 42 years old, of Bethpage, L. I., and Frank Pugliese, 36, who is in Lewisburg Federal Penitentiary, had talked, "the court could very well have been imposing sentences today on the actual policemen who stole the narcotics."

Mr. Lefkowitz awaited official word from the Governor's office on the two orders needed to move the political case—the amendment extending Mr. Nadjari's authority from his original mandate, the criminal justice system, to include Bronx politics, and another appointing Supreme Court Justice Jacob B. Grumet as a special prosecutor.

Mr. Grumet has the demanding task of investigating the Nadjari charge that the Governor was trying, by dismissing him, to cover up an inquiry involving Mr. Cunningham. Mr. Grumet is scheduled to start his inquiry next Monday. A spokesman for Mr. Carey said the details of his mandate and budget were being worked out.

The New York Times

Published: January 29, 1976
Copyright © The New York Times

# 5 Officers Are Charged With Stealing $30,000 From 4 Narcotics Suspects

### By NICHOLAS GAGE

Five police officers have been indicted on charges of stealing more than $30,000 from suspected narcotics dealers and assaulting some of them, District Attorney Robert M. Morgenthau of Manhattan announced yesterday.

One of the officers was also indicted on a charge of firing his gun illegally and pretending he was under sniper attack. As a result of the alleged firing, 100 police officers spent the night of last Nov. 14 searching buildings on the Lower East Side looking for snipers.

Mr. Morgenthau did not disclose the origins of the case, but apparently a fellow officer not involved in the alleged crimes told the Police Department's Internal Affairs Division about the five defendants.

This was seen as further evidence that the tradition of silence about corruption among policemen had been broken. Since the Knapp Commission hearings, which saw officers for the first time—Frank Serpico and David Durk—accusing fellow police officers of taking bribes, several other police officers have come forth with information about corruption in the department.

The first deputy police commissioner, James M. Taylor, who joined Mr. Morgenthau in announcing the indictments, said:

"These cases may indicate some slippage, but they also show we have the system to identify corruption and move against it. Corruption will not be tolerated under any circumstances."

"Organized corruption in the department, he said, is under control.

### Transfer Explained

The Internal Affairs Division, which investigated the charges against the five men, brought its evidence last Feb. 2 to the office of Maurice H. Nadjari, who was then the special state prosecutor for cases involving the criminal-justice system.

When Mr. Nadjari's office took no action on the case after four weeks, the division went to Mr. Morgenthau, who obtained approval from the special prosecutor to pursue the case.

Carl M. Bornstein, executive special assistant to Mr. Nadjari's successor, John F.



**Associated Press**
**Robert M. Morgenthau**

Keenan, said about the case:

"It is not inconsistent with this office to refer cases to a district attorney on occasion, but we will not speculate on the reasons why this case was sent to Mr. Morgenthau."

Another source in the special prosecutor's office said no action had been taken on the case because staff members were preoccupied with the investigation of Patrick J. Cunningham, the suspended state chairman of the Democratic Party. Mr. Cunningham was subsequently indicted on a charge of bribery conspiracy and tampering with evidence.

The indictments against the five officers represent the second case involving police officers that the Manhattan District Attorney's office has handled since the special state prosecutor's office was created four years ago.

The defendants included Anthony Manisera, 26 years old, of 8205 16th Avenue, Brooklyn; John Boos, 27, of 14 Orchard Road Levittown, L.I.; James Meehan, 26, of 56 Sharpe Avenue, Staten Island, and Joseph Wilczynski, 27, of 645 Humboldt Street, Brooklyn.

The fifth defendant is expected to surrender on Monday upon returning from an out-of-town trip. He was not identified yesterday because state law prohibits naming an indicted defendant before he is taken into custody.

The five officers all serve at the Ninth Precinct station on Fifth Street, as does the officer who informed on them. His identity was not revealed.

The defendants are among the youngest policemen left in the department since the cutbacks forced by the city's fiscal crisis. The average age of policemen now is 38.7.

The five officers have been among the most active in making arrests in the Ninth Precinct. They were charged with having ransacked apartments of persons they suspected of involvement in narcotics in search of money and other valuables.

They allegedly took more than $30,000 in money and property from four persons they arrested. The four individuals, whose cases have been dismissed as a result of the investigation of the officers, were identified as Aida Velasquez, Carmen Lucre and Luis and Gilberto Pagan. All live on the Lower East Side.

### Shots From Police Car

Mr. Manisera, was charged also with the improper firing of a revolver last Nov. 14 and pretending he was under sniper fire.

According to the police, Mr. Manisera and his partner, who was not identified, allegedly shot out a window of their police car, firing their pistols in the air, and then called in an officer-in-distress alarm, saying they were under sniper attack.

Ten police cruisers converged on the scene, and ultimately 100 police officers fanned out looking for snipers. The incident caused concern, because a television movie playing that night was about the actual ambush and murder of officers Rocco Lurie and Gregory Foster.

An investigation of the firing incident is continuing.

The four named officers were araigned before Justice Robert M. Haft in State Supreme Court, and were paroled for a hearing July 30.

Benjamin Brafman, the assistant district attorney who directed the investigation of the case, told the judge that two of the defendants had threatened cooperating witnesses. Justice Haft said the parole would be subject to review of supporting evidence of the threats.

EXHIBIT F

THE KNAPP COMMISSION

REPORT ON

POLICE CORRUPTION

130921

George Braziller    *New York*

MAY 14 1973



For information address the publisher:
George Braziller, Inc.
One Park Avenue, New York, N.Y. 10016

Standard Book Number:
0-8076-0688-X, Cloth
0-8076-0689-8, Paper

Library of Congress Catalog Number:
73-76969
Printed in the United States of America

# FOREWORD

This report was submitted to Mayor John V. Lindsay on December 26, 1972, bringing to a close the Knapp Commission's two and one half year investigation into corruption in the New York Police Department.

Informally named for its chairman, Whitman Knapp, the Commission was made up of five private citizens appointed by the Mayor. It was established after serious charges of police corruption had been made in the press. A committee of law enforcement officials, named by the Mayor to examine these charges, had recommended that the job of looking into corruption in the Department could best be done by an independent citizens commission with a full-time staff of its own. Both the Commission and the staff it assembled were composed of people whose preconceptions, if any, were sympathetic to the police. Three of the five commissioners and six of the eight staff attorneys were former prosecutors. The twelve investigators all had extensive backgrounds in law enforcement.

The Commission investigated the extent and patterns of corruption in the Department, held public hearings and, finally, issued the recommendations and findings contained in the report which follows. The report is divided into two main sections. The first, originally issued on August 3, 1972, is a summary of the Commission's investigative findings and a presentation of its principal recommendations. The second is the main report, containing a history of the Commission's activities, a topic-by-topic analysis of corruption in the Department and analyses of the anti-corruption efforts of the Department and related agencies. A short interim report, issued on July 1, 1971 is included in the appendix.

A word about a few things that are not in this report. Police officers, wounded by criticism which they feel was generated by the Commission's disclosures rather than by the conditions which were disclosed, have objected that too little attention was paid to the good work they do and to corruption elsewhere in a society from which they feel singled out. Both subjects are, in fact, dealt with in the Commission's report. Neither is dwelt upon at length because, quite simply, it was not the Commission's job to do so. The Commission was charged with investigating a single problem, corruption, in a



single city agency, the Police Department. Having found police graft to be a serious problem, it was obliged to focus in its report upon the reasons for its finding and the steps that are being and might be taken by way of remedy. The heroism and distinction with which countless police officers, whether or not they accept graft, perform their difficult and dangerous jobs is relevant to a study of graft only in shedding light upon police attitudes having a bearing upon the problem of corruption. Similarly, the obvious fact that corruption is not found only among policemen must be recognized in order to put police corruption in something of a proper perspective. However, the Commission had neither the legal authority nor the resources to investigate other governmental agencies, much less society as a whole. However great the need may be for further investigations, that need affords no excuse for discounting or ignoring the results of this one.

Another thing the report is not is a blanket indictment of all police officers. This charge has been made by some who misinterpret in order more easily to attack—even at the cost of perpetuating in the public mind the very impression to which they object. When the president of the Patrolmen's Benevolent Association complains that the Commission report condemns the entire police force many people accept his characterization—and tend to believe it. Anyone seriously interested in evaluating the Commission's efforts must begin—as the PBA president did not before making his public observations—by reading the report.

The report describes in specific detail patterns of corruption which no knowledgeable police officer or law enforcement official has challenged, which the Department's new leadership acknowledges, and which recent indictments confirm. In helping to bring these patterns out into the open, the Commission has made its contribution to the vigorous efforts now being made to deal with a problem that for too long could not adequately be met because those in a position to do something about it could not—or would not—recognize it for what it was.

Michael F. Armstrong



Commission to Investigate Allegations of Police Corruption
and the City's Anti-Corruption Procedures

# COMMISSION REPORT

(With Summary and Principal Recommendations,
Issued August 3, 1972)

WHITMAN KNAPP
Chairman

JOSEPH MONSERRAT
JOHN E. SPRIZZO
FRANKLIN A. THOMAS
CYRUS R. VANCE

MICHAEL F. ARMSTRONG
Chief Counsel

DECEMBER 26, 1972



THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

December 27, 1972

Honorable Whitman Knapp
United States District Court
United States Courthouse
Foley Square
New York, New York  10007

Dear Judge Knapp:

We have come a long way since the Serpico case in
1967 raised allegations of corruption which began the
process which culminated in my appointment of your
Commission.  That was more than five years ago, and for the
last 2 1/2 years, the Commission has worked diligently
to create greater public understanding and a climate for
action.  As you have pointed out, this is the first time
in the history of New York that a Mayor has created an
independent commission to investigate corruption of the
City's police.  Although one would think that this
project would win wide support, you and I will remember
the strong opposition to the creation of the Commission
and the renewal of your subpoena powers.  Those were
important political battles that required the most
intensive efforts of my Administration to sustain the
authority of the Commission.

With full independence, you conducted your own
inquiry and reached your own conclusions.  Your procedures,
hearings and findings have, at times, been controversial,
and even painful, and no single observer will agree with
all of your conclusions.  There may well be conclusions
which I cannot agree with.  But you have performed a vital
task for our City and its police, focusing full public
scrutiny and debate on one of government's more sensitive
areas.

At the same time, Police Commissioner Patrick V.
Murphy has been waging a tough, persistent campaign against
corruption in the Police Department.  With my full support,
Commissioner Murphy has been taking dramatic steps to
reform the practice, procedures and codes of conduct of

Hon. Whitman Knapp          -2-          December 27, 1972

the Department.  That has been the hardest fight of all
-- to improve supervision and the daily actions of
30,000 police officers.  No Police Commissioner in our
City's history has set such high standards of integrity
and accountability -- and few have taken on such for-
midable obstacles.

