# UNITED STATES DISTRICT COURT

## FOR THE

## SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------x
Louis Diaz, Gregory Korniloff, and :
Jack Toal, on their own behalf and :
as representatives of the Class,   :
                                   :   Civil Action No. 08-cv-00401(CM)
               Plaintiffs,         :
                                   :
               v.                  :
                                   :
NBC Universal, Inc.,               :
                                   :
               Defendant.          :
---------------------------------x
```

**MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO
DISMISS PURSUANT TO RULE 12(B)(6) AND IN SUPPORT
OF PLAINTIFFS' APPLICATION FOR INJUNCTIVE RELIEF**

(Corrected)

DOMINIC F. AMOROSA
521 Fifth Avenue, Suite 3300
New York, NY 10175-3399
lawoffices@dfamorosa.com
Tel.: 212-406-7000


CAREY & ASSOCIATES LLC
521 Fifth Avenue, Suite 3300
New York, NY 10175-3399
mqc@CareyLitigation.com
Tel.: 212-758-0076

Attorneys for Plaintiffs

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................... II

  A.   CASES ........................................................ II

  B.   OTHER AUTHORITIES .......................................... II

PRELIMINARY STATEMENT ............................................... 1

NBC UNIVERSAL'S FALSE LEGEND HAS LIBELED PLAINTIFFS ................. 1

THE COMPLAINT ....................................................... 6

ARGUMENT ........................................................... 13

POINT I ............................................................ 13

THE COMPLAINT ADEQUATELY ALLEGES THAT THE FALSE LEGEND IS "OF
AND CONCERNING" PLAINTIFFS ......................................... 13

  A.   AVERAGE VIEWERS WOULD IDENTIFY THE LEGEND WITH DEA AND THE
       PLAINTIFFS ................................................. 15

  B.   THE FALSE LEGEND SINGLED OUT EVERY MEMBER OF THE NEW YORK
       CITY DEA AND IN PARTICULAR PLAINTIFF GREGORY KORNILOFF AND
       THE OTHER DEA AGENTS WHO SEARCHED LUCAS HOUSE ............... 19

  C.   DEFENDANT'S MOTION TO DISMISS SHOULD BE DENIED EVEN IF
       PLAINTIFFS WERE NOT IN FACT REFERRED TO IN THE LEGEND. ...... 22

POINT II ........................................................... 29

A PRELIMINARY INJUNCTION IS WARRANTED .............................. 29

  A.   THE LIBEL IS UNQUESTIONABLE ................................ 30

  B.   NO PRIOR RESTRAINT IS AT ISSUE ............................. 32

  C.   PLAINTIFFS DID NOT UNREASONABLY DELAY IN SEEKING RELIEF ..... 34

CONCLUSION ......................................................... 35

## TABLE OF AUTHORITIES

**A.  CASES**

ALGARIN V. TOWN OF WALLKILL, 421 F.3D 137 (2ND CIR. 2005) ...... 26,27

ALVORD-POLK, INC. V. F. SCHUMACHER & CO., 37 F. 3D 996, 1015
     (3D CIR. 1994) ........................................... 20

BIHARI V. GROSS, 119 F.SUPP 2D 309 (S.D.N.Y. 2000) ......... 20,32,33

BRADY V. OTTAWAY NEWPAPERS, INC., 84 A.D.2D 226, 445 N.Y.S.2D
     786 (2ND DEPT, 1981) ...................................... 22-27

CHURCH OF SCIENTOLOGY INT'L V. TIME WARNER, 806 F. SUPP. 1157
     (S.D.N.Y. 1992), AFF'D 238 F. 3D 168 (2D CIR. 2001) ......... 20

CHURCH OF SCIENTOLOGY INTERN. V. ELI LILLY & CO., 778 F.SUPP.
     661 (S.D.N.Y. 1991) ..................................... 33

EUROPEAN AMERICAN BANK V. RAMPAGE PRODUCTIONS, 1988 WL 61926
     (S.D.N.Y. 1988) ........................................ 30N6

FAWCETT PUB V. MORRIS, 377 P.2D 42 (OK. 1962) ................... 23

GROSS V. CANTOR, 270 N.Y. 93, 200 N.E.592 (1936) ............... 28

JAMES V. GANNETT, CO., 40 N.Y.2D 415, 386 N.Y.S. 2D 871 (1976) 14,20

JORDAN V. METROPOLITAN LIFE INS. CO., 280 F.SUPP.2D 104
     (S.D.N.Y. 2003) ........................................ 29,33

PITTSBURGH PRESS CO. V. PITTSBURGH COMMISSION ON HUMAN
     RELATIONS, 413 U.S. 376, 93 SUP. CT. 2553 (1973) ............ 32

UNITED STATES V. QUATTRONE, 402 F.3D 304 (2D CIR. 2005) .......... 32

**B.  OTHER AUTHORITIES**

CHEMERINSKY, INJUNCTIONS IN DEFAMATION CASES, 57 SYRACUSE L.
     REV. 157 (2007) ........................................ 32

1 ROBERT D. SACK, SACK ON DEFAMATION, LIBEL, SLANDER AND
     RELATED PROBLEMS, SECTION 2.9.1 AT 2-128-30 (3RD ED. 2005) ... 26

## PRELIMINARY STATEMENT

This Memorandum of Law is respectfully submitted on behalf of Plaintiffs in opposition to the motion of Defendant NBC Universal, Inc. ("**NBC Universal**") to dismiss the Complaint pursuant to Rule 12(b)(6), and in support of Plaintiffs' application for injunctive relief.[1]

## NBC UNIVERSAL'S FALSE LEGEND HAS LIBELED PLAINTIFFS

When the Compliant is viewed in a light most favorable to Plaintiffs, including the three individual plaintiffs, who have sued Defendant on their own behalf and as representatives of a class, it is clearly sufficient.

Defendant's Memorandum of Law contains, unfortunately, distortions of American Gangster designed to support its factual position. As we show below, contrary to what is argued in

---

[1]     Defined terms used in this memorandum have the same meaning as those terms defined in Plaintiffs' memorandum of law in support of their application for an Order to Show Cause, dated January 22, 2008. ("**Pl OSC Memo**").
