UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————x

Louis Diaz, Gregory Korniloff and Jack Toal
on behalf of themselves and as representatives of
the Class,

        Plaintiffs,

        -against-

NBC Universal, Inc.,

        Defendant.

—————————————————————————x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/14/08

08 Civ. 401 (CM)

### DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS THE COMPLAINT AND DENYING PLAINTIFFS' APPLICATION FOR INJUNCTIVE RELIEF

McMahon, J.:

The feature film American Gangster (the "Film"), which was produced by Universal Pictures (a division of Universal City Studios, LLP) is "based on" a true story involving a notorious heroin dealer, Frank Lucas. Lucas was a key figure in the New York City drug trade in the late 1960s and early 1970s. Eventually, Lucas joined "Team America" and cooperated in the prosecution of some high level drug dealers in New York City.

Plaintiffs Louis Diaz, Gregory Korniloff and Jack Toal have sued on behalf of themselves and as representatives of a class of "approximately 400 present and former Special Agent of the New York office of the United States Drug Enforcement Administration" (the "USDEA" or "DEA") who were employed at some time during the period from 1973 through 1985. The Complaint alleges that the three named plaintiffs and every New York City-based DEA agent during that 12 year period were defamed by an allegedly false legend that appears on screen at the end of the film. The legend says that Frank Lucas' "collaboration [with law

enforcement] led to the conviction of three quarters of New York City's Drug Enforcement Agency."

Plaintiffs assert claims for libel, intentional infliction of emotional distress, and negligent infliction of emotional distress. They seek an injunction prohibiting Universal from continuing to distribute the Film until the legend is corrected. Defendant opposes plaintiffs' request for injunctive relief and has moved to dismiss the complaint.

The statement about Lucas' cooperation leading to these convictions is not true. Nonetheless, the Complaint must be dismissed.

## I. Background

The following well-pleaded facts are presumed true.

### A. *The parties*

Defendant NBC Universal is a Delaware corporation, with its principal place of business in New York, New York.

Plaintiff Jack Toal is a former Special Agent of the USDEA, having been employed in that position from 1969 to 1982. He is a resident of Florida.

Plaintiff Gregory Korniloff is a former Special Agent of the USDEA, having been employed in that position from 1971 to 1978. He is a resident of Nevada.

Plaintiff Louis Diaz is a former Special Agent of the USDEA, having been employed in that position from 1975 to 1985. He is a resident of California.

### B. *The Facts*

#### 1. *The movie*

Defendant NBC Universal, Inc. ("Universal") is in the business of, among other things, producing, releasing and distributing motion pictures to the public throughout the world. On or

-2-

about November 2, 2007, Universal released and distributed American Gangster to the public. American Gangster has been shown in movie theaters in every state in the United States, including in this District. The movie has grossed at least $127,000,000 in profits for the defendant, excluding profits made through secondary businesses.

The Film depicts the life of Frank Lucas (played by Denzel Washington), an African American drug kingpin in New York City who was arrested in 1975 and subsequently convicted of drug trafficking. The film also includes a character identified as Richie Roberts (played by Russell Crowe), a law enforcement official in Essex County, New Jersey. As is common with motion pictures inspired by true events, the Film ends with a standard disclaimer noting that a number of the incidents are "fictionalized," and that "some of the characters have been composited or invented. . . ."

Throughout the film, there are references to corruption among some members of the local police forces in New York City and New Jersey. Several characters depict corrupt narcotics detectives employed by the New York City Police Department (NYPD) – including Josh Brolin, who plays a character identified as Detective Trupo of the NYPD's Special Investigations Narcotics Unit. At no point in the Film is any character identified as a DEA agent; neither is there any suggestion that any federal agent is corrupt. To the contrary, early in the film, Roberts (who is not corrupt) is told by his boss to accept a new assignment working as a partner with federal agents on a special narcotics investigative team.

At one point in the film, law enforcement personnel search Lucas' home. During this scene, Lucas' wife is assaulted, his dog is shot in a vicious manner, and hundreds of thousands of dollars are stolen by corrupt law enforcement officials. The film does not identify the people

-3-

who do these despicable things as DEA agents. The officer who steals the money, however, says that the Feds are going to arrive later and "take everything..."