          These combined efforts have resulted in
enormous progress.  There is good reason to believe
that the problems faced by Patrolman Serpico six years
ago would not recur today.  But it is just as obvious
that the problem of police corruption is not yet fully
solved.  Last week's startling revelations that hundreds
of pounds of narcotics were stolen from the Police
Department, going back over a ten year period, shows how
deep this problem is and how much work remains to be done.

          But we have made a substantial start.  I be-
lieve that never before in our City -- not in the 80
years since serious investigations into police corruption
have been conducted -- has there been a more forthright,
rigorous, and sustained attack on this problem.  No goal
has had higher priority in my Administration than protect-
ing the integrity of the administration of criminal justice.
Against considerable political opposition, we have insisted
that the Police Department be accountable to the elected
civilian leadership of the City and to the public.  This
has not been easy.  But in seven years of fighting for
improved police productivity and professionalism, I believe
that we have proved that it is essential for the Mayor to
demand accountability for the policies and performance of
the City's police.  I consider this seven year effort, and
particularly the focus on corruption of the past 2 1/2
years, aided by the work of your Commission, to be one of
the most important accomplishments of my Administration.

          I am determined that this work continue in the
years to come.  That will require the continuing courageous
leadership of police commissioners like Pat Murphy, and the
strong support of the Mayor in what will not always be a
popular or easy effort.

Hon. Whitman Knapp        -3-      December 27, 1972

    And it will mean some real legislative creativity
in Albany if the promise of your report is to be
fulfilled and the historical cycle of corruption that
has persisted for almost a century is to be truly
broken for the first time.  As your report shows in
detail, the State government, through its outmoded
and unrealistic criminal laws, must bear its share
of the responsibility for the continued opportunities
for corruption.  It is therefore essential that we
intensify our efforts to win reforms in next year's
State Legislature to remove these unfair burdens from
our police.

    For your personal role in leading this historic
Commission, and for the diligent work of your fellow
Commissioners and your able staff, you have my warm
thanks and those of all New Yorkers.

                    Sincerely,


                    John V. Lindsay
                    M a y o r

## Table of Contents

# SUMMARY AND PRINCIPAL RECOMMENDATIONS

|  | Page |
|---|---|
| PREFACE: The Commission's Mandate | I |
| SUMMARY |  |
| The Extent of Police Corruption | 1 |
| The Nature and Significance of Police Corruption | 4 |
| Departmental Attitudes Towards Police Corruption | 5 |
| The Commission's Action | 7 |
| Changing Departmental Attitudes | 11 |
| A PLAN FOR IMMEDIATE ACTION | 13 |
| A PLAN FOR ANTI-CORRUPTION ACTION IN THE POLICE DEPARTMENT | 16 |
| OTHER RECOMMENDATIONS | 17 |
| Reducing the Opportunities for Corrupt Activity | 18 |
| Changing Laws | 18 |
| Gambling | 18 |
| Sabbath Laws | 18 |
| Prostitution | 18 |
| Narcotics | 19 |
| Regulated Industries | 19 |
| Reducing the Temptations and Increasing the Risks | 21 |
| Penalizing Bribe Givers | 21 |
| Procedures to Facilitate Corruption Investigations | 21 |
| Personnel Records | 21 |
| Complaints of Corruption | 23 |
| Line-ups | 23 |
| Treatment of Cooperative Police Witnesses | 23 |

v

|                                                                          | Page |
|--------------------------------------------------------------------------|------|
| Enforcement Responsibility                                               | 24   |
| Departmental Action Against Infractions Indicative of Corruption         | 24   |
| Expanded Penalties in Department Hearings                                | 25   |
| Hearing Officers                                                         | 26   |
| Pensions                                                                 | 26   |
| Effect of Disciplinary Records Upon Promotions                          | 27   |
| Changing Procedures Which Encourage Corruption                           | 27   |
| Reimbursement of Expenses                                                | 28   |
| Arrest Quotas                                                            | 28   |
| Informants                                                               | 28   |
| Paid Informants                                                          | 29   |
| Gratuities                                                               | 29   |
| Sleeping Accommodations                                                  | 29   |
| Management Procedures                                                    | 30   |
| Field Activity Reporting                                                 | 30   |
| Arrest Procedures                                                        | 31   |
| Name Tags                                                                | 31   |
| Reducing the Susceptibility to Corruption                                | 31   |
| Background Investigations                                                | 32   |
| Lateral Entry to Supervisory Ranks                                       | 32   |
| Police College                                                          | 32   |
| Partners for New Officers                                                | 33   |
| Master Patrolmen                                                         | 33   |
| Enlisting Public Support                                                 | 33   |
| Progress Reporting                                                       | 33   |
| Publication of Statistics                                                | 34   |

vi

# COMMISSION REPORT

## Section One:  Commission Activities

| | Page |
|---|---|
| 1. HISTORY OF COMMISSION | 35 |
| Origin of Commission | 35 |
| Purposes and Goals | 36 |
| Assembling a Staff | 37 |
| Investigative Activities | 38 |
| Public Hearings | 40 |
| 2. METHODS OF INVESTIGATION AND SOURCES OF IN-FORMATION | 42 |
| Initial Steps | 42 |
| Field Investigations | 43 |
| Document Analysis | 46 |
| Interviews of Supervisors | 46 |
| Investigations by Others | 46 |
| Executive Hearings | 47 |
| Police Witnesses | 47 |

## Section Two:  Patterns of Police Corruption

| | |
|---|---|
| 3. INTRODUCTION | 61 |
| Police Corruption: A Historical View | 61 |
| Grass-Eaters and Meat-Eaters | 65 |
| Pads, Scores and Gratuities | 66 |
| Factors Influencing Corruption | 67 |
| Sources of Payoffs | 68 |
| Organization of the Department | 69 |
| Patrol Force | 69 |
| Plainclothes | 69 |
| Detectives | 70 |
| The Commissioner's Office | 70 |
| Patterns | 70 |

vii

|  |  | Page |
|---|---|---|
| 4. | GAMBLING | 71 |
|  | Reasons for Gambling Payoffs | 71 |
|  | Plainclothesmen and Gambling | 73 |
|  | The Pad | 74 |
|  | Different Kinds of Gambling and Different-Sized Payoffs | 77 |
|  | Numbers | 78 |
|  | Bookmaking | 85 |
|  | Card and Dice Games | 87 |
|  | Comments | 89 |
| 5. | NARCOTICS | 91 |
|  | Patterns of Corruption in Narcotics Law Enforcement | 94 |
|  | Extortion and Bribe-Taking | 94 |
|  | Illegal Use of Wiretaps | 98 |
|  | Stealing Money and Narcotics | 99 |
|  | Flaking and Padding | 103 |
|  | Possession and Sale of Narcotics | 104 |
|  | Miscellaneous Narcotics-Related Corruption | 110 |
|  | Comments | 112 |
| 6. | PROSTITUTION | 116 |
|  | Police Attitudes Toward Accepting Payoffs from Prostitutes | 116 |
|  | Brothels | 117 |
|  | Prostitute Bars | 120 |
|  | Call Girls and Streetwalkers | 121 |
|  | Comments | 122 |
| 7. | CONSTRUCTION | 123 |
|  | The Investigation | 123 |
|  | Reasons for Police Corruption in Relation to Construction | 124 |
|  | Police Enforcement of Laws Regulating Construction | 126 |
|  | Patterns of Police Corruption in Construction | 127 |
|  | Comments | 131 |

Page

8. BARS ................................................................. 133

The Investigation ................................................. 134

Patterns of Police Payoffs by Licensed Bars ...................... 135

Patterns of Police Payoffs by Unlicensed Bars .................... 140

Comments ......................................................... 146

9. SABBATH LAW ...................................................... 149

Patterns of Payoffs by Food Store Owners ......................... 149

Department Response .............................................. 150

Comments ......................................................... 151

10. PARKING AND TRAFFIC ............................................. 152

Patterns of Payoffs by Motorists ................................. 152

Comments ......................................................... 156

11. TOW TRUCKS ...................................................... 158

Reasons for Payoffs by Tow-Truck Companies ....................... 158

The Investigation ................................................ 159

Comments ......................................................... 162

12. RETRIEVING SEIZED AUTOMOBILES FROM THE PO-
LICE ............................................................. 163

Payments to Policemen at City Auto Storage Yards ................. 163

Payments to Precinct Patrolmen ................................... 165

Comments ......................................................... 165

13. INTRADEPARTMENTAL PAYMENTS ...................................... 166

Payment for Paperwork ............................................ 166

Payment for Temporary Assignments ................................ 167

Payment for Permanent Assignments ................................ 167

Buying Medical Discharges ........................................ 168

Sale of Information .............................................. 169

Comments ......................................................... 169

ix

|  |  | Page |
|---|---|---|
| 14. | **GRATUITIES** | 170 |
|  | Free Meals | 170 |
|  | Hotels | 174 |
|  | Free Drinks | 176 |
|  | Christmas Payments | 176 |
|  | Free Merchandise and Other Gifts | 178 |
|  | Tips for Services Rendered | 179 |
|  | Comments | 180 |
| 15. | **MISCELLANY** | 183 |
|  | Loansharks | 183 |
|  | DOA's | 184 |
|  | Hijacking | 185 |
|  | Auto Theft Rings | 185 |
|  | Police Theft from Burglarized Premises | 185 |
|  | Court-Related Payoffs | 187 |
|  | The Garment Industry | 187 |
|  | Peddlers | 187 |
|  | Polling Places | 188 |
|  | Pistol Permits | 188 |
|  | Sale of Information | 190 |
|  | Fortune Tellers | 190 |
| 16. | **INDIVIDUAL MISCONDUCT UNCOVERED BY THE COMMISSION** | 193 |

x

## Section Three:  Anti-Corruption Efforts

|  |  | Page |
|---|---|---|
| 17. | THE SERPICO-DURK STORY: A MISHANDLED CORRUPTION COMPLAINT | 196 |
|  | Ninetieth Precinct Incident | 196 |
|  | Seventh Division Incident | 198 |
|  | Conclusions | 203 |
| 18. | DEPARTMENTAL MACHINERY FOR INVESTIGATING CORRUPTION | 205 |
|  | Past Deficiencies | 205 |
|  | Organizational Fragmentation | 205 |
|  | Lack of Authority | 206 |
|  | Lack of Manpower | 207 |
|  | Inadequate Investigative Techniques | 208 |
|  | Lack of Coordination in Assignment of Investigations | 208 |
|  | Disorganized Records | 209 |
|  | Improper Attitudes | 210 |
|  | Correction of Deficiencies | 213 |
|  | Increased Manpower | 213 |
|  | New Investigative Approach | 214 |
|  | Improved Investigative Methods | 217 |
| 19. | DEPARTMENTAL DISCIPLINARY ACTION IN CORRUPTION CASES | 219 |
|  | Administrative Discipline | 219 |
|  | Discipline of Commanders by the Police Commissioner | 221 |
|  | Removal/Appointment of Detectives | 222 |
|  | Extension of Administrative Discipline | 225 |
|  | The Police Justice Process | 226 |
|  | Conduct of Departmental Hearings | 226 |
|  | Delays | 228 |
|  | Penalties in Departmental Hearings | 229 |
|  | Judicial Review | 230 |