    Citations preceded by "**NBCU Memo**" refer to the pages of the Memorandum of Law in Support of NBC Universal Inc.'s Motion to Dismiss the Complaint…, dated February 1, 2008.
    Citations preceded by "**Comp**" refer to the paragraphs of the Complaint.
    Citations preceded by "**DFA Aff**" refer to the affirmation of Dominic F. Amorosa, executed January 22, 2008.
    Citations preceded by "**Korniloff Aff**" refer to the Affidavit of Gregory Korniloff, sworn to on January 14, 2008.
    Citations preceded by "**Scalzo Aff**" refer to the Affidavit of Arthur W. Scalzo, sworn to on January 12, 2008.
    Citations preceded by "**Toal Aff**" refer to the Affidavit of Jack Toal, sworn to on January 14, 2008.
    Citations preceded by "**Toal Aff #2**" refer to the Affidavit of Jack Toal, sworn to on February 6, 2008.
    Citations preceded by "**Thomas Aff**" refer to the affidavit of Andrew J. Thomas, counsel to NBC Universal, sworn to January 31, 2008,

Defendant's Memorandum of Law, the film indeed purports to show that the New York City Branch of the Drug Enforcement Administration, also known as the New York City Drug Enforcement Agency ("DEA"), is corrupt. In fact, the entire thrust of film is that almost all narcotics' law enforcement officers in New York City, both federal and state, other than Richard Roberts and his team, were corrupt. (Comp ¶36). Thus, when the false legend, "Frank and Richie's collaboration led to the convictions of three quarters of New York City's Drug Enforcement Agency", appears on the screen, the viewer readily identifies it with DEA and Plaintiffs, and not some other mysterious agency, which Defendant has chosen not to name.

For example, a critical scene in the film is the search of Lucas' house. This search was in actuality conducted legally by Plaintiff Gregory Korniloff and approximately 8 other New York City DEA Agents on January 28, 1975, assisted by approximately 6 officers of the NYPD. (Toal Aff #2 ¶ 4). The agents seized $585,000 in currency during the search, which was later introduced into evidence at Lucas' criminal trial in the Southern District of New York. (Comp ¶¶3,23).

The film states it was based upon an article by Mark Jacobson, entitled *The Return of Superfly*. The article appeared in *New York Magazine* on August 7, 2000. In the Article, Lucas was quoted as informing Jacobson that Agents Korniloff and his

DEA colleagues "took something on the order of 9 to 10 million dollars from him that fateful night." (DFA Aff ¶16, Ex A, p 13). In the scene in the film depicting the search of Lucas' house for money, Trupo, a character representing a corrupt NYPD officer, says to Lucas' wife,

> **Feds are going to come in and take everything, and they are going to take it all, but not before I get my gratuity.** (Thomas Aff Ex B at 02:58.08 – 02:58.22) (emphasis added).

The feds are of course DEA. The clear suggestion here is that DEA was coming to the house to steal the money, which is exactly what Lucas alleged in the article on which the film was based. Note the emphasis on the verb "take" in both the magazine article and the film. There was nothing else for DEA to "take" except money.

Tellingly, Defendant's Memorandum of Law distorts this scene, and many others, in an effort to show that the film does not suggest DEA agents are corrupt, and the False Legend, even though it actually references DEA agents, does not refer to them. Defendant's Memorandum of Law carefully omits the actual language that the actor uses in this scene, and states in summary that the actor said the feds were going to "confiscate" the money. (NBCU Memo at 20). The difference between "take everything, take it all" and "confiscate" is plain, given the many other references to corrupt federal law enforcement in the

film, and given Jacobson's article in which Lucas claimed DEA stole millions from him. Indeed, early in the film, there is a scene depicting an exchange between Roberts and his boss in which Roberts, in his efforts to bring narcotics violators to justice, informs his boss that he cannot get federal cooperation. (Thomas Aff Ex B at 02:36.33 — 02:36.39). The following exchange occurs in the film:

> Boss: Because they all think you are on the take and you think they are.
>
> Roberts: You know, I don't think they want this to stop. I think it employs too many people, judges, lawyers, cops, politicians, prison guards, probation officers. If you stop bringing dope into this country, about 100,000 people are going to be out of a job. (Thomas Aff Ex B at 02:36.40 — 02:37.02).

Of course here the boss is referring to Roberts' belief that New York City DEA agents are also on the take.

An average viewer, having read Lucas' comment in the article on which the film is based, that DEA agents stole millions from him during the search, and having heard the actor state the "feds will take everything, take it all" will readily conclude that the DEA agents were as corrupt as everyone else depicted in this film. And that average viewer would also readily conclude, as 20 of our soldiers stationed in Iraq concluded (Comp ¶60), thanks to the False Legend, that these allegedly corrupt federal agents, including Plaintiff Korniloff

- 4 -

and his colleagues, were convicted as a result of this corruption. In fact, the Complaint alleges that millions of people who saw this film concluded the same thing. (Comp ¶51).

Defendant's Memorandum, of course, in its recitation of the contents of the film, neglects to deal with these scenes. It is in this context that the Court must view whether the Complaint states a claim for libel "of and concerning" Plaintiffs. The False Legend directly relates, at the very least, to the 9 NYC DEA agents who searched Lucas' house, despite the fact that it does not name them.

This libel was no accident. The use of the name, "New York Drug Enforcement Agency" in the false legend not only explicitly identifies DEA, but was designed to identify DEA. (Comp ¶29). And it was designed to, and did, affect negatively every single New York City DEA Agent, including Plaintiff Korniloff and the others who did the search, an event that was publicly reported by the media. (Comp ¶25).

During the conference call the Court conducted with counsel on January 23, 2007, the Court asked counsel for NBC Universal the describe the genesis of the False Legend. Tellingly, Defendant's 32 page Memorandum of Law and numerous affidavits do not answer that question. NBC Universal insinuates but does not state that the agency named "New York City's Drug Enforcement Agency" might be, perhaps, the New York City Special

Investigations Unit, a Unit of the NYPD. (NBCU Memo p 7 n 5).