After the Lucas character has been arrested by Roberts and his team, the film ends with a series of vignettes that purport to show how everything worked out: Lucas meets with Roberts; photographs of the actors who portray corrupt New York City narcotics officers are tacked to a bulletin board; and those same New York City police officers are arrested (or, in the case of the Brolin character, commit suicide). Voiceovers accompanying these scenes include "news" reports describing the arrests and prosecution of local police officers by federal authorities. There follow shots with text at the bottom. One of those texts (the "legend") refers to Lucas' cooperation with authorities, and notes that Lucas' cooperation led to "the convictions of three quarters of New York City's Drug Enforcement Agency."

### 2. *The real story*

As a result of his narcotics trafficking, Frank Lucas became a target of the New York City office of the USDEA, an agency within the United States Department of Justice, as well as the United States Attorney's Office for the Southern District of New York (the "USAO"). (Cplt. ¶ 3.) After an intensive investigation, special agents from the New York City office of the USDEA, assisted by officers from the New York City Police Department (the "NYPD"), arrested Lucas on January 28, 1975 at his home in Teaneck, New Jersey. (Id.) At the time of his arrest, Lucas' house was lawfully searched pursuant to a warrant and agents seized $585,000 in currency derived from the sale of narcotics. (Id.)

Named plaintiff Gregory Korniloff was the New York City-based DEA case agent working in New York City on the Lucas investigation; he was present during the search of Lucas' house and participated in the arrest of Lucas. (Id. at ¶ 23.)

Lucas was tried in September 1975 by the USAO, convicted, and sentenced to 40 years' imprisonment. (Id. at ¶ 3.) The NYPD Special Investigations Narcotics Unit (the unit the Detective Trupo character works for in the Film) had nothing to do with the arrest and prosecution of Lucas. (Id. at ¶ 31.)

At the time, there were media reports about the Lucas case. (Id. at ¶ 25.) These reports included information about the search of Lucas' house by USDEA agents and NYPD officers. (Id.)

Subsequently, Lucas cooperated with the USAO and the DEA and assisted in the apprehension and convictions of numerous other narcotics traffickers. (Id. at ¶ 3.) Lucas' cooperation, however, did not lead to the conviction of a single agent of the New York City office of the USDEA or any member of the NYPD, or any other law enforcement official in New York or elsewhere. (Id.)

There was and is no federal, state or local agency called the "New York City Drug Enforcement Agency." (Id. at ¶¶ 45, 46.) The federal agency is and always has been the Drug Enforcement *Administration.* NYPD has at various times had special units devoted to narcotics (*e.g.,* the Special Investigations Narcotics Unit), none of which was called the Drug Enforcement Agency.

To put it bluntly, of the facts pleaded are true (and must presume that they are) the "legend" that appears onscreen at the end of film is wholly inaccurate.

### 3.    *Alleged injury*

A former Special Agent from the New York City office of the USDEA is currently stationed in Iraq and is a member of the putative plaintiff class. (Id. at ¶ 60.) Approximately 20 soldiers stationed in Iraq who saw American Gangster questioned him about the legend. (Id.)

The soldiers all thought the legend referred to Special Agents of DEA, and they asked the former DEA agent how three quarters of the USDEA agents based in New York City could be convicted criminals. (Id.) Although Korniloff told these soldiers that no such thing happened, he felt "deeply hurt and embarrassed by the questions, even though he knew the legend was false." (Id.)

Some members of the putative plaintiff class are currently employed as private investigators, and many members are currently employed in law enforcement agencies (including the USDEA) and security companies. (Id. at ¶ 61.) Plaintiffs contend that the erroneous legend harms their reputation and damages them in their trade and profession. (Id. at ¶ 62.)

Plaintiffs and the putative plaintiff class allege that they have been damaged in excess of $5,000,000, exclusive of interest and costs. (Id. at ¶ 72.)