| | | Page |
|---|---|---|
| **20.** | **CHANGES IN DEPARTMENTAL POLICIES AND PROCEDURES AFFECTING CORRUPTION CONTROL** | 231 |
| | Providing Accountability | 231 |
| |     The Problem of Fixing Responsibility | 233 |
| |     Improving Supervisory Accountability | 234 |
| |     Improving Command Accountability | 235 |
| |     Improving Detective Accountability | 237 |
| |     Prospects for Long-Term Changes | 238 |
| | Controlling Corruption Hazards | 238 |
| | Improving Training and Evaluation | 238 |
| |     Recruit Training | 239 |
| |     Academy Training of Superior Officers | 241 |
| |     Field Training | 241 |
| |     Evaluation | 243 |
| **21.** | **ANTI-POLICE-CORRUPTION EFFORTS BY THE DEPARTMENT OF INVESTIGATION** | 245 |
| **22.** | **THE CRIMINAL JUSTICE SYSTEM AND POLICE CORRUPTION** | 249 |
| | Police Corruption Cases | 249 |
| | Police Corruption Cases of 1968 to June 30, 1972 | 250 |
| | Disposition of Police Corruption Cases | 252 |
| | Dispositions in Non-Police Corruption Cases | 253 |
| | Reliance on Police Investigators | 255 |
| | Case-by-Case Approach to Prosecution | 257 |
| | Investigative Techniques | 257 |
| | Citywide Investigations | 258 |
| | Federal Anti-Corruption Efforts | 258 |
| **23.** | **THE OUTLOOK FOR THE FUTURE** | 260 |

# SUMMARY AND PRINCIPAL RECOMMENDATIONS
(Issued August 3, 1972)

# SUMMARY

### The Extent of Police Corruption

We found corruption to be widespread. It took various forms depending upon the activity involved, appearing at its most sophisticated among plainclothesmen assigned to enforcing gambling laws. In the five plainclothes divisions where our investigations were concentrated we found a strikingly standardized pattern of corruption. Plainclothesmen, participating in what is known in police parlance as a "pad," collected regular bi-weekly or monthly payments amounting to as much as $3,500 from each of the gambling establishments in the area under their jurisdiction, and divided the take in equal shares. The monthly share per man (called the "nut") ranged from $300 and $400 in midtown Manhattan to $1,500 in Harlem. When supervisors were involved they received a share and a half. A newly assigned plainclothesman was not entitled to his share for about two months, while he was checked out for reliability, but the earnings lost by the delay were made up to him in the form of two months' severance pay when he left the division.

Evidence before us led us to the conclusion that the same pattern existed in the remaining divisions which we did not investigate in depth. This conclusion was confirmed by events occurring before and after the period of our investigation. Prior to the Commission's existence, exposures by former plainclothesman Frank Serpico had led to indictments or departmental charges against nineteen plainclothesmen in a Bronx division for involvement in a pad where the nut was $800. After our public hearings had been completed, an investigation conducted by the Kings County District Attorney and the Department's Internal Affairs Division—which investigation neither the Commission nor its staff had even known about—resulted in indictments and charges against thirty-seven Brooklyn plainclothesmen who had participated in a pad with a nut of $1,200. The manner of operation of the pad involved

2

in each of these situations was in every detail identical to that described at the Commission hearings, and in each almost every plainclothesman in the division, including supervisory lieutenants, was implicated.

Corruption in narcotics enforcement lacked the organization of the gambling pads, but individual payments—known as "scores"—were commonly received and could be staggering in amount. Our investigation, a concurrent probe by the State Investigation Commission and prosecutions by Federal and local authorities all revealed a pattern whereby corrupt officers customarily collected scores in substantial amounts from narcotics violators. These scores were either kept by the individual officer or shared with a partner and, perhaps, a superior officer. They ranged from minor shakedowns to payments of many thousands of dollars, the largest narcotics payoff uncovered in our investigation having been $80,000. According to information developed by the S.I.C. and in recent Federal investigations, the size of this score was by no means unique.

Corruption among detectives assigned to general investigative duties also took the form of shakedowns of individual targets of opportunity. Although these scores were not in the huge amounts found in narcotics, they not infrequently came to several thousand dollars.

Uniformed patrolmen assigned to street duties were not found to receive money on nearly so grand or organized a scale, but the large number of small payments they received present an equally serious if less dramatic problem. Uniformed patrolmen, particularly those assigned to radio patrol cars, participated in gambling pads more modest in size than those received by plainclothes units and received regular payments from construction sites, bars, grocery stores and other business establishments. These payments were usually made on a regular basis to sector car patrolmen and on a haphazard basis to others. While individual payments to uniformed men were small, mostly under $20, they were often so numerous as to add substantially to a patrolman's

3

income. Other less regular payments to uniformed patrolmen included those made by after-hours bars, bottle clubs, tow trucks, motorists, cab drivers, parking lots, prostitutes and defendants wanting to fix their cases in court. Another practice found to be widespread was the payment of gratuities by policemen to other policemen to expedite normal police procedures or to gain favorable assignments.

Sergeants and lieutenants who were so inclined participated in the same kind of corruption as the men they supervised. In addition, some sergeants had their own pads from which patrolmen were excluded.

Although the Commission was unable to develop hard evidence establishing that officers above the rank of lieutenant received payoffs, considerable circumstantial evidence and some testimony so indicated. Most often when a superior officer is corrupt, he uses a patrolman as his ''bagman'' who collects for him and keeps a percentage of the take. Because the bagman may keep the money for himself, although he claims to be collecting for his superior, it is extremely difficult to determine with any accuracy when the superior actually is involved.

Of course, not all policemen are corrupt. If we are to exclude such petty infractions as free meals, an appreciable number do not engage in any corrupt activities. Yet, with extremely rare exceptions, even those who themselves engage in no corrupt activities are involved in corruption in the sense that they take no steps to prevent what they know or suspect to be going on about them.

It must be made clear that—in a little over a year with a staff having as few as two and never more than twelve field investigators— we did not examine every precinct in the Department. Our conclusion that corruption is widespread throughout the Department is based on the fact that information supplied to us by hundreds of sources within and without the Department was consistently borne out by specific observations made in areas we were able to investigate in detail.

4

## The Nature and Significance of Police Corruption

Corruption, although widespread, is by no means uniform in degree. Corrupt policemen have been described as falling into two basic categories: "meat-eaters" and "grass-eaters." As the names might suggest, the meat-eaters are those policemen who, like Patrolman William Phillips who testified at our hearings, aggressively misuse their police powers for personal gain. The grass-eaters simply accept the payoffs that the happenstances of police work throw their way. Although the meat-eaters get the huge payoffs that make the headlines, they represent a small percentage of all corrupt policemen. The truth is, the vast majority of policemen on the take don't deal in huge amounts of graft.

And yet, grass-eaters are the heart of the problem. Their great numbers tend to make corruption "respectable." They also tend to encourage the code of silence that brands anyone who exposes corruption a traitor. At the time our investigation began, any policeman violating the code did so at his peril. The result was described in our interim report: "The rookie who comes into the Department is faced with the situation where it is easier for him to become corrupt than to remain honest."

More importantly, although meat-eaters can and have been individually induced to make their peace with society, the grass-eaters may be more easily reformed. We believe that, given proper leadership and support, many police who have slipped into corruption would exchange their illicit income for the satisfaction of belonging to a corruption-free Department in which they could take genuine pride.

The problem of corruption is neither new, nor confined to the police. Reports of prior investigations into police corruption, testimony taken by the Commission, and opinions of informed persons both within and without the Department make it abundantly clear that police corruption has been a problem for many years. Investigations

5

have occurred on the average of once in twenty years since before
the turn of the century, and yet conditions exposed by one investiga-
tion seem substantially unchanged when the next one makes its report.
This doesn't mean that the police have a monopoly on corruption.
On the contrary, in every area where police corruption exists it is
paralleled by corruption in other agencies of government, in industry
and labor, and in the professions.

Our own mandate was limited solely to the police. There are
sound reasons for such a special concern with police corruption. The
police have a unique place in our society. The policeman is expected
to "uphold the law" and "keep the peace." He is charged with
everything from traffic control to riot control. He is expected to pro-
tect our lives and our property. As a result, society gives him spe-
cial powers and prerogatives, which include the right and obligation
to bear arms, along with the authority to take away our liberty by
arresting us.

Symbolically, his role is even greater. For most people, the po-
liceman is the law. To them, the law is administered by the patrolman
on the beat and the captain in the station house. Little wonder that
the public becomes aroused and alarmed when the police are charged
with corruption or are shown to be corrupt.

### Departmental Attitudes Towards Police Corruption

Although this special concern is justified, public preoccupation
with police corruption as opposed to corruption in other agencies of
government inevitably seems unfair to the policeman. He believes
that he is unjustly blamed for the results of corruption in other parts
of the criminal justice system. This sense of unfairness intensifies
the sense of isolation and hostility to which the nature of police work
inevitably gives rise.

Feelings of isolation and hostility are experienced by policemen
not just in New York, but everywhere. To understand these feelings

6

one must appreciate an important characteristic of any metropolitan police department, namely an extremely intense group loyalty. When properly understood, this group loyalty can be used in the fight against corruption. If misunderstood or ignored, it can undermine anti-corruption activities.

Pressures that give rise to this group loyalty include the danger to which policemen are constantly exposed and the hostility they encounter from society at large. Everyone agrees that a policeman's life is a dangerous one, and that his safety, not to mention his life, can depend on his ability to rely on a fellow officer in a moment of crisis. It is less generally realized that the policeman works in a sea of hostility. This is true, not only in high crime areas, but throughout the City. Nobody, whether a burglar or a Sunday motorist, likes to have his activities interfered with. As a result, most citizens, at one time or another, regard the police with varying degrees of hostility. The policeman feels, and naturally often returns, this hostility.

Two principal characteristics emerge from this group loyalty: suspicion and hostility directed at any outside interference with the Department, and an intense desire to be proud of the Department. This mixture of hostility and pride has created what the Commission has found to be the most serious roadblock to a rational attack upon police corruption: a stubborn refusal at all levels of the Department to acknowledge that a serious problem exists.

The interaction of stubbornness, hostility and pride has given rise to the so-called "rotten-apple" theory. According to this theory, which bordered on official Department doctrine, any policeman found to be corrupt must promply be denounced as a rotten apple in an otherwise clean barrel. It must never be admitted that his individual corruption may be symptomatic of underlying disease.