Defendant's speculative statement does not contradict repeated
factual allegations of the Complaint, and the Affidavits
submitted in support of the application for injunctive relief,
that the New York City Drug Enforcement Agency is DEA, or that
not a single law enforcement officer, anywhere, anytime, in DEA
or the NYPD, was convicted of anything as a result of the so-
called "collaboration" of Frank Lucas and Richard Roberts. Nor
did the Special Investigations Unit have anything whatever to do
with the investigation of Lucas. (Comp ¶¶ 31, 44-46). Absent any
stated basis for its speculation, in other words, NBC
Universal's footnote may be an attempt to mislead the Court.

### THE COMPLAINT

On November 2, 2007, defendant NBC Universal Inc., through
its Universal Studios, released American Gangster to the public.
(Comp ¶19). American Gangster purports to represent the alleged
narcotics' trafficking activities of Frank Lucas, as well as his
cooperation with law enforcement following his conviction. From
the early 1970's until his arrest on January 28, 1975 by New
York City's DEA, Lucas was a major narcotics' trafficker in the
New York City area. As a result of his narcotics' trafficking,
Lucas became a target of New York City's DEA and the United
States Attorney's Office. After an intensive investigation, New
York City's DEA, assisted by officers of the NYPD, arrested

Lucas on January 28, 1975 at his house in Teaneck, New Jersey. At the time of his arrest, Lucas' house was lawfully searched pursuant to warrant and $585,000 in currency was seized which had been derived from the sale of narcotics. One of the arresting New York City DEA agents was the Plaintiff, Gregory Korniloff, who was also the DEA case agent on the Lucas investigation and prosecution. (Comp ¶¶3,23). There was media attention given to New York City's DEA's involvement in investigating and arresting Lucas, and the public was aware that it was DEA which investigated and arrested Lucas. (Comp ¶25.

Lucas was thereafter tried in September 1975 by the USAO in the Southern District of New York, convicted and sentenced to 40 years' imprisonment. Subsequently, he cooperated with the USAO and with New York City's DEA and assisted in the apprehension and convictions of numerous other narcotics' traffickers. Lucas' cooperation, however, did not lead to the conviction of a single agent of New York City's DEA, or officer of the NYPD, including any officer of the whether in any Special Investigations Unit ("SIU"), nor any other law enforcement official in New York or elsewhere, ever. (Comp ¶¶3, 27-28).

American Gangster, which asserts it is based on "a true story" and identifies that source as an article by Mark Jacobson entitled the "Return of Superfly", represents the above actual events falsely. It asserts that Richard Roberts, a former law

enforcement official in Newark, New Jersey, was the individual primarily responsible, together with others working in his squad, for investigating, apprehending and prosecuting Lucas. American Gangster represents that it was with Roberts that Lucas cooperated after his arrest in the investigation of law enforcement involvement in corruption. (Comp ¶4).

American Gangster represents the search of Lucas' house on January 28, 1975, led Plaintiff, Gregory Korniloff, in the most awful and corrupt manner during which Lucas' wife was assaulted, his dog shot in a vicious manner, and hundreds of thousands of dollars stolen by several corrupt law enforcement officials. (Comp ¶4).

While the scenes depicting this illegal search, assault and shooting do not identify Plaintiff Korniloff or the other DEA agents who participated in the search by name, the public is well aware through media reports that it was DEA which conducted the search, together with officers of the NYPD, but not anyone associated with SIU, as SIU had long since been disbanded. (Comp ¶¶25, 31; Ex 1, page 2).

At the end of the film a written legend appears on the screen stating as a fact that Frank Lucas and Richard Roberts' **"collaboration led to the convictions of three quarters of New York City's Drug Enforcement Agency"**. The legend is utterly false. Not a single member of the New York City's DEA, or any

other law enforcement Agency, was ever convicted of anything
based on the so-called "collaboration" of Lucas and Roberts.
(Comp ¶¶4, 27-29).

The false legend was meant to validate the "truth" of
various false representations made in the film that Lucas was
repeatedly victimized by corrupt New York City narcotics' law
enforcement officials, including having his house illegally
searched and his money stolen. (Comp ¶5). In other words, to
validate a lie at the expense of New York City DEA Agents who
risked their lives on a daily basis bringing to justice people
like Lucas. (Comp Ex.1).

There are other scenes in American Gangster depicting the
corruption of narcotics law enforcement officials who were
investigation Lucas, which the public knew from media report was
DEA. (Comp ¶¶25,32). The whole thrust of the film is that
Roberts and a few others from New Jersey were honest, but the
New York law enforcement officers investigating Lucas, both
federal and state, were criminals on the take. (Comp ¶ 36).
Contrary to defendant's assertions in its Memorandum of Law, the
film repeatedly casts aspersions on federal law enforcement
officials, as we have shown. (See pages 3-4 supra and 30-31,
infra).

Defendant's scheme, in essence a scheme to defraud the
public at the expense of New York City's DEA, was in fact

- 9 -

successful. The film has been seen by millions of people, has already grossed over $127,000,000 in domestic sales, and is expected to be seen by millions more in DVD and other media. (Comp ¶¶6,20-21). As a result of viewing American Gangster, millions of people now believe an awful falsity: that the DEA agents, including Plaintiff, Gregory Korniloff, who searched Lucas' house, in addition to his colleagues who investigated Lucas, were brutally corrupt and were convicted for this corruption as a result of the so called "collaboration" of Lucas and Roberts. Hundreds of DEA Special Agents who risked their lives on a daily basis on the streets of New York City in the 1970's and 1980's have been deliberately defamed, libeled and slandered in the eyes of millions. (Comp ¶¶2-5,21).

With particular attention to defendant's argument on this motion that no DEA agent is sufficiently identified by the False Legend in the eyes of an average viewer; that the False Legend is not "of and concerning" any New York City DEA agent, the Compliant alleges the following:

> Approximately 20 soldiers stationed in
> Iraq who saw the American Gangster
> recently questioned a former Special
> Agent of New York City's DEA about the
> legend after they saw the film. The
> former New York City DEA agent is now
> also stationed in Iraq and is a member
> of the Class. This former New York City
> DEA agent is on a leave of absence from
> his employment with the Suffolk County
> Prosecutor's Office. The soldiers all

> understood the legend to refer to
> convictions of Special Agents of DEA,
> and asked the former agent of DEA how
> it came about that three quarters of
> the New York City DEA were convicted
> criminals. Although the former New York
> City DEA agent told these soldiers the
> truth, that no such thing had happened,
> he felt deeply hurt and embarrassed by
> the questions even though he knew the
> legend was false. Although he explained
> the truth to the soldiers, his
> affidavit states that he could not
> "explain it to the millions of others
> who have seen this lie and also believe
> it to be true." (Comp ¶60).