## C.   *Procedural history*

On November 23, 2007, counsel for plaintiff Gregory Korniloff wrote to Universal Studios, owned by defendant, demanding that the allegedly false legend be removed from further distribution of American Gangster. On December 7, 2007, David L. Burg, Senior Vice President of NBC Universal, wrote to Mr. Korniloff's counsel, rejecting this demand.

On January 16, 2007, plaintiffs filed this lawsuit, alleging claims for libel, intentional infliction of emotional distress, and negligent infliction of emotional distress. Plaintiffs seek the following relief, plus costs: (1) a preliminary and permanent injunction enjoining Universal, and its employees and agents, from any further distribution of the Film in its current form; (2) an order that defendant to recall each copy of the Film with the legend; (3) an order that defendant immediately deliver up all signs, prints, packages, and advertisements in its possession or under its control bearing the legend, (4) restitution of all monies obtained directly or indirectly by

-6-

defendant by means of this improper conduct, (5) disgorgement of all of Universal's profits from American Gangster, (6) an order that defendant publish in the same media outlets in which it allegedly defamed plaintiffs and the plaintiff class the truth about the DEA's role in the investigation, arrest, and prosecution of Frank Lucas; and (7) compensatory and punitive damages.

On January 22, 2007, plaintiffs filed an application for a temporary restraining order, which was denied on January 23, 2007.

## II.    Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a claim upon which relief can be granted. The standard of review on a motion to dismiss is heavily weighted in favor of the plaintiff. "In ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, the court is required to accept the material facts alleged in the complaint as true." Frasier v. General Elec. Co., 930 F.2d 1004, 1007 (2d Cir. 1991). The court is also required to read a complaint generously, drawing all reasonable inferences from its allegations in favor of the plaintiff. California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 515 (1972).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007) (internal quotation marks, citations, and alterations omitted). Indeed, a plaintiff must assert "enough facts to state a claim to relief that is plausible on its face." Id. at 1974. This "plausibility standard" is a flexible one, "oblig[ing] a pleader to amplify a claim with some factual allegations in those

-7-

contexts where such amplification is needed to render the claim *plausible*." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007).

In deciding a motion to dismiss, this court may consider the full text of documents that are quoted in the complaint or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit. Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000); San Leandro Emerg. Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808 (2d Cir. 1996).

### III.   Discussion

#### A.   *Libel*

Although the Complaint contains a lengthy description of the many items in the Film with which plaintiffs are dissatisfied, the Complaint identifies only one allegedly defamatory statement: the legend that appears for a few seconds at the end of the Film, stating that Lucas' cooperation with authorities after his arrest "led to the conviction of three quarters of New York City's Drug Enforcement Agency."

Plaintiffs' libel claim is barred under constitutional and common law principles, because plaintiffs cannot demonstrate that the allegedly defamatory statement is "of and concerning" any particular person.

"Hornbook libel law requires that an allegedly defamatory statement must be 'of and concerning' a particular individual." Cerasani v. Sony Corp., 991 F. Supp. 343, 355 (S.D.N.Y. 1998) (citing Fetler v. Houghton Mifflin Co., 364 F.2d 650-651-53 (2d Cir. 1966)); see also Restatement (Second) of Torts § 558 (1977); Carlucci v. Poughkeepsie Newspapers, Inc., 57 N.Y.2d 883, 885, 456 NY.S.2d 44, 45 (1982). In New York Times Co. v. Sullivan, 376 U.S. 254, 288, 84 S. Ct. 710, 730 (1964), the Supreme Court made clear that this requirement is of

constitutional dimension, holding that the plaintiff's defamation claim was "constitutionally defective" under the First Amendment because he could not show that the challenged statements were "of and concerning" him. Id. at 288; accord Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 164, 176 (2d Cir. 2000).