This doctrine was bottomed on two basic premises: First, the morale of the Department requires that there be no official recogni-

7

tion of corruption, even though practically all members of the Department know it is in truth extensive; second, the Department's public image and effectiveness require official denial of this truth.

The rotten-apple doctrine has in many ways been a basic obstacle to meaningful reform. To begin with, it reinforced and gave respectability to the code of silence. The official view that the Department's image and morale forbade public disclosure of the extent of corruption inhibited any officer who wished to disclose corruption and justified any who preferred to remain silent. The doctrine also made difficult, if not impossible, any meaningful attempt at managerial reform. A high command unwilling to acknowledge that the problem of corruption is extensive cannot very well argue that drastic changes are necessary to deal with that problem. Thus neither the Mayor's Office nor the Police Department took adequate steps to see that such changes were made when the need for them was indicated by the charges made by Officers Frank Serpico and David Durk in 1968. This was demonstrated in the Commission's second set of public hearings in December 1971.

Finally, the doctrine made impossible the use of one of the most effective techniques for dealing with any entrenched criminal activity, namely persuading a participant to help provide evidence against his partners in crime. If a corrupt policeman is merely an isolated rotten apple, no reason can be given for not exposing him the minute he is discovered. If, on the other hand, it is acknowledged that a corrupt officer is only one part of an apparatus of corruption, common sense dictates that every effort should be made to enlist the offender's aid in providing the evidence to destroy the apparatus.

### The Commission's Actions

The Commission examined and rejected the premises upon which the rotten-apple doctrine rested. We concluded that there was no justification for fearing that public acknowledgment of the extent of corruption would damage the image and effectiveness of the Depart-

8

ment. We are convinced that instead of damaging its image a realistic attitude toward corruption could only enhance the Department's credibility. The conditions described in the Commission's public hearings came as no surprise to the large numbers of City residents who had experienced them for years. If, then, the Department makes it a point to acknowledge corrupt conditions the public already knows to exist, it can hardly damage its image. On the contrary, it can only promote confidence in the Department's good-faith desire to deal with those conditions.

The Commission looked at the question of morale in much the same way. We did not—and do not—believe that the morale of the average policeman is enhanced by a commanding officer who insists on denying facts that the policeman knows to be true. We believed —and continue to believe—that such false denials can only undercut the policeman's confidence in his commander. If a policeman listens to his commander solemnly deny the existence of an obvious corrupt situation, the policeman can draw only one of two conclusions: Either the commander is hopelessly naive or he is content to let the corruption continue.

Once we had rejected the premises of the rotten-apple doctrine, the Commission determined to employ one of the techniques that adherence to the doctrine had made impossible, namely to persuade formerly corrupt police officers to work with us in providing evidence of continuing corruption.

The mere decision to use the technique did not automatically produce a body of officers able and eager to assist us in this manner. Indeed, knowledgeable persons assured us that the code of silence was so strong that we would never find a corrupt officer who could be persuaded to assist in exposing corruption. We ultimately did persuade four officers, including Detective Robert L. Leuci and Patrolmen William Phillips, Edward Droge and Alfonso Jannotta to undertake undercover work. Of these, all but Detective Leuci did so under

9

the compulsion of having been caught by Commission investigators. Patrolmen Phillips and Droge testified at public hearings held in October 1971. Patrolman Jannotta was unavailable due to illness at the time of the hearings. The information disclosed by Detective Leuci was so vital that we did not, since our time was limited, feel justified in keeping it to ourselves. Leuci and the Commission staff members who had debriefed him and worked with him on his initial undercover operations were turned over to the Federal Government for the long-term investigation which was required. Leuci's work as a Federal undercover agent is now resulting in the series of important narcotics-related indictments being obtained by United States Attorney Whitney North Seymour, Jr.

Success in persuading these officers to assist in the investigation was a first step in demonstrating that the rotten-apple doctrine was invalid. Patrolman Phillips' three days of testimony about systematic corruption in various parts of the Department, corroborated by tape-recorded conversations with many police officers and others, was in itself enough to make the doctrine seem untenable. Patrolman Droge described how departmental pressures gradually converted an idealistic rookie into an increasingly bold finder of bribes and payoffs. Former Patrolman Waverly Logan, who volunteered to testify about corruption in which he had been involved, corroborated Droge's testimony and went on to tell about policemen in Harlem who received monthly as much as $3,000 each in narcotics graft. Patrolman Logan also introduced the Commission to two addicts who were willing to work with us in obtaining evidence to corroborate these assertions. The Commission's work with these addicts produced movies and recorded conversations of policemen selling narcotics. Some of the narcotics were paid for with merchandise the policemen believed to be stolen. Captain Daniel McGowan, a police officer of unquestioned integrity and experienced in anti-corruption work, testified that the picture of corruption presented by Patrolmen Phillips, Droge and Logan was an accurate one. In addition, there was testimony from, among others, a Harlem gambler,

10

Commission agents describing their investigations, and witnesses in the business community revealing corrupt police dealings with the hotel and construction industries.  Recorded conversations and movies documented instances of police corruption, including gambling and narcotics payoffs, fixing court cases and shaking down a tow-truck operator.  The cumulative effect of these two weeks of testimony made it not only unrealistic but absurd for anyone thereafter to adhere to the rotten-apple doctrine, either publicly or privately.

The doctrine did not die easily.  Institutional pressures within the Department seemed to force the high command to continue giving lip service to the doctrine even when speaking out against corruption. Commissioner Murphy in his early statements about corruption regularly included a pointed statement indicating that the corruption in the Department was limited to a few officers.  On one occasion he went so far as to imply that there were no more than about 300 corrupt police officers in the entire Department.  After Patrolman Phillips had completed two of his three days of testimony at our public hearings, Commissioner Murphy found it necessary to discount his testimony of widespread corruption, referring to him as a "rogue cop."

However, one week later, after Phillips had completed his testimony and had been followed by Patrolmen Logan and Droge and others, the Department, speaking through First Deputy Commissioner William H. T. Smith, forthrightly rejected the rotten-apple doctrine by name.  Smith defined it as standing for the proposition that "police departments are essentially free of corruption except for the presence of a few corrupt officers who have managed to slip into police service and also into key assignments such as gambling investigations, despite rigorously applied screening procedures designed to keep them out." He said that traditional police strategy had been to react defensively whenever a scandal arose by "promising to crack down on graft, to go after the 'rogue cops,' to get rid of 'rotten apples.' " Smith said the Department now rejected this approach "not just on principle,

11

but because as a way of controlling corruption it had utterly failed."
He acknowledged that the result of adherence to the theory had been
a breakdown in public confidence: ". . . they [the public] are sick of
'bobbing for rotten apples' in the police barrel. They want an en-
tirely new barrel that will never again become contaminated."

### Changing Departmental Attitudes

The public hearings, in addition to helping bring about official
abandonment of the rotten-apple doctrine, have had dramatic effect
on the way members of the Department discuss corruption. This change
was graphically described shortly after our hearings by former Assist-
ant Chief Inspector Sidney C. Cooper in colorful language: "Not very
long ago we talked about corruption with all the enthusiasm of a group
of little old ladies talking about venereal disease. Now there is a little
more open discussion about combatting graft as if it were a public
health problem." In short, the first barrier to a realistic look at cor-
ruption has been overcome: The problem has been officially, and
unofficially, acknowledged.

Some time after the public hearings were over, it was revealed
that Detective Leuci had been doing undercover work for the Federal
Government for over a year and a half, and that he had been doing it
with both the knowledge and protection of the Department's high com-
mand. News also began to spread throughout the Department that
other formerly corrupt policemen were doing undercover work for the
Department's Internal Affairs Division and for at least one District
Attorney's office. These revelations had considerable impact, both
direct and indirect, upon attitudes toward corruption within the
Department.

To put the direct impact in proper perspective, it should be
pointed out that any criminal activity, within a police department or
elsewhere, cannot thrive unless all of its participants are able to main-
tain confidence in each other. Patrolman Phillips' testimony made

12

this very clear. In testifying about his own corrupt activities, he described how he could, by making a few telephone calls within five or ten minutes, "check out" the reliability of any other officer whose assistance he might require in a corrupt enterprise. By way of illustration, he described instances where he had been similarly checked out while doing undercover work for the Commission. This ability to check out, and rely upon, an officer with whom one has had no previous contact rested on the assumption—unchallenged before the advent of our Commission—that no police officer who had once become involved in corruption could ever be persuaded to disclose the corruption of others. The actions of Detective Leuci and Patrolmen Phillips and Droge and of others as yet unnamed who are presently working undercover have undermined this assumption.

Even more important was the indirect effect produced by general knowledge that the undercover activities of these formerly corrupt policemen had been known to—and protected by—the Department's high command. Traditionally, the rank and file have shown a deep cynicism, well justified by history, concerning pronouncements of new police commissioners. They carefully examine the new commissioner's every word and action, searching for "messages": Does he mean business? Can he stand up against institutional pressures?

The initial lack of clarity in Commissioner Murphy's statements on the rotten-apple theory and his "rogue cop" reaction to the first widely publicized defiance of the code of silence were interpreted by some as suggesting a lack of commitment to total war on corruption. However, the Department's final repudiation of the doctrine, and the general knowledge that the Department was using and protecting policemen who had agreed to do undercover work, gave reassurance to the doubters.

In short, we believe that the Department's recent reactions to the Commission's activities have promoted realistic self-criticism within

13

the Department. This spirit of self-criticism is an encouraging sign.
For one thing, it is becoming less unusual for police officers to report
evidence of police corruption. If this tendency continues, the day may
be approaching when the rookie coming into the Department will not
be pressured toward corruption, but can count on finding support for
his desire to remain honest.

The present situation is quite like that existing at the close of
previous investigations. A considerable momentum for reform has
been generated, but not enough time has elapsed to reverse attitudes
that have been solidifying for many years in the minds of both the
public and the police.

After previous investigations, the momentum was allowed to
evaporate.

The question now is: Will history repeat itself? Or does society
finally realize that police corruption is a problem that must be dealt
with and not just talked about once every twenty years?

Both immediate and long-term actions are mandatory. The re-
forms already initiated within the Department must be completed and
expanded; there must be changes, both legislative and administrative,
to curb pressures toward police corruption and to facilitate its con-
trol; and the momentum generated by the events before and during
the life of this Commission must be maintained.

## A PLAN FOR IMMEDIATE ACTION

We are convinced that there is an immediate need for a supplement
to the agencies currently charged with combatting police corruption.

A basic weakness in the present approaches to the problem of
police corruption is that all agencies regularly involved with the prob-
lem rely primarily on policemen to do their investigative work. The

### Chapter Five

### NARCOTICS

"Police officers have been involved in activities such as extortion of money and/or narcotics from narcotics violators in order to avoid arrest; they have accepted bribes; they have sold narcotics. They have known of narcotics violations and have failed to take proper enforcement action. They have entered into personal associations with narcotics criminals and in some cases have used narcotics. They have given false testimony in court in order to obtain dismissal of the charges against a defendant."