On November 23, 2007, counsel for plaintiff Gregory Korniloff wrote to Universal Studios demanding that the False Legend be removed from further distribution of American Gangster. (Comp Ex. 1). By letter dated, December 7, 2007, Defendant refused. (Comp ¶¶ 42-46; Ex.2). In his letter rejecting Plaintiff's demand, David L. Burg, Senior Vice President of defendant, NBC Universal, wrote that "corrupt law enforcement officers <u>portrayed in the film</u> are specifically identified as members of the New York City Police Department, and the film refers to their subsequent prosecution by the federal government". <u>Id</u>. (emphasis added).[2]

Defendant's factual defense is that it did not libel the agents of New York's DEA; it libeled the officers of the NYPD. However, Mr. Berg's assertion is untrue. There was not a single

---

[2]    Burg's answer referenced the film but avoided any express statement concerning the False Legend.

member of the NYPD convicted of corruption based upon Lucas' cooperation. (Comp ¶¶42-45).

Moreover, Mr. Burg's claim is not supported by the language of the False Legend. The False Legend does not refer to the NYPD by name at all. The legend refers to the New York City Drug Enforcement Agency. There is and was no agency of the NYPD known as New York City's Drug Enforcement Agency. The only entity known as New York City's Drug Enforcement Agency is DEA. (Comp ¶ 46.[3]

Other than DEA, there has never been a New York City Drug Enforcement Agency, federal or state. On December 20, 2007, utilizing the Google search engine, a search conducted for "New York City Drug Enforcement Agency" revealed thousands of search results. The first result shown is the New York City address of the Drug Enforcement Administration, the DEA. Almost all the other search results refer to DEA as well. (Comp ¶¶45-46; 49-50). (See also Affidavit of Jack Toal, dated 18, 2008, ¶6). The Exhibit to Mr. Toal's affidavit is the first page of the Google search.

The plain fact is that Defendant published to millions of people a terrible falsity which has affected the lives of numerous former and current agents of the DEA who have spent their lives bringing people like Lucas to justice.

---

[3]    NBC Universal's papers do not directly refute these assertions.

**ARGUMENT**

**POINT I**

**THE COMPLAINT ADEQUATELY ALLEGES THAT THE
FALSE LEGEND IS "OF AND CONCERNING"
PLAINTIFFS**

Defendant argues that the legend is not "of and concerning" a single DEA plaintiff, not even the 9 DEA agents who legally searched Lucas' house, but were made to look in the film as if they were hardened criminals and thieves. Defendant makes two separate arguments with respect to this claim. First, Defendant argues that no reasonable person could interpret the legend to refer to New York City's DEA, even though that is what the legend says. Defendant's argument is that the false legend really refers to some other agency, which Defendant does not choose to identify, and that reasonable people would have identified the legend with this other unidentified Agency. Defendant does insinuate, without stating, that the other Agency is the Special Investigations Unit of the New York Police Department. (NBCU Memo at 7, n. 5). The Complaint, however, makes very clear, and the affidavit of Jack Toal makes clearer still, that this Unit had nothing to do with the Lucas investigation, and that not a single person from this Unit, or any other organization, federal or state, was convicted as a result to the so-called "collaboration" of Lucas and Roberts. Indeed, SIU was disbanded before Lucas came on the scene as a major narcotics player. (Comp ¶31, 45, Ex 1).

- 13 -

Secondly, Defendant argues that even if the legend can be identified by reasonable viewers as relating to DEA agents, Plaintiffs cannot proceed because they have not been individually named or identified in the legend and therefore the group libel doctrine precludes recovery. This argument fails also. An average viewer would certainly believe that the legend refers to all the New York City DEA agents, who were identified in the movie as corrupted, and this is the standard. See James v. Gannett, Co., 40 N.Y.2d 415, 420, 386 N.Y.S. 2d 871, 875 (1976). Indeed, what the average viewer would believe has already been established here in an affidavit which is the source of and supports the allegations referred to in Paragraph 60 of the Complaint.[4] In this Affidavit, former New York City DEA agent, Arthur Scalzo, relates that approximately 20 U.S.

---

[4]    Paragraph 60 states:

> Approximately 20 soldiers stationed in Iraq who saw the American Gangster recently questioned a former Special Agent of New York City's DEA about the legend after they saw the film.  The former New York City DEA agent is now also stationed in Iraq and is a member of the Class.  This former New York City DEA agent is on a leave of absence from his employment with the Suffolk County Prosecutor's Office.  The soldiers all understood the legend to refer to convictions of Special Agents of DEA, and asked the former agent of DEA how it came about that three quarters of the New York City DEA were convicted criminals.  Although the former New York City DEA agent told these solders the truth, that no such thing had happened, he felt deeply hurt and embarrassed by the questions even though he knew the legend was false.  Although he explained the truth to the soldiers, his affidavit states that he could not "explain it to the millions of others who have seen this lie and also believed it to be true."

soldiers serving in Iraq, who viewed the film, questioned him about the legend. Scalzo was in Iraq on leave from the Suffock County District Attorney's Office, and serving in Iraq as an expert. Scalzo states that the soldiers all understood the "legend to refer to agents with whom I served in New York City in the 1970's. In essence they asked me how it came about that there could be so many corrupt agents working in DEA." As the standard in assessing whether a libel is actionable is whether an average viewer would consider it "of and concerning" a plaintiff, Agent Scalzo's proof is strong evidence that the libel here was indeed "of and concerning" all of the New York City DEA agents, and certainly Agent Scalzo, who was deeply hurt by what the soldier believed. (Scalzo Aff ¶¶ 3-4). Importantly, in none of the cases cited by NBC Universal did plaintiff establish this kind of actual proof.