Although the "of and concerning" requirement generally presents a factual question for the jury, "the Court properly may dismiss an action pursuant to Rule 12(b)(6) where the statements are incapable of supporting a jury's finding that the allegedly libelous statements refer to plaintiff." Church of Scientology Intern. v. Time Warner, Inc., 806 F. Supp. 1157, 1160 (S.D.N.Y. 1992) (quotations omitted); see also Anyanwu v. Columbia Broadcasting System, Inc., 887 F. Supp. 690, 692 (S.D.N.Y. 1995). "Whether the complaint alleges facts sufficient to demonstrate a reasonable connection between the plaintiff and the alleged libel is thus a question for the Court." Church of Scientology, 806 F. Supp. at 1157; see also Carlucci, 57 N.Y.2d at 885, 456 N.Y.S.2d at 45; Cohn v. National Broadcasting Co., 414 N.Y.S.2d 906, 907-08 (1st Dep't 1979); Algarin v. Town of Wallkill, 421 F.3d 137, 139-40 (2d Cir. 2005); Friends of Falun Gong v. Pacific Cultural Enterprise, Inc., 288 F. Supp. 2d 273, 282 (E.D.N.Y. 2003), aff'd 109 Fed Appx. 442 (2d Cir. 2004); Drug Research Corp. v. Curtis Publishing Co., 7 N.Y.2d 435, 199 N.Y.S.2d 33 (1960).

Under the group libel doctrine, when a reference is made to a large group of people, no individual within that group can fairly say that the statement is about him, nor can the "group" as a whole state a claim for defamation. See, e.g., Sullivan, 376 U.S. at 288, 84 S. Ct. at 730; Algarin, 421 F.3d at 139-40; Truong v. American Bible Society, 367 F. Supp. 2d 525, 528-29 (S.D.N.Y. 2005); Blatty v. New York Times Co., 42 Cal. 3d 1033, 1046 (1986); Church of Scientology, 806 F. Supp. at 1160. "In order to overcome the group libel doctrine, a plaintiff

must demonstrate that 'the circumstances of the publication reasonably give rise to the conclusion that there is a particular reference to the member.'" Church of Scientology, 806 F. Supp. at 1160 (quoting Restatement (Second) of Torts, § 564A(b)); see also National Nutritional Foods Ass'n v. Whelan, 492 F. Supp. 374, 380 (S.D.N.Y. 1980); Friends of the Falun Gong, 288 F. Supp. 2d at 282.

"The New York Courts have not set a particular group number above which defamation of a group member is not possible." Anyanwu, 887 F. Supp. at 693 (citing Brady v. Ottoway Newspapers, Inc., 445 N.Y.S.2d 786 (2d Dep't 1981)). However, a court in this district has noted the absence of "any cases where individual members of groups larger than sixty have been permitted to go forward [with a libel claim]." Id.

The putative class contains approximately four hundred former and current special agents of the USDEA. Plaintiffs concede that neither the legend, nor the movie more generally, ever specifically identifies any of the named plaintiffs, or any other putative class member, by name. Thus, under New York law, they would appear to be out of court. The same results pertain if the governing law is the law of California (where Universal produced the film) or Nevada or Florida (where two named plaintiffs reside), since the law in all four states is identical. See, e.g., Blatty, 42 Cal. 3d at 1046 ("Where the group is large – in general, any group numbering over twenty-five members – the courts in California and other states have consistently held that plaintiffs cannot show that the statements were 'of and concerning them.'"); Thomas v. Jacksonville Television, Inc., 699 So. 2d 800, 802 805-06 (Fla. App. 1997) (affirming dismissal of group libel claim by group of 436 commercial net fishermen); Macaulay v. Bryan, 75 Nev. 278, 281 (Nev. 1959) (dismissing group libel claim).

Nonetheless, plaintiffs allege that each of them can be identified by an average viewer because the film depicts as corrupt virtually the entire New York City narcotics law enforcement community. Therefore, plaintiffs argue that the legend need not reference the plaintiffs by name. Plaintiffs rely on Brady v. Ottaway Newspapers, Inc., 445 N.Y.S.2d 786 (2d Dep't 1981) to support their contention.

In Brady, the court permitted a group of 53 unindicted police officers to pursue a libel claim based upon a newspaper publication that stated that their "entire [police] department was under a cloud" because of the indictment of some of them. In this case, however, the legend did not cast a cloud over the entire (non-existent) "New York City DEA;" it said that a fraction (albeit a substantial fraction) of the members of that group were convicted. See Algarin, 421 F.3d at 140 (noting the importance of "whether the defamatory statement refers to 'all' or only 'some' members of the group," and observing that even small groups generally are not permitted to bring defamation claims where only some percentage of their members were targeted by the statement); Sacco v. Pataki, 114 F. Supp. 2d 264, 271 (S.D.N.Y. 2000) (same). Thus, even assuming arguendo that the legend concerned the plaintiff group, plaintiffs' libel claim would still be barred.