— Donald F. Cawley, Commander,
Inspections Division
Testifying before the State
Commission of Investigation,
April, 1971

Corruption in narcotics law enforcement has grown in recent years to the point where high-ranking police officials acknowledge it to be the most serious problem facing the Department. In the course of its investigation, the Commission became familiar with each of the practices detailed by Chief Cawley, as well as many other corrupt patterns, including:

Keeping money and/or narcotics confiscated at the time of an arrest or raid.

Selling narcotics to addict-informants in exchange for stolen goods.

Passing on confiscated drugs to police informants for sale to addicts.

"Flaking," or planting narcotics on an arrested person in order to have evidence of a law violation.

"Padding," or adding to the quantity of narcotics found on an arrested person in order to upgrade an arrest.

Storing narcotics, needles and other drug paraphernalia in police lockers.

92

Illegally tapping suspects' telephones to obtain incriminating evidence to be used either in making cases against the suspects, or to blackmail them.

Purporting to guarantee freedom from police wiretaps for a monthly service charge.

Accepting money or narcotics from suspected narcotics law violators as payment for the disclosure of official information.

Accepting money for registering as police informants persons who were in fact giving no information and falsely attributing leads and arrests to them, so that their "cooperation" with the police may win them amnesty for prior misconduct.

Financing heroin transactions.

In addition to these typical patterns, the Commission learned of numerous individual instances of narcotics-related corrupt conduct on the part of police officers, such as:

Determining the purity and strength of unfamiliar drugs they had seized by giving small quantities to addict-informants to test on themselves.

Introducing potential customers to narcotics pushers.

Revealing the identity of a government informant to narcotics criminals.

Kidnapping critical witnesses at the time of trial to prevent them from testifying.

Providing armed protection for narcotics dealers.

Offering to obtain "hit men" to kill potential witnesses.

There is a traditional unwritten rule among policemen that narcotics graft is "dirty" money not acceptable even to those who take "clean" money from gamblers, bar owners, and the like. However, more relaxed attitudes toward drugs, particularly among young people, and the enormous profits to be derived from drug traffic have combined to make narcotics-related payoffs more acceptable to more and more

93

policemen. According to officers in the Narcotics Division, the widespread narcotics corruption in the unit was well known to both the men and their superiors, all of whom tolerated it at least to the extent that they took no action against those known to be corrupt.

Before the Commission's hearings, the Police Department and other agencies had uncovered individual instances of participation by police officers in the narcotics racket. They had also acquired information indicating substantial participation by members of the Department in narcotics operations that extended from street pushing to large quantity distribution.

As former Supervising Assistant Chief Inspector Chief McGovern pointed out in his testimony before the State Commission of Investigation (SCI), narcotics corruption involves "the largest single category of complaints concerning misconduct by policemen" and is not limited to any one division of the Department. In the course of its investigation this Commission looked into many allegations concerning narcotics-related corruption in various parts of the Department and found Chief McGovern's observation to be correct. However, the principal target of the Commission's investigation in this area was the Narcotics Division, which had the primary responsibility for narcotics law enforcement at the local level. At the time of the investigation, the division was a separate unit within the Detective Bureau, and had a complement of 782 men divided into two main groups, each with a different level of responsibility.

The field unit, which consisted of seven groups assigned to various critical locations, was charged with the enforcement of narcotics laws at the street level. Some of these groups worked out of precinct houses and others from independent locations. The field groups generally operated in sub-groups of four men.

The other main unit of the Narcotics Division was the Special Investigation Unit (SIU), to which approximately seventy-five officers

94

were assigned. SIU's responsibility was to initiate long-term investigations of narcotics wholesalers in an effort to apprehend those responsible for high-level drug distribution in the City.

In 1968, allegations of irregularities in the Narcotics Division led to an investigation by the Department's Internal Affairs Division. As a result of this investigation, many members of the division, including almost the entire staff of SIU, were gradually transferred out of the Division. However, three years later, this Commission's study of narcotics-related corruption revealed that both sectors of the Narcotics Division were still pervaded by corruption. Within the past year, there has been a nearly one hundred percent turnover in Narcotics Division personnel, but as the present commander of the Division recently told the Commission, the problem of corruption remains.

### Patterns of Corruption in Narcotics Law Enforcement

The most common form of narcotics-related police corruption is not the systematic pad common in other areas such as gambling, but the individual score of money, narcotics, or both, seized at the scene of a raid or arrest.

### Extortion and Bribe-Taking

In many cases police officers actively extort money and/or drugs from suspected narcotics law violators. Recently, for example, the motel room of a "dealer" (actually a federal undercover agent who was recording the conversation) was raided by two detectives and one patrolman. They found $12,000 in cash on the premises and demanded that the "dealer" surrender $10,000 to avoid arrest. The "dealer" was finally able to persuade them to leave him $4,000 as getaway money. The detectives later paid a $1,000 finder's fee to another detective who had alerted them to the "dealer's" presence in town.

In June, 1972, a dismissed plainclothesman who had been assigned to the Narcotics Division was convicted in New York County and sen-

95

tenced to up to four years in prison for his part in an extortion scheme which involved six members of the Narcotics Division. According to testimony at the trial, he and two other police officers contacted a restaurant owner and demanded $6,000, threatening to arrest his daughter-in-law on a narcotics charge unless he paid them. They further threatened to send the woman's two children to a foundling home in the event of her arrest. The restaurant owner paid them what they asked.

Within a few months, the same policeman, along with some other members of the unit, again approached the man and demanded an additional $12,000. The man told them to return in a few days, and in the interim he arranged for police surveillance of the next transaction. The plainclothesman was arrested when he accepted a down payment in marked money.

Two of the Commission's informants in the narcotics area were hard-core heroin addicts who, as registered police informants, were able to witness and sometimes record many instances of police profiteering on the street level. While these informants' credibility is necessarily suspect, there is ample evidence from other sources that the extortion practices they described were common occurrences in the Narcotics Division at the time of the Commission's investigation.

They told of participation in police shakedowns of narcotics "cribs" and said that it was standard practice for an informant to find a location where drugs were being sold in large quantities, and by attempting to make a buy with a large denomination bill, to induce the seller to reveal the hiding place of his cash supply. (Sellers in stationary locations try to keep as little money as possible on their person in order to minimize losses in case of an arrest or shakedown.) On leaving, the informant would arrange to return later to make another buy. On his next visit, as the seller opened the door, the police would crash in behind the informant. If the police felt they could score without risk, they would take whatever money and narcotics were



available and let the seller go. If the amount of money was small, they would usually arrest the seller but still keep most of the narcotics, turning in only the amount necessary to charge a felony or misdemeanor as the case might be.

The informants stated that three out of every four times they went out on a raid with plainclothesmen from the Narcotics Division, no arrests were made and scores ranged from a few hundred dollars to as much as $20,000 on one occasion, with the informants getting some money and quantities of drugs as compensation.

The Commission found that, even without prompting from the police, it was quite common for an apprehended suspect to offer to pay his captors for his release and for the right to keep part of his narcotics and cash. This was especially true at higher levels of distribution where the profits to be made and the penalties risked by a dealer were very high. One such case was that of a suspended Narcotics Division detective who was recently indicted in Queens County and charged with taking bribes to overlook narcotics offenses. The indictment alleged that this officer accepted $1,500 on one occasion for not arresting a suspected drug pusher who was apprehended while in possession of $15,000 worth of heroin. There is evidence that on another occasion this detective was paid $4,000 by a different narcotics pusher for agreeing not to confiscate $150,000 worth of heroin. The detective has pleaded guilty to attempting to receive a bribe, and his sentence is pending.

Even after arrest, a suspect would sometimes try to pay the arresting officer to leave him enough money for his legal expenses, or to downgrade the arrest by holding back a large part of the seized narcotics, or to make sure that his case would be a "throw-out" in court. Police officers have accomplished this favor by writing up an ambiguous complaint which did not explicitly link the evidence seized in the arrest to the defendant. For example, an officer's affidavit could aver that

97

narcotics had been discovered not on the defendant's person, but on the ground near his feet. In such a case, of course, the evidence would be inadmissible against the defendant and the case would be thrown out.

The opportunity for an arresting officer to score does not end at the scene of an arrest. As suspended patrolman William Phillips told the Commission in the course of his testimony about similar fixed arrest affidavits in gambling cases, "It's never too late to do business." That is, a police officer who is skillful or experienced enough can write an affidavit which appears to be very strong, but is still open-ended enough to work in favor of a defendant when coupled with appropriate testimony from the arresting officer. For example, an officer could state in his complaint that the suspect threw the evidence to the ground at the approach of the police. Should that officer later testify that he lost sight of the evidence as it fell, the evidence and the case could well be dismissed. The Commission learned that it was not uncommon for defense attorneys in narcotics cases to pay policemen for such favors as lying under oath and procuring confidential police and judicial records concerning their clients' cases.

It was, of course, beyond the scope of this Commission to seek out evidence of narcotics-related crime among agencies and officials outside the Police Department. However, the temptation of a police officer to profit illegally from a narcotics arrest could not be examined completely apart from his awareness or suspicion of corruption among those charged with the prosecution and adjudication of cases he has made. Evidence uncovered by the United States Attorney's Office in Manhattan in a current investigation of bribery by heroin dealers confirms the fact that corruption in narcotics law enforcement goes beyond the Police Department and involves prosecutors, attorneys, bondsmen, and allegedly even certain judges. While this fact does not excuse the illegal conduct of policemen who accept bribes, it does serve to illustrate the demoralizing environment in which police are expected to enforce narcotics laws.

98

The experience of one Narcotics Division detective who worked as an undercover agent for the U.S. Attorney's Office illustrates the pressures many police officers face after making a legitimate narcotics arrest. In a secretly recorded conversation, an attorney for a defendant in a narcotics case offered the detective various amounts ranging from $15,000 to $30,000 to give false testimony on behalf of his defendant. In an earlier recorded conversation, a co-defendant who had won a dismissal of charges told the detective that he had paid the attorney $20,000 to fix the case.

The belief that an officer's efforts to enforce narcotics law have been or may be nullified by dealings higher up in the legal system has in some instances caused members of the Department to rebel against such corruption. Unfortunately, it seems to be much more common for policemen exposed to such high-level corruption to try to get in on the profits. Such was the case of one Tactical Patrol Force officer who was apparently so confident of the acceptability of bribery that he attempted to arrange for a significant narcotics violator to bribe an assistant district attorney. He later pleaded guilty to bribery and resigned from the force after having served in the Department for eighteen years.

### Illegal Use of Wiretaps

An extortion attempt by police officers is sometimes the end product of careful surveillance of a target, often by means of wiretaps. The wiretap is an essential tool in the Police Department's efforts to make cases against narcotics law violators. One state official with extensive experience in the enforcement of narcotics laws told the Commission that he didn't know of a single significant narcotics case prosecuted in the New York State courts without evidence or leads obtained through wiretapping, legal or illegal.