**A.    AVERAGE VIEWERS WOULD IDENTIFY THE LEGEND WITH DEA AND THE PLAINTIFFS**

With respect to Defendant's first claim, that a reasonable viewer cannot identify the false legend with DEA, and the Plaintiffs, we note that the Complaint alleges that the New York City Drug Enforcement Agency is DEA. (Comp ¶46). This allegation must be considered as true on this motion. Defendant's argument appears to be that even though it must be considered true for purposes of this motion, a reasonable person could still not identify it with DEA. This is a frivolous argument.

The Complaint alleges that a search was performed on December 20, 2007 on the Google search engine for "New York City Drug Enforcement Agency", which produced hundreds of thousands of search results. The very first search result was the New York City address for DEA. Almost all of the first 100 search results identified this Agency with DEA. (Comp ¶49). Moreover, the Complaint alleges that the New York City Drug Enforcement Agency "is identical in the minds of the public with New York City's DEA". (Comp ¶50).

Further, not only have 20 soldiers in Iraq who have seen the film identified the Agency noted in the false legend as DEA, see pages 10-11, supra, but other people who have seen the film reported to others that "the film depicted the corruption of numerous members of New York City's DEA who were convicted as a result of the 'collaboration' of Lucas and Roberts." (Comp ¶55). According to the Complaint, there is simply no other agency known as the New York City Drug Enforcement Agency other than DEA. (Comp ¶46).

The public was well aware from news reports that DEA investigated and prosecuted Lucas. Indeed, the public was aware that it was DEA that searched Lucas' house and arrested him. (Comp ¶25). The Special Investigation Unit, to which Defendant now appears to turn, had nothing whatever to do with the Lucas case. (Comp ¶ 31). The public would naturally assume, as the 20

soldiers in Iraq assumed, that the awful search depicted in the film was conducted by at least some DEA agents, and these agents were later convicted of corruption.

The illegal search of Lucas' house depicted in the film was perpetrated by a number of law enforcement officials. While the film identified at least one of these individuals as working with the Special Investigations Unit, the others were not identified in the movie, and an average viewer could very well conclude that they were DEA agents, especially those viewers who recall that it was DEA which searched Lucas house. It is generally known that federal and local law enforcement work together in task forces in investigating and prosecuting narcotics' violators. In the Lucas case itself, there was such a task force. DEA was assisted in the search of Lucas' house by the NYPD. (Comp ¶23). All of this further suggests that an average viewer would have understood the legend to convey what it actually says, that three quarters of DEA agents had been convicted.

Further, this film, contrary to defendant's claims here, contained references to corrupt federal law enforcement officials. (See pages 3-4, supra and 30-31, infra). Indeed, the whole thrust of this film was that the entire New York law enforcement establishment was rotten to the core. (Comp ¶36).

We have already noted in the Preliminary Statement that the

article which formed the basis for the film has a contention by
Lucas that Agent Korniloff and his DEA colleagues **took** 9 or 10
million dollars from him during this search. (See pages 3-4,
supra). During the search scene in the film, Trupo, a character
portraying a corrupt NYPD officer, states to Lucas' wife that
the "Feds are going to come in and take everything, take it all,
but not before I get my gratuity". The clear implication to an
average viewer, especially those who read the story which was
the basis for the film, is that the DEA Agents who did the
search stole 9 or 10 million dollars, and that they were later
convicted for these crimes.

NBC Universal's request that the Court take judicial notice
of various prosecutions conducted in New York City is
disingenuous. (NBCU Memo p 7, n 5). It is a means for Defendant
to avoid having to admit the critical truth in this case, that
is, that not a single law enforcement officer, whether employed
by DEA or the NYPD, was convicted of anything based upon the so-
called "collaboration" of Lucas and Roberts. Importantly,
Defendant does not assert that Lucas or Roberts had anything to
do with the prosecutions referenced in the footnote. Nor does
Defendant assert that those convicted, as referenced in the
footnote, were members of the "New York City Drug Enforcement
Agency". Again, the SIU was not known as the New York City Drug
Enforcement Agency. DEA was.

Essentially, defendant asserts that this case is all a great misunderstanding; a series of unfortunate coincidences. The series of coincidences would include the facts that (1) DEA was involved in the search of Lucas' house; (2) Lucas told Jacobson that DEA stole millions from him during the search; (3) Jacobson put this allegation in his article; (4) the film says the article was a factual basis for the film; (5) the search depicted in the film included a statement by a corrupt law enforcement officer that the "feds are going to come in and take everything, take it all…" (6) portions of the film portray federal agents as corrupt; (7) and the legend refers to DEA. To say the least, a jury must be permitted to decide whether these were merely coincidences or whether defendant intentionally libeled Plaintiffs with the actual intent to harm them, and did so for enormous profit, as the Complaint alleges. (Comp ¶52).

**B.    THE FALSE LEGEND SINGLED OUT EVERY MEMBER OF THE NEW YORK CITY DEA AND IN PARTICULAR PLAINTIFF GREGORY KORNILOFF AND THE OTHER DEA AGENTS WHO SEARCHED LUCAS HOUSE**

Defendant's argument that the Plaintiffs have alleged a non-actionable group libel which is not "of and concerning" any one of them is meritless. Defendant's position is essentially that it should be permitted to continue to distribute its film to millions more people for profit even if the legend is false and that Plaintiffs have no recourse. Such is not the law.

With respect to Plaintiff Korniloff and the 8 other DEA

agents who searched Lucas' house, defendant's argument entirely
ignores the Complaint's allegations that "American Gangster
falsely represents that Lucas cooperated with Roberts in causing
the convictions of the corrupt law enforcement officials who
searched his house on January 28, 1975." (Comp ¶4). The beliefs
of the average viewer are controlling. See James v. Gannett Co.,
40 N.Y.2d ay 420. As it was DEA agents who searched the house,
known by the public through media reports, and as the search in
the film involved the theft during the search by law enforcement
officers, it is clear an average viewer who was aware that DEA
searched the house, would view these corrupt DEA agents as those
convicted as a result of the "collaboration" of Lucas and
Roberts.

We have already documented the connection between Lucas'
claim that the DEA agents who searched his house stole millions
of dollars from him and the fact that this was the basis for the
scenes in the film. (See pages 3-4, supra). If an average viewer
would consider anyone to have been convicted of this theft, it
would have been these DEA agents who searched the house.