At a minimum, plaintiffs argue that the claims of the nine DEA agents who took part in the search of Lucas' home should be permitted to go forward, because (1) that subset of the entire group is small enough to fall within the exception to the group libel doctrine, and (2) the searching officers in the Film engage in particularly despicable conduct that never happened. To support their position, plaintiffs argue that the article on which the Film is based, "Return of the Superfly," by Mark Jacobson, contains a contention by Lucas that Agent Korniloff and his DEA colleagues took nine or ten million dollars from him during this search. During the search scene

Case 1:08-cv-00401-CM    Document 26    Filed 02/14/2008    Page 12 of 14

in the film, a character portraying a corrupt NYPD officer tells Lucas' wife that the, "Feds are going to come in and take everything, take it all, but not before I get my gratuity." (He then steals money.) Plaintiffs contend that these statements allegedly defame "the Feds" (i.e., the DEA), and so need not reference these plaintiffs by name, since an average viewer who was aware that DEA searched the house would view these DEA agents as having stolen nine or ten million dollars ("take[n] it all"). The same viewer would then assume that DEA agents were later convicted for these crimes.

The first thing to note is that the Complaint does not mention the Jacobson article, so it is of no moment what it does or does not say. Moreover, it would be improper to "bootstrap" an erroneous statement in the Jacobson article onto the movie (which does not track the article), and then to find that the movie (not the article) libels Korniloff and his companions. In the film, the nine DEA agents who participated in the search are not identifiable. The film never names the DEA agents who searched Lucas' home. (Pl. Opp. at 8.) Nor does the film mention that DEA agents (or anyone else) stole "nine or ten million dollars" from Lucas' home. The movie does not show a single person who is identifiable as a DEA agent. The person who steals the money is an NYPD officer. (In fact, the line quoted by plaintiffs could just as easily mean that the "Feds" would seize "all" of Lucas' money *legally*, and that the corrupt NYPD officer wanted to get his "gratuity" before the "Feds" got there.) A viewer must go beyond the movie (*i.e.,* have read the Jacobson article) to know that Lucas alleged the theft of a much greater sum by the DEA agents ("Feds") who searched his house. Korniloff may have been libeled by Lucas' statement in the "Superfly" article (as to which the statute of limitations has long run). However, he and the eight other DEA agents were not libeled by the legend that appears onscreen at the end of American Gangster.

-12-

The cause of action for libel is dismissed as barred by the group libel doctrine. I need not reach defendant's alternative argument that no reasonable person could interpret the legend as referring to federal DEA agents, rather than New York City police officers.

**B.    *Intentional and negligent infliction of emotional distress***

Plaintiffs' claims for intentional and negligent infliction of emotional distress are barred under the same constitutional and common law principles as plaintiffs' libel claim. They too must be dismissed.

As the Supreme Court announced in Hustler Magazine v. Falwell, 485 U.S. 46, 57, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988), when additional tort claims are aimed at controlling the same speech that is the basis of a libel claim, courts should not entertain the additional claims under less stringent standards. 485 U.S. 46, 57, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988).

Additionally, since plaintiffs' emotional distress claims rely on the same underlying facts and are variations on the libel claim, these causes of action are entirely superfluous and do no state a separate claim for relief. See Anyanwu, 887 F. Supp. at 693-94 ("New York cases have held that a separate cause of action for what are essentially defamation claims should not be entertained.").

### IV.    Conclusion

It would behoove a major corporation like Universal (which is owned by a major news organization, NBC) not to put inaccurate statements at the end of popular films. However, nothing in this particular untrue statement is actionable. The Complaint is dismissed. The Clerk should close the file. This constitutes the decision and order of the Court.

Dated:  February 11, 2008

_____

U.S.D.J.

BY ECF AND FAX TO ALL COUNSEL