Theoretically, police may not secretly tap a suspect's telephone without a warrant. However, since strict constitutional safeguards

99

and a certain amount of red tape surround the procedure for obtaining a warrant, it was not uncommon for Narcotics Division detectives to monitor and record the conversations of suspects without the required court order.

Since the Police Department has no official record of a wiretap installed without a warrant, no arrest is officially expected. Thus, information obtained by means of illegal taps can be used as easily to extort money and drugs from suspects who have been overheard as to make cases against them. Two Narcotics Division detectives were recently observed by a federal undercover agent as they engineered just such a score. The detectives illegally tapped the telephone conversations of a suspect in order to determine the extent of his dealings in narcotics. They then confronted the suspect with the evidence they had against him and threatened to arrest him unless he paid them $50,000. The suspect acceded to their demand and was given his freedom. The undercover agent, a former member of the Narcotics Division, told the Commission that in his experience the case is not unique.

**Stealing Money and Narcotics**

A score in the narcotics area is by no means dependent upon a suspect's offer or agreement to pay off the police. Most often a police officer seeking to score simply keeps for himself all or part of the money and drugs confiscated during a raid or arrest. One former member of the Narcotics Division recently assigned to other duties told the Commission that in his experience eighty to ninety percent of the members of the Narcotics Division participated in at least this type of score. While it was not possible for the Commission to verify this estimate, Commission investigators did ascertain that the holding back of money or narcotics contraband is very common and not limited to the Narcotics Division or other special squads.

The Commission learned of several sizable scores made by policemen during narcotics arrests. One such score was described by a plain-

100

clothesman in a secretly recorded conversation with Patrolman William Phillips. He told Phillips of an arrest he had made where $137,000 was turned in to the Department while three policemen split an additional $80,000.

Captain Daniel McGowan, then assigned to the Department's Public Morals Administrative Division, testified before the Commission about one matter he had investigated involving the arrest of several people and the confiscation of $150,000. Of this amount, McGowan stated, only $50,000 was turned in, the arresting officers keeping $100,000 for themselves.

Dismissed Patrolman Waverly Logan testified before the Commission about similar stealing, albeit on a lesser scale, by members of the elite Preventive Enforcement Patrol (PEP) Squad. Logan told the Commission that in his experience it was very common for arresting officers to keep confiscated money and drugs for themselves, and he gave many examples of the practice. After one narcotics arrest, for example, Logan and two other patrolmen vouchered $200 and held back $300 to divide among themselves. Later, Logan said, he discovered that one of the arresting officers had pocketed still another $500 which he had seized during the arrest. After another arrest during which Logan had scored $200, he watched from the precinct house window as another patrolman and a sergeant from his squad searched the suspect's car. The sergeant took a black fur coat from the trunk of the car and hid it in his own, while the patrolman walked away with a stereo tape device and several tape cassettes. Other situations described by Logan indicate that theft by police of furnishings and other personal property from premises where a narcotics raid had taken place were not uncommon.

Logan testified that his PEP Squad sergeant taught him the various techniques of scoring, and that such scoring was standard police procedure among his fellow officers. Logan told of one arrest he made

where he did turn in all the money and contraband that he had seized. At the precinct station house where he vouchered the evidence, no one would believe that he was turning in the full amount of money confiscated. No matter how much money an arresting officer vouchered, Logan testified, other officers always assumed that he had kept back some for himself. As a result, in Logan's words:

"When you're new, you turn in all the money. But when you're working on the job awhile, you turn in no money. That's been my experience, that you don't voucher no money, or you voucher very little of what you made when a boss is there, and the boss is straight."

At the Commission hearings, Waverly Logan also described the attitude of some members of the Department that even if narcotics bribes are "dirty money," thefts from arrested drug dealers are "clean":

"[T]he general feeling was that the man was going to jail, was going to get what was coming to him, so why should you give him back his money and let him bail himself out. In a way we felt that he was a narcotics pusher, we knew he was a narcotics pusher, we kind of felt he didn't deserve no rights since he was selling narcotics."

This rationalization, certainly a departure from the unwritten rule that not even a "bad cop" would make money in narcotics, was repeated in various terms by other police officers. One former detective in the Narcotics Division told the Commission that money taken from a narcotics dealer or pusher is considered to be "clean" by police officers because no innocent person is directly injured by such a score. Former Detective Frank Serpico testified about the same attitude in hearings before the SCI. "Something that is accepted in narcotics," Serpico said, "is the fact that . . . if you were to make an arrest and there were large sums of money, that the money would be confiscated and not vouchered and the rationale there is the City is going to get it anyway and why shouldn't they." Serpico said that policemen who

102

take money in this way do not worry that the arrested person will complain, because a narcotics team usually consists of four men, and "[t]he feeling is that it is his word against theirs."

Waverly Logan, on the other hand, apparently was bothered by the fact that arrested suspects might complain about having their money stolen by the police. Although he continued to make scores, Logan testified that he began to let suspects go after he had taken their money, so that they would be less likely to complain. This practice was in keeping with the philosophy of scoring taught to Logan by his sergeant: "[W]hen you are scoring a guy, try to leave him happy. If you leave a guy happy, he won't beef, won't make a complaint against you." Logan explained in his testimony that this could be accomplished even after a large amount of money was taken from a suspect by releasing him with enough of his narcotics to get him back into business.

It is clear from evidence assembled by this Commission and by other investigatory agencies that Waverly Logan's experiences and attitude with respect to holding back money and drugs are not unique in the Department. During the SCI public hearings on police corruption in narcotics law enforcement, a former Narcotics Division patrolman who had been convicted for supplying a heroin addict with narcotics to sell on the streets for him was asked to reveal the source of his heroin supply. He testified that one of the ways in which he obtained narcotics was to take it from dope addicts in the street, without making an arrest.

"Q. Was this a common thing in the Narcotics Division?
"A. That's where I learned it from.
"Q. You learned it from other members of the Narcotics Division?
"A. Yes.               •  •  •

"Q. Would you say this practice was generally known not only to the patrolmen and detectives, but by superiors?
"A. I would.

103

"Q. And on what basis do you make that statement?
"A. Being an ex-officer and knowing the routine of the office. It was pretty general knowledge what went on in the streets.

\* \* \*

"Q. In addition to obtaining narcotics in the fashion you just described, were there ever occasions where you would make an arrest but hold back the amount seized?
"A. That is true.
"Q. Was that practice also common with the Narcotics Division?
"A. It was."

Another detective, assigned to a squad in Queens, had been a full partner in a narcotics wholesale enterprise, and testified at the same hearings that when he decided to join the partnership, he discussed with fellow officers the fact that at least part of his heroin supply would come from holding back large quantities of heroin from important narcotics arrests.

In addition to sale at a profit, either directly or through addict-pushers, drugs seized and retained by police officers were put to a variety of illegal uses by police, including payment of finder's fees to police informants and payment to addicts for merchandise stolen to order for policemen. Narcotics retained from prior arrests are also used for "padding," that is, for adding to the quantity of narcotics found on a subsequently arrested person, thus enabling the arresting officer to upgrade the charge to a felony. It is also common to use illegally retained narcotics to "flake" a narcotics suspect, that is, to plant evidence on a person in order to make a narcotics arrest.

## Flaking and Padding

Flaking and padding sometimes result from the frustration a police officer feels when he is unable to catch a known narcotics law violator in the actual commission of a crime. An obvious danger is that an officer who can rationalize the illegal arrest of a known nar-



cotics dealer is not far from making easy arrests of persons merely suspected of dealing in narcotics. Traditionally this danger has been magnified by the fact that certain commands in the Narcotics Division required a minimum number of felony arrests per month, usually four, from each officer who hoped for promotion or wished to avoid a transfer back to uniform.

Waverly Logan, in his testimony before the Commission, told of an occasion when he flaked a suspect. He had arrested a suspected narcotics seller and planted four bags of narcotics on him. At the precinct house the prisoner told two narcotics detectives how the arrest had been made. One of the detectives then took Logan aside and carefully instructed him on how to write up the complaint in order to make the case stick.

Former Patrolman Edward Droge explained that padding is sometimes prompted by the fact that smart dealers, who know that the possession of certain amounts of narcotics constitutes a felony rather than a misdemeanor charge, make sure that the quantity of narcotics they carry is somewhat less than the felony amount. When an arrest is made that involves narcotics just short of the felony amount, Droge said, an officer merely has to add a few bags from his own supply. During the SCI public hearings on police corruption, one patrolman testified that padding can also be accomplished by mixing the seized narcotics with adulterants such as quinine and mannitol.

**Possession and Sale of Narcotics**

Former Assistant Chief Inspector Sydney Cooper, who commanded the Department's Internal Affairs Division and later headed the Special Force established to investigate cases referred to the Department by our Commission, said in a televised interview in August, 1972:

> "We have had cases where allegations were made and the investigations disclosed that policemen became active entrepreneurs in narcotics operations. They were either suppliers of drugs [or] they themselves were sellers of drugs; or they ran shotgun."

105

The Commission found that police officers were involved in possession and sale of narcotics in a variety of ways, including financing transactions, recruiting informants and addicts as pushers, and share-selling, where the pusher is given drugs on consignment and retains part of the proceeds as payment. In addition, the Commission found it common for police officers to use narcotics as a medium of exchange for goods and services.

The Commission's two addict-informants reported that while acting as registered police informants they had carried on a lively business selling various items to the police for narcotics. Goods sold included guns, liquor, beer, tires, typewriters, clothes, cigarettes, power tools, and other specialty items. The informants stated that in most instances the merchandise was stolen and that the police knew that the items were "hot." On some occasions, the informants purchased merchandise and sold it to the police for narcotics because they could receive more narcotics from the police than the cash expended on the merchandise would have purchased directly. If they had to steal and hock or fence merchandise to get cash for narcotics, the amount of merchandise required would increase four- or fivefold as opposed to selling the goods to police officers for more or less the direct equivalent value in narcotics.

The informants explained that obtaining their narcotics by selling merchandise to police officers greatly reduced their risk. Obviously not only would the police not arrest them for the transaction, but after having committed crimes under police auspices, they would run much less risk of arrest for crimes committed on their own account.

The Commission was able to verify the allegations that merchandise-for-drugs transactions between police officers and addicts were commonplace. The informants, wearing microphones and transmitters, were observed, and in some instances filmed, by Commission agents as police officers approached them and placed their orders. In each



instance at least two Commission agents were on hand for surveillance of the transaction, and the conversations between the police and the informants were recorded on tape. The merchandise the informants traded for narcotics was supplied by the Commission.