Even in cases in which courts have found that the group
libel doctrine is relevant, this impediment is overcome when
"the circumstances of the publication reasonably give rise to
the conclusion that there is a particular reference to a
member." See Church of Scientology Int'l v. Time Warner, 806 F.

- 20 -

Supp. 1157, 1160 (S.D.N.Y. 1992), aff'd 238 F. 3d 168 (2d Cir. 2001). See also Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F. 3d 996, 1015 (3d Cir. 1994), holding that members of a group can be subject to defamation when they "may be readily identified and the recipients of the [statements] are likely to identify some, if not all, of them as intended objects of the defamation." Here, assuming arguendo that a group libel situation existed, the ready identification of the agents who conducted the search at Lucas' house would bring these agents into this exception.[5]

Moreover, the remainder of New York City's DEA agents would also be sufficiently identified by an average viewer to permit them to sue as well for libel. The film depicts as corrupt almost the entirety of the New York narcotics law enforcement community. (Comp ¶36). An average viewer would therefore take very literally the false legend's claim that a full "three quarters" of the New York City DEA were convicted. This would comprise the class here.

As noted above, where Roberts informs his boss that he cannot obtain the assistance of federal law enforcement in his efforts to bring to justice narcotics violators, which would include Lucas, he is attacking the New York City DEA. The

---

[5]      At the very least, the claims of the 9 DEA agents who took part in the search should be permitted to go forward. These include Plaintiff Korniloff.

implication is that New York City DEA is corrupt and will not pursue Lucas. The following exchange then takes place between Roberts and his boss:

> Boss: Because they all think you are on the take and you think they are. (Thomas Aff Ex B at 02:36.40 — 02:37.02).

There is only one group that Roberts could be speaking about here, the agency that was responsible for narcotics law enforcement in New York City, the New York City DEA.

**C.  DEFENDANT'S MOTION TO DISMISS SHOULD BE DENIED EVEN IF PLAINTIFFS WERE NOT IN FACT REFERRED TO IN THE LEGEND.**

In <u>Brady v. Ottaway Newpapers, Inc.</u>, 84 A.D.2d 226, 445 N.Y.S.2d 786 (2nd Dept, 1981), the Court held that 53 individual, un-indicted law enforcement officers of the Newburgh, New York Police Department each had individual causes of action for defamation based upon a newspaper publication which stated in essence that the "entire department was under a cloud" because of the indictment of some of them. This was a case, unlike the one here, in which no individual member of the police department was refereed to specifically or named. Notwithstanding this, the Court found that the libel was "of and concerning" the 53 individual members of the department.

<u>Brady</u> expressly rejected the rationale in some cases that there should be a limit on the size of a group that can sue for libel. The Court stated: "An absolute limit on size is not

justifiable. There is no compelling logic 'in allowing a greater number of wrongs to afford a lesser degree of liability' in group defamation cases.", Brady, at 234. The Court, relying upon Fawcett Pub v. Morris, 377 P.2d 42, 51 (Ok. 1962), which defendant does not cite, applied what it called an "intensity of suspicion" test in determining that the 53 could sue individually for libel.

Fawcett involved an accusation against 60 or 70 members of a football team. The individual plaintiff was a fullback and a prominent player. Although the fullback was not referenced in any manner in the alleged defamatory statement, the Oklahoma Supreme Court held that he was sufficiently identified to sue for libel notwithstanding the size of the team. In so doing the Oklahoma Court applied the intensity of suspicion test. It was this test which Brady adopted. Brady stated that this test:

> is consistent with New York law. It
> provides a flexible approach for
> balancing the competing interests
> present in group defamation actions.
> The proper application of the reference
> elements of the test will prevent
> vexious actions based on impersonal
> discussions of matter of public concern
> without terminating suits on an
> arbitrary size limitation where real
> injury is present." Id. at 237.

Brady stated that while size of the group was a factor to be examined, it was to be balanced "against the definiteness in number and composition of the group and its degree of

organization. … The list of balancing factors or reference elements is not meant to be exclusive. The variations in the types of groups is too great." Id. The court noted these considerations in assessing cases:

> Public perception of the size of the group is an important factor in focusing on the degree of suspicion attributed to individual members of the group irrespective of the actual size of the group. Unless the recipient of the defamatory allegations can perceive the size of the group to which the allegations refer, the recipient cannot judge whether to apply the observation that the comment is less likely to be true with respect to every member of a large group. Moreover, given the nature and specificity of the charge herein and its compelling logic, the increased size is not sufficient to dilute the harm caused to the individuals from the statement so that the resulting injury falls below the threshold of legal recognition." Id. at 238.

Other factors the Brady Court looked to in sustaining the Complaint were the restricted nature of the membership of the Police Department, the qualities of visibility of the Department and lack of easy access to it, all of which are applicable to the relatively small group of DEA here. Id. at 239.

Brady rejected the very argument being made here by Defendant, that is, that the defamatory statement does not bring enough suspicion upon the Plaintiffs to allow them to proceed because the group is too large. However, the Complaint here not

only alleges specific harm to each of the Plaintiff class, but it details that harm in the eyes of the average viewer, as the Scalzo Affidavit attests and as is alleged in the Complaint. (Comp ¶60). There is no better proof than this to demonstrate how the libel here was "of and concerning" all of the New York City DEA at the relevant time period. In no case cited by Defendant did such compelling proof exist showing how an average viewer would connect a defamatory statement to the plaintiff group.

The rationale of the restriction on group libel cases is that the larger the group, the less likely an average viewer would believe there was individual harm to the Plaintiff. "The underlying premise of this principle is that the larger the collectivity named in the libel, the less likely it is that a reader would understand it to refer to a particular individual." Brady at 228. Here, however, we know from the Scalzo affidavit what the average "reader" believes. The average "reader" believes, between the film and the legend, that all the New York City DEA are a bunch of crooks, with three quarters of them being convicted.

Moreover, just like Brady, the class here is made up of a definite, restricted group, and at least as recognizable as the group of 53 un-indicted officers in Brady in terms of the perception of the public. The Complaint here makes no claim that

every single DEA agent in the country is a member of the group
that was libeled. In 1975, when Lucas was arrested, there were
approximately 2135 DEA agents located around he world. The New
York City Branch of DEA, the Plaintiffs here, had approximately
233 agents. In 1975, there were 13 domestic DEA offices,
including New York, each reporting to DEA headquarters in
Washington, D.C. The offices were located in Boston, New York,
Philadelphia, Baltimore, Miami, New Orleans, Chicago, Los
Angeles, Seattle, Dallas, Kansas City, Detroit, and Denver.