One plainclothesman, in the middle of a narcotics-for-cigarettes transaction ordered a gasoline powered mini-bike. The informant explained that it was still daylight and that he could not conveniently and easily steal a mini-bike in Central Park until sundown. The officer indicated he didn't care about the informant's troubles in obtaining a mini-bike, he just wanted it and, emphatically, that night. The Commission could hardly have permitted its agents to participate in a robbery or larceny, so, since no funds were available to purchase a mini-bike, that particular transaction was not consummated.

On another occasion, while the two informants were stationed outside headquarters with a bag of merchandise, the Commission filmed and recorded a dozen or more police officers approaching them to ask what was available.

Later the same morning, one patrolman was recorded on film opening the trunk of his car and instructing the informants to put in four bottles of liquor that he was purchasing. The patrolman went into headquarters, came down again, directed the informants to enter his car, and drove around the block. While driving around the block he gave each of the informants a bag containing a white powder which was later found to be heroin valued at about $30. Commission agents observed the two informants leaving the car and immediately took the narcotics from them for analysis.

Among the completed drugs-for-merchandise transactions were several involving whiskey and other alcoholic beverages. In one of these a narcotics plainclothesman gave the two Commission informants a written list specifying thirty-one quart bottles by brand name. He

told them to make sure to "come through because I need them for my daughter's wedding shower." The patrolman paid for the liquor with a quantity of white powder containing heroin, starch, quinine, and mannitol.

The police officers who dealt with the informants made little effort to conceal what they were doing. One police officer in uniform met with the informants in a doorway two houses east of the Twenty-Eighth Precinct in Harlem, took from them two large bags containing eight quart bottles of whiskey, and walked back into the station house. He passed the patrolman on guard duty at the doorway and returned shortly to pay the informants with narcotics he said he had just removed from his station house locker. Earlier, when this officer had consummated a similar transaction while in plainclothes and was asked by one of the informants if he wanted the whiskey surreptitiously placed in his car, he grabbed the whiskey and stated, "I am going to walk down the street like I own it."

In all, ten transactions involving the sale of supposedly stolen merchandise to police officers in return for narcotics were recorded by Commission personnel within a period of a few weeks. The police involved included men assigned to the Narcotics Division as well as to local precincts. In addition, approximately twenty additional transactions which the informants said they could arrange were not consummated because of reported changes of plans by police officers, inability to muster sufficient Commission personnel to monitor the transactions properly, or the excessive expense of the items ordered. One scheduled sale was, according to the informants, postponed by the plainclothesman involved because he had to attend a Department anti-corruption meeting.

A police officer who pays in narcotics to have addict-informants steal for him or supply information to him is not far from the realization that he can pay in drugs to have informants push heroin for him.

108 

One witness told the Commission in private that before he had been rehabilitated and took over the leadership of a drug program, he had been a very heavy user-pusher. For a while during this period he had become one of several share sellers for a group of three police officers, two of whom were still on the force as detectives in SIU at the time the witness testified. Although the association had been terminated for more than a year, the former addict said he lived in constant fear of these police officers.

Another similar case which resulted in the conviction of a police officer involved a young woman, the addict mother of several children, who had been arrested on information supplied by her mother and her boyfriend, who hoped she would be treated. The arresting officer, a member of the Narcotics Division, persuaded her to become an informant and continued to supply her with large quantities of narcotics. The arresting officer later introduced her to a "gangster"—actually another member of the Narcotics Division—and together, by threatening to harm her children, they forced her into becoming a share-seller pusher.

Eventually her boyfriend complained to the Internal Affairs Division and an arrest was made. At one point during the investigation, the patrolman kidnapped the victim and held her in captivity while trying to frighten her into refraining from testifying against him.

This patrolman obtained the narcotics he was supplying for sale in part from holding back narcotics seized in arrests and from taking narcotics from addicts in the street without making arrests. As he testified at the SCI public hearings on narcotics-related police corruption, he obtained the balance of the drugs he was pushing from a fellow police officer. The other patrolman asked no questions when he was approached for drugs because "it was a pretty regular thing for one officer to give narcotics to another officer." The patrolman also stated that he had chosen this particular fellow officer to ask for narcotics merely because he knew him better than some of the others, but that

he could well have approached many other men in the unit and made the same request.

Several policemen have been investigated and prosecuted in the past three years for their involvement in large-quantity narcotics businesses. In the case of one police officer who was convicted for selling narcotics, it was clear from the evidence that during the period covered by the charges, from the summer of 1970 to December, 1970, he had been a wholesaler of substantial amounts of cocaine. The conviction was obtained largely through the cooperation of another arrested former policeman, who on several occasions had acted as a distributor for him. The evidence included a secretly-recorded conversation in which the defendant discussed the possible effects of his distributor's arrest on his cocaine operation, the possibility of fixing the colleague's case, and the desirability of killing the informant who was responsible for the arrest.

Another police officer, while under investigation by the Police Department and the Federal Bureau of Narcotics and Dangerous Drugs, recently arranged a significant heroin transaction for a federal undercover agent who had been introduced to the police officer as a potential customer. Until his recent arrest and conviction on an unrelated charge of narcotics possession, this patrolman is believed to have been involved in the interstate transport of large quantities of heroin.

One probationary patrolman was recently sentenced to ten years in prison for selling narcotics and to a concurrent five-year term for the possession of a large quantity of narcotics. The patrolman had aroused departmental suspicions because he was often seen in the company of known narcotics addicts. He was finally arrested when he sold fifty bags of heroin to a Police Department undercover agent.

A former Narcotics Division detective, while a member of the force, financed a narcotics wholesale business that dealt in one-eighth kilo

110 

quantities of heroin. He obtained some of the heroin he used for resale from an underworld connection, a wholesaler in narcotics.

In the SCI public hearings this police officer testified that he tried to protect his investment by providing armed protection for drug deliveries. He would watch the transactions from a convenient vantage point, he said, prepared to intervene with a loaded weapon in the event of trouble from outsiders, or to intercede with fellow police officers in the event of a threatened arrest.

For his participation in this multi-kilo heroin operation, the officer was indicted in Queens County and charged with conspiracy to sell heroin and with four counts of official misconduct. He pleaded guilty to one count of official misconduct, a misdemeanor, and was sentenced to one year of probation.

**Miscellaneous Narcotics-Related Corruption**

Policemen have been involved in many other illegal activities connected with narcotics traffic. They have tipped off narcotics dealers to impending arrests and raids and have sold the contents of confidential police files to narcotics suspects. Some police officers have accepted bribes to provide information on the existence, duration, and results of telephone taps, and a few even have collected a monthly fee to guarantee suspected narcotics law violators freedom from taps by the Police Department. In addition, policemen have interceded for known narcotics criminals—both with their fellow officers, and in at least one instance, with an assistant district attorney.

An investigation conducted by local authorities in Brooklyn, which led to the exposure of a narcotics wholesale ring that was responsible for the monthly distribution of 1.5 million dollars' worth of heroin, revealed that a New York City patrolman provided armed protection as the ring made its deliveries.

111

In at least one case, a policeman has provided rental automobiles for a known narcotics criminal, so that any law enforcement officer suspecting one of the vehicles and checking the license plate would discover only that the car was rented to a police officer.

Members of the Narcotics Division have helped known narcotic violators win amnesty or leniency from district attorneys' offices by fraudulently registering them as police informants and attributing arrests and leads from other sources to these "informants" on official Department records.

Captain Daniel McGowan testified before the Commission about another serious instance of narcotics-related police crime. "[W]e received the information from three separate independent sources," Captain McGowan testified, "that a member of our Narcotics Bureau learned the identity of an East Harlem character who was an informant for the Federal Narcotics Bureau and the allegation was that he passed this information on to the organized crime people in that area, that the informant was subsequently taken upstate and murdered, and the detective was paid $5,000."

The Commission observed and taped one conversation between a plainclothesman and a registered informant that revealed an especially brutal instance of police misbehavior. The conversation concerned a quantity of heroin seized and not turned in by the officer at the time of an arrest a few days earlier. Since no part of the narcotics had been reported through official channels, the officer would never receive a lab report on the nature, strength, and purity of the narcotics. As the conversation progressed, it became clear that the police officer had given the addict a certain quantity of the untested drugs earlier in the day to test on himself to make sure that it was safe for sale to others. If the drug had been pure heroin, causing the addict to take an overdose, or if it had been a dangerous substance, the addict would have been unlikely to complain even if he had survived.

112

### Comments

It is extremely difficult to estimate the effect of police corruption on the volume of narcotics traffic in New York City. The SCI, upon completing a thorough analysis of the performance of the Narcotics Division in recent years, concluded that in a great number of cases the Department's enforcement effort in narcotics has been completely wasted. However, as the SCI explained in its 1972 Annual Report, this failure was due to a variety of factors besides corruption, including the congestion of the courts and the Narcotics Division's chronic shortage of modern equipment and adequate training and supervision.

In his statement of April 20, 1971, before the SCI, Police Commissioner Murphy insisted that "corruption is not a significant factor either in the incidence of narcotics addiction or in the volume of narcotics traffic." Whatever the validity of his conclusion, Commissioner Murphy correctly pointed out in his statement that the international market structure of narcotics distribution, together with large-scale demand for illegal drugs and the high profitability of narcotics dealing severely limit the ability of local police to deal with the narcotics problem. This would be true even of the most honest and efficient police force.

It is also true, however, that the public depends very heavily on the local police for protection against narcotics-related crime. The role of the policeman in combating this crime is a vital link in the total federal, state, and local response to the narcotics crisis, and this link is certainly being eroded by the growing corruption problem in the Department. The SCI, which observed that the operations of the Narcotics Division in recent years would have been ineffective even in the absence of corruption, went on to say in its Annual Report that "[w]ith the added ingredient of corruption, local enforcement became a tragic farce."

Of course, it is unfair of some City residents to assume that the existence anywhere of conspicuous narcotics trading proves that police-

113

men are either directly involved or are being paid to close their eyes to the illegal activity. Very often, it is not police corruption, but the overcrowding of the courts and the penal system, and the difficult standard of proof required to convict an arrested suspect that are to blame for the apparent non-enforcement of narcotics laws. Nevertheless, there is enough affirmative evidence of narcotics-related police corruption to justify a loss of public confidence in the Department and to diminish the self-esteem of its members. To some extent the public may understand, if not condone, police involvement in so-called victimless crimes such as gambling. But the complicity of some policemen in narcotics dealing—a crime considered utterly heinous by a large segment of society—inevitably has a devastating effect on the public's attitude toward the Department.

As long as society deems it necessary to invoke criminal sanctions in the narcotics area, the Commission believes that the Department must continue to assume responsibility for the enforcement of laws forbidding the sale and possession of narcotics. Of course increased study and attention should be given to ways other than criminal sanctions for dealing with narcotics addiction, but meanwhile, the Department must direct its attention to ways of improving the efficiency and integrity of its anti-narcotics units.