(Toal Aff #2 ¶¶ 2-3).

Defendant's reliance on language in Brady that the entire
group of 53 un-indicted officers were defamed, and therefore the
Court did not have to analyze the law with respect to situations
where only a portion of a group is defamed, Defendant's
Memorandum at 12, is just mistaken. The allegation here is that
the entire New York City DEA was defamed by allegations of
corruption, not just the three quarters of them who were alleged
to have been convicted.

Thus Brady fully supports Plaintiffs' Complaint here. See
also 1 Robert D. Sack, Sack on Defamation, Libel, Slander and
Related Problems, section 2.9.1 at 2-128-30 (3rd ed. 2005),
collecting other cases supporting group libel actions.

Nothing in Algarin v. Town of Wallkill, 421 F.3d 137 (2nd
Cir. 2005) is to the contrary in this analysis. Indeed, it

supports the Complaint. The Court in <u>Algarin</u> held that a number
of police officers of the Wallkill Police Department were not
sufficiently identified by an alleged libel contained in an
investigative report issued by the town. <u>Algarin, supra,</u> at 139.
The Court recognized the continued validity of cases permitting
unnamed members of a group to maintain defamation actions where
a defamatory statement has been made against the group. <u>Algarin,
supra,</u> at 139, citing Sack, <u>supra,</u> Section 2.9.4. In rejecting
the Complaint, the Court in <u>Algarin</u> stated that regardless "of
how rigorous or lenient the standards might be for permitting a
member of a group to complain about defamatory statements
directed at the group", the Complaint against the Town of
Wallkill was plainly inadequate. Tellingly, the Court noted that
the alleged libel was not even all that harmful. <u>Id</u>. at 140. In
fact, the statements complained of were "a conscientious effort"
to remedy administrative problems in the Wallkill Police
Department. <u>Id</u>. at 140. This can hardly compare with the
egregious libel in this case.

<u>Algarin's</u> emphasis on the relatively insignificant nature
of the alleged libel in rejecting the claim suggests a balancing
of interests in these cases. This is especially so because <u>Brady</u>
also spoke of a balance of interests. <u>Brady, supra,</u> at 236. The
more egregious the alleged libel of a group, the more likely a
defamation of a group will direct suspicion at its individual

members and will be found to be "of and concerning" members of
that group. There can be no more damaging lie about a law
enforcement officer than to say that he has been convicted for
corruption.

Gross v. Cantor, 270 N.Y. 93, 200 N.E. 592 (1936) is also
supportive of Plaintiffs' Complaint. In Gross, the Court of
Appeals permitted to proceed a libel action filed by a radio
editor against an entertainer. The alleged defamation involved a
magazine article in which defendant was quoted as stating that a
group of radio editors were experts at "logrolling, who use
their columns for delving into personalities that have nothing
to do with radio and whose various rackets are a disgrace to the
newspaper profession." There were approximately 12 such editors,
none of whom was identified. One sued based upon the remarks
about the group. In sustaining the Complaint, the Court held
that it "does not appear that the publication was so scattered a
generality or described so large a class that no one could have
been personally injured by it. Perhaps the plaintiff will be
able to satisfy a jury of the reality of his position that the
article was directed at him as an individual and did not miss
the mark." Id. at 593. The same rationale should apply here.

Defendant cites no case that would preclude individual
libel actions in the unique Complaint here, supported by
Affidavits that average viewers consider each Agent to have been

- 28 -

convicted. The libel at issue here is shocking in its intensity. Claiming falsely that current and former law enforcement officers are convicted criminals is one of the worst things that could be said about such individuals. Conviction implies proof beyond a reasonable doubt. The fact that the libel was seen by millions of people is an aggravating factor. The Complaint alleges that millions now believe this libel. (Comp ¶51). The Complaint alleges that defendant did this for profit and to make its false story of law enforcement corruption more believable and it was extraordinarily successful in its design. (Comp ¶¶21,52-55). It is in this context that this issue must be judged. It is for a jury to decide whether the libel focuses enough suspicion upon each member of the class here.

**POINT II**

**A PRELIMINARY INJUNCTION IS WARRANTED**

Plaintiffs ask the Court principally to restrain NBC Universal from repeating the false charges now contained in the False Legend in future distribution of and advertising for American Gangster. NBC Universal does not argue that the Court would have difficulty tailoring such an injunction, as required. Jordan v. Metropolitan Life Ins. Co., 280 F.Supp.2d 104, 112

(S.D.N.Y.2003). Plaintiffs' application should be granted.[6]

## A.   THE LIBEL IS UNQUESTIONABLE

NBC Universal argues the conclusion that the false legend is not about Plaintiffs and that "the Film does not contain <u>any</u> scenes depicting, or any statements concerning, any corruption or wrongdoing by agents in the United States Drug Enforcement Administration…." (NBCU Memo p 18) (emphasis in original).

NBC Universal is mistaken, if not deliberately misleading the Court. The collaboration between Lucas and Roberts referred to in the False Legend is admittedly about the events in the film. (NBCU Memo p 18) and, despite NBC Universal's argument, a reasonable viewer could only understand the collaboration as leading to the alleged convictions of Plaintiffs. American Gangster has unquestionably libeled Plaintiffs. It did so by charging, in the following scenes, among others, that Plaintiffs were corrupt and were under investigation for narcotics related crimes:

1.   In a conversation between Roberts and his boss, the boss emphasizes that the federal narcotics agency in Washington recruited them, police officers in New Jersey, to conduct an investigation of law enforcement corruption in NYC, reflecting the belief that DEA in New York could not be trusted to do so itself. Roberts' boss states:

BOSS: The greatest city in the world is

---

[6]   Plaintiffs also requested an order that NBC Universal be required to segregate and keep on hand the revenues generated by American Gangster. <u>Cf</u>. <u>European American Bank v. Rampage Productions</u>, 1988 WL 61926 (S.D.N.Y. 1988) at *1 (film proceeds owed to Pl for a few days pending PI hearing).

turning into an open sore, <u>everybody's
stealing, dealing</u>. Look at you, you
can't work because you did your job
[earlier, Roberts turned in
approximately $1 million]. (Thomas Aff
Ex B at 01:43.24 — 01:43.40; emphasis
added; see NBCU Memo p 6, see also p 3
(Roberts "joins with federal agents [in
Washington]").

2.    Roberts tells his boss that he can't get the
cooperation of federal agencies and shows his distrust
of the NYC branch office of the DEA by not saying he
attempted to enlist their cooperation. (Thomas Aff Ex
B at 02:36.33 — 02:36.39). The boss explains why:

Boss: Because they all think you are on
the take and you think they are.
(Thomas Aff Ex B at 02:36.40 —
02:37.02).

3.    In the search of Lucas' home, Trupo tells Lucas' wife
the "feds" are also corrupt:

Feds are going to come in and take
everything, and they are going to take
it all…. (Thomas Aff Ex B at 02:58.08 -
02:58.22).

4.    The sound track mentions corruption, not simply in the
New York City Police Department, but throughout the
ranks of those in New York City drug enforcement,
thereby referring to the DEA:

The investigation into police
corruption has swept through New York's
drug enforcement ranks … brought it
today with the arrest of [fade out].
(Thomas Aff Ex B at 03:25.12 —
03:25.21)

Finally, after making the above allegations of corruption

against Plaintiffs, America Gangster libeled Plaintiffs in the

False Legend:

1.    The False Legend expressly states that three quarters
of the New York City Drug Enforcement Agency were
convicted of crimes through the collaboration of Lucas
and Roberts.

2.  The False Legend does not refer to the "NYPD", to the "New York City Police Department" or to any derivative of such terms.

3.  The only agency in New York City that could be identified as the Drug Enforcement Agency is the DEA.

NBC Universal has not challenged Plaintiffs assertion that not one federal agent or police officer was ever convicted of any crimes related to those of Lucas; and not one federal agent or police officer was ever charged with or convicted of any offense through the vaunted Lucas-Roberts collaboration.

## B.  NO PRIOR RESTRAINT IS AT ISSUE

Plaintiffs have easily met their heavy burden to prove the False Legend was not protected opinion. Bihari v. Gross, 119 F.Supp 2d 309, 326 (S.D.N.Y. 2000).

NBC Universal couches its argument in terms of a prohibited prior restraint upon free speech. (NBCU Memo e.g. p 23 at caption III). The libel has already been published and an injunction against repetition of a statement is not a prior restraint. Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations, 413 U.S. 376, 390, 93 Sup. Ct. 2553, 2561 (1973); Chemerinsky, Injunctions In Defamation Cases, 57 Syracuse L. Rev. 157, at 165-66, (2007); see United States v. Quattrone, 402 F.3d 304, 309, 310 n5 (2d Cir. 2005). Here, the Court knows exactly what Plaintiffs seek to restrain.

A false accusation that someone is a convicted criminal is not protected speech that is violated by a prior restraint. (see

cases at Pl OSC Memo p 12); Church of Scientology Intern. V. Eli Lilly & Co., 778 F.Supp. 661, 666-67 (S.D.N.Y. 1991).

Moreover, only opinion, not fact, is protected. Church of Scientology, 778 F.Supp. at 666-67. Whether fact or opinion is a question of law for the Court, Id. At 667, but defendant has not claimed the False Legend was an expression of its opinion. NBC Universal has also failed to express any need to preserve a right to notify the viewing public of the unquestionably false legend or of any other opinion that might be enjoined if Plaintiffs' application is granted. Jordan v. Metropolitan Life Ins. Co., 280 F.Supp.2d at 112. Plaintiffs do not seek to enjoin all future distribution of the film.

Defendant emphasizes that the publication of the Libel is merely part of an enterprise focused on profit. It argues against an injunction on the grounds that it would prohibit "distribution" of the film (NBCU Memo p 24, 31) and that the cost of altering the film to remove the False Legend would "quickly run into the millions of dollars." (NBC Memo p 31). Its argument fails to mention its expected profits or the amount by which they would dwarf the cost of the corrective action that would enable distribution to resume. An injunction is more readily available where the sole plausible objection is the potential loss of profits from future distribution of the film. Cf. Bihari v. Gross, 119 F.Supp 2d at 326. Plaintiffs seek only

to delay distribution until the False Legend is removed and the truth substituted in its place. NBC Universal has not estimated how long it would take to make the correction.

**C.  PLAINTIFFS DID NOT UNREASONABLY DELAY IN SEEKING RELIEF**

American Gangster was copyright registered on October 31, 2007 (Thomas Aff Ex D) and released nationally November 2, 2007. (NBCU Memo p 4). Three weeks later, by letter dated November 23, 2007, counsel for Plaintiffs demanded that NBCU retract the False Legend. (Compl Ex 1). NBC Universal responded two weeks later, by letter dated December 7, 2007, and rejected Plaintiffs' demand. (Complaint Ex 2). Plaintiffs filed the complaint approximately five weeks later, on January 16, 2008 and presented to the Court on January 23, 2008, seven days after that, the application for an order to show cause ("**OSC**").

The entire lapsed time from national release through making the application for an OSC was merely 11 weeks, nine weeks if the Court deducts NBCU's two week delay in rejecting plaintiffs' retraction demand. Plaintiffs took only six weeks from receipt of NBCU's rejection of the retraction demand until they moved for an OSC.

**CONCLUSION**

The Court should grant the application for a preliminary injunction.

Dated:  New York, New York
        February 6, 2008

                          Respectfully submitted,


                          */s/ DOMINIC F. AMOROSA*
                          DOMINIC F. AMOROSA
                          521 Fifth Avenue, Suite 3300
                          New York, NY 10175-3399
                          lawoffices@dfamorosa.com
                          Tel.: 212-406-7000


                          CAREY & ASSOCIATES LLC


                          By: */s/ MICHAEL Q. CAREY*
                              Michael Q. Carey
                          521 Fifth Avenue, Suite 3300
                          New York, NY 10175-3399
                          mqc@CareyLitigation.com
                          Tel.: 212-758-0076

                          Attorneys for Plaintiffs