After its year-long study of the operations of the Narcotics Division, the SCI pointed out a number of specific areas in which it felt the Department could improve the effectiveness of its narcotics law enforcement efforts. Among other improvements, the SCI recommended increased supervision and coordination of investigative activities, stricter control of procedures for handling contraband, and the elimination of the quota system as a method of evaluating police performance. The SCI also recommended that the Department's enforcement efforts be directed away from indiscriminate drug loitering arrests and toward making good cases against high-level drug distributors.

114

In the past year the Department has instituted many salutary changes in narcotics law enforcement, including many of the improvements proposed by the SCI. For example, the Department has to some extent done away with the traditional distinction between SIU and the field units. Now the primary mission of both is to conduct long range investigations leading to the arrest of those responsible for drug distribution at the highest levels. Investigations are to be closely directed and coordinated from headquarters—a change which should result in less free-lancing by individual teams of investigators and therefore less opportunity for officers to exploit an arrest or raid situation for their own profit.

With an influx of new sergeants into the division, the ratio of supervisors to investigators has dropped to one to six. Thus each investigator will be under closer supervision in the field. This should lessen the opportunity for scoring by investigators. It should also provide a police officer's superiors with a method of rating his field performance that is more dependable and certainly less subject to abuse than the discredited quota system. Sergeants are now expected to accompany their men on important arrests, and in some cases, to make the actual arrest and take custody of the seized narcotics. New handling and reporting procedures have been designed to make it much more difficult for an officer who has confiscated narcotics to avoid turning them in to the Department.

When a police officer keeps for himself a portion of confiscated narcotics he is not always acting from corrupt motives. The Department's practice in the past of not providing money to pay informants, who usually are addicts themselves, created great pressure on police officers to use seized narcotics to pay for information. Money is now being made available for paying informants and this temptation, which often can be the first step to more serious illegal behavior, should be reduced as a result.

115

These and other improvements represent an important step in making narcotics graft less accessible to police officers. But as Chief Inspector William T. Bonacum, the commander of the Narcotics Division, recently told the Commission, such changes are meaningless unless the desire of his men to score in the narcotics area can be eliminated. To this end, Chief Bonacum has been conducting regular anti-corruption meetings with his men to keep them aware of the dangers of corruption and to instill in them the desire to make their division corruption-free. In addition, he meets regularly with individual members of the division to discover their problems and to keep them personally apprised of division policies. A complete change in attitude from the toleration of corruption that the Commission found to be prevalent in the division is necessarily a long-range goal. In the meantime, the Department can help to suppress narcotics corruption by dealing effectively with corruption in other areas, where it is usually considered less serious. Unchecked corruption anywhere in the Department creates a climate of permissiveness that makes it easier for a police officer to overcome his natural reluctance to become involved in narcotics traffic.

249

### Chapter Twenty-Two

## THE CRIMINAL JUSTICE SYSTEM AND POLICE CORRUPTION

Information gathered in the course of this Commission's investigation makes it clear that police corruption does not exist in a vacuum and must be considered in the context of other elements in the criminal justice system. The Commission, which was appointed by the Mayor, only had power to command the cooperation of City agencies and, accordingly, did not conduct extensive investigations into the district attorneys' offices or the court system. However, it is obvious that both have an important role to play in the fight against police corruption. In addition, our investigation showed that the manner in which many policemen perform their duties is strongly affected by their opinions of how well the prosecutors and judges are performing theirs.

### Police Corruption Cases

From information obtained from the district attorneys' offices and checked against court records, the Commission has tabulated all corruption cases brought against police officers over the past few years. (These figures do not include cases brought against police officers for crimes unrelated to corruption.)

The number of cases fluctuates widely from county to county, reflecting the diversity of the various counties in the number of policemen assigned to each and the corruption opportunities present.

250

The breakdown of criminal charges is as follows:

### Police Corruption Cases 1968 to June 30, 1972

| County/Year | Indictments* | Defendants | Dispositions | | | Sentences | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Conv. | Dis./Acq. | Pend. | Total Jailed | 1 Year or More |
| BRONX | | | | | | | |
| 1965 | No figures | | | | | | |
| 1966 | 1 | 1 | 1 | | | | |
| 1967 | 2 | 3 | 3 | | | | |
| 1968 | 1 | 1 | 1 | | | 1 | |
| 1969 | 13 | 14 | 9 | 4 | 1 | 3 | 2 |
| 1970 | 7 | 12 | 6 | 2 | 4 | 4 | 3 |
| 1971 | 8 | 11 | 6 | 2 | 3 | 2 | 2 |
| 1972 | 2 | 2 | | | 2 | | |
| TOTAL | 34 | 44 | 26 | 8 | 10 | 10 | 7 |
| TOTAL 1968-72 | 31 | 40 | 22 | 8 | 10 | 10 | 7 |

* Includes bills of information filed in criminal court.

| County/Year | Indictments* | Defendants | Dispositions | | | Sentences | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Conv. | Dis./Acq. | Pend. | Total Jailed | 1 Year or More |
| NEW YORK | | | | | | | |
| 1965-67 | No figures | | | | | | |
| 1968 | 1 | 19 | 19 | | | 4 | |
| 1969 | 6 | 7 | 7 | | | 4 | 3 |
| 1970 | 11 | 14 | 8 | 3 | 3 | 5 | 2 |
| 1971* | 22 | 26 | 8 | 1 | 17 | 2 | 1 |
| 1972** | 5 | 8 | | | 8 | | |
| TOTAL | 45 | 74 | 42 | 4 | 28 | 15 | 6 |

* 5 of the 22 indictments, involving 9 of 26 defendants, were referred by the Knapp Commission.

** 2 of the 5 indictments, involving 5 of 8 defendants, were referred by the Knapp Commission.

251

| County/Year | Indictments | Defendants | Dispositions | | | Sentences | |
|---|---|---|---|---|---|---|---|
| | | | Conv. | Dis./Acq. | Pend. | Total Jailed | 1 Year or More |
| QUEENS | | | | | | | |
| 1965-66 | No figures | | | | | | |
| 1967 | 2 | 3 | 3 | | | 1 | 1 |
| 1968 | 1 | 1 | | 1 | | | |
| 1969 | 3 | 3 | 3 | | | 1 | 1 |
| 1970 | 1 | 1 | 1 | | | | |
| 1971 | 2 | 4 | 2 | | 2 | 2 | 2 |
| 1972 | 3 | 3 | 1 | | 2 | | |
| TOTAL | 12 | 15 | 10 | 1 | 4 | 4 | 4 |
| TOTAL 1968-72 | 10 | 12 | 7 | 1 | 4 | 3 | 3 |
| | | | | | | | |
| KINGS | | | | | | | |
| 1965-67 | No figures | | | | | | |
| 1968 | 3 | 7 | | 7 | | | |
| 1969 | 4 | 8 | 2 | 6 | | | |
| 1970 | 19 | 25 | 11 | 13 | 1 | 2 | 2 |
| 1971 | 16 | 20 | 5 | 7 | 8 | 1 | 1 |
| 1972 | 7 | 31 | 1 | | 30 | | |
| TOTAL | 49 | 91 | 19 | 33 | 39 | 3 | 3 |
| | | | | | | | |
| RICHMOND | | | | | | | |
| 1965 | | | | | | | |
| 1966 | | | | | | | |
| 1967 | | | | | | | |
| 1968 | | | | | | | |
| 1969 | | | | | | | |
| 1970 | | | | | | | |
| 1971 | 1 | 1 | 1 | | | | 1 |
| 1972 | | | | | | | |
| TOTAL | 1 | 1 | 1 | | | | 1 |

In the four and a half years from the beginning of 1968 through the first six months of 1972, the five prosecutors initiated 136 Supreme Court and Criminal Court proceedings involving 218 police defendants in police corruption cases. There has been a noticeable increase in

252

activity in recent years in most counties. In 1968 there were six cases involving twenty-nine defendants (nineteen of whom were named in one case); in 1969, twenty-six cases with thirty-two defendants; in 1970, thirty-eight cases with fifty-two defendants; in 1971, fifty-nine cases with sixty-two defendants; and, in the first six months of 1972, seventeen cases with forty-four defendants. Since then, arrests and indictments have been announced in a number of significant police corruption cases, indicating that the trend toward making such cases is continuing. Figures for the period before 1968 were available only for two counties: Queens, where there were two cases involving three defendants in 1967, and the Bronx, where there were three cases involving four defendants in 1966 and 1967.

Of the 218 defendants in this period, 158 were patrolmen, thirty-nine were detectives, nine were sergeants, eleven were lieutenants and one was an assistant chief inspector. Sixty-three defendants pleaded guilty, twenty-eight were convicted after trial, forty-six were acquitted or dismissed and eighty-one are awaiting trial.

### Disposition of Police Corruption Cases

Of the ninety-one officers who have been convicted, eighty have so far been sentenced; forty-nine were either set free or given suspended sentences, and thirty-one received jail terms, fourteen for less than one year.

Bronx County District Attorney Burton Roberts testified before the Commission that light sentences were common in cases involving police officers, and went on to describe one:

"We worked hard and we convicted a man by the name of ————, a detective. He was found guilty after trial, guilty of bribe-receiving. We go into court. We ask for sentence. We ask for jail time. He winds up with a suspended sentence."

It is clear that the risks of severe punishment for corrupt behavior are slight. A dishonest policeman knows that, even if he is caught and

253

convicted, he will probably receive a court reprimand or, at most, a fairly short jail sentence. Considering the vast sums to be made in some plainclothes squads or in narcotics enforcement, the gains from corruption seem far to outweigh the risks. Both William Phillips and Edward Droge said that they assessed the risk of meaningful punishment and determined that they had little to fear.

### Dispositions in Non-Police-Corruption Cases

Criminal justice proceedings also have another more subtle effect on police corruption. According to Commissioner Murphy, of 94,000 suspects arrested for felonies in 1971, only 552 (slightly over one-half of one percent) stood trial. The other ninety-nine and one-half percent either had their cases dismissed or pleaded guilty, usually after having the charges against them reduced to misdemeanors or lesser felonies via plea-bargaining. "No doubt," said the Commissioner, "certain of the honest, dedicated policemen who made these 94,000 arrests last year came to the belief that conscientious police work is a waste of time, a waste of effort and a waste of devotion."

Most court cases are now settled via plea-bargaining, an arrangement made between the prosecutor and the defendant whereby the defendant agrees to plead guilty to a lesser crime than the one he was originally charged with, in return for a lighter sentence than he would have received if convicted of the original crime. This practice is inevitable in view of the unmanageable calendars with which the state criminal courts are faced. However, as more suspects are arrested and charged and the jails become more crowded and the court backlog increases, defendants tend to be allowed to plead to lesser and lesser charges and to receive lighter and lighter sentences. This process results in the frustration to which Commissioner Murphy referred.

Three studies of gambling and narcotics arrests illustrate the effects of plea-bargaining. These studies are of particular interest because gambling and narcotics are the most prominent areas